**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES | ) | Case No. 17 CR 495 |
| | ) | |
| v. | ) | Judge Andrea R. Wood |
| | ) | |
| ROBERT O'ROURKE | ) | |

**DEFENDANT ROBERT O'ROURKE'S RULE 33 MOTION
FOR A NEW TRIAL AND SUPPORTING MEMORANDUM**

Respectfully Submitted,

KULWIN, MASCIOPINTO & KULWIN, LLP

By: _/s/ Anthony J. Masciopinto_
       One of Defendant's Attorneys

Anthony J. Masciopinto & Rachel A. Katz
Kulwin, Masciopinto & Kulwin, LLP.
161 N. Clark Street, Suite #2500
Chicago, Illinois 60601
T: 312.641.0300; F: 312.855.0350
amasciopinto@kmklawllp.com
rkatz@kmklawllp.com

**TABLE OF CONTENTS**
*United States v. O'Rourke*, Case No. 17 CR 495

I.   INTRODUCTION ...................................................................................................1

II.  LEGAL STANDARD..........................................................................................1

     A.     Weight of the Evidence Standard ..........................................................2

     B.     "Other Errors" Standard........................................................................2

III. ARGUMENT ......................................................................................................3

     A.  Error in Allowing Government to Proceed on Attempt Charges...................................3

     B.  Erroneous Jury Instructions……………………………………………………6

          1.   O'Rourke's Elements Instruction for the Substantive Offenses Was Erroneous….6

          2.   "Unique Combination" Trade Secret Jury Instruction Was Erroneous……………9

          3.   Failing to Ensure Juror Unanimity for Specific Trade Secret(s) Was Error………12

     C.     The Cumulative Weight of the Evidence Does Not Support a Judgment of Guilt....14

IV. CONCLUSION…..………………………………………………………………………...20

**TABLE OF AUTHORITIES**
*United States v. O'Rourke*, Case No. 17 CR 495

**PAGES**

<u>**Federal Cases**</u>

*Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*
1 F.Supp.3d 224 (S.D.N.Y. 2014)......................................................................................10

*BioD, LLC v. Amnio Tech*
No. 2:13-CV-1670-HRH, 2014 WL 3864658 (D. Ariz. Aug. 6, 2014)........................................10

*Brigham Young Uni. V. Pfizer, Inc.*
861 F.Supp.2d 1320 (D. Utah 2012) ............................................................................10

*Composite Marine Propellers, Inc. v. Van Der Woude*
962 F.2d 1263 (7th Cir. 1992) ....................................................................................10

*Johnson v. Louisiana*
406 U.S. 356 (1972)……………………………………………………….......12

*Richardson v. United States*
526 U.S. 813 (1999)…………………………………………………………...12

*Russel v. United States*
369 U.S. 749 (1962) .................................................................................................12

*United States v. Acosta*
149 F.Supp.2d 1073 (E.D. Wis. 2001)………………………………………………13

*United States v. Canino*
949 F.2d 928 (7th Cir. 1991)………………………………………………………..12

*United States v. Case*
2007 WL 1746399 (S.D. Miss. June 15, 2007) .......................................................12

*United States v. Chung*
633 F.Supp.2d 1134 (C.D. Cal. 2009). ......................................................................7

*United States v. Eberhart*
388 F.3d 1043 (7th Cir.2004) .................................................................................2

*United States v. Gaudin*
515 U.S. 506 (1995)...............................................................................................9

*United States v. Hanjuan Jin*
833 F.Supp.2d 977 (N.D. Ill. 2012),.......................................................................7

ii

*United States v. Hester*
2012 WL 1655950 (N.D.Ill. May 10, 2012) ............................................................2

*United States. v. Hsu*
40 F.Supp.2d 623 (E.D.Pa.1999) .........................................................................8

*United States v. Knight*
800 F.3d 491 (8th Cir. 2015) ................................................................................6

*United States v. Krumei*
258 F.3d 535 (6th Cir. 2001) ...............................................................................8

*United States v. LaFaive*
618 F.3d 613 (7th Cir. 2010). ..............................................................................5

*United States v. Liew*
11 CR 00573 (N.D. Cal. Feb. 25, 2015) ......................................................5, 7, 11

*United States v. Madoch*
149 F.3d 596 (7th Cir.1998) .................................................................................6

*United States v. Minneman*
143 F.3d 274 (7th Cir.1998) .................................................................................6

*United States v. Nosal*
2009 WL 981336 (N.D.Cal. Apr. 13, 2009) ..........................................................7

*United States v. Reed*
875 F.2d 107 (7th Cir.1989) .................................................................................2

*United States v. Ruggiero*
726 F.2d 913 (9th Cir.1984) ...............................................................................13

*United States v. Santos*
20 F.3d 280 (7th Cir.1994) ..................................................................................2

*United States v. Shiah*
2008 WL 11230384 (C.D. Cal. Feb. 19, 2008)......................................................7

*United States v. Tykarsky*
446 F.3d 458 (3d Cir. 2006)…………………….....……....……………………………14

*United States v. Vicaria*
12 F.3d 195 (11th Cir. 1994) ................................................................................3

*United States v. Warner*
2006 WL 2583722 (N.D. Ill. Sept. 7, 2006)……………………………….........................…14

*United States v. Washington*
615 F.2d 441 (7th Cir. 1980) ...........................................................................................2

## Other Authority

7th Cir. Pattern Crim. Fed. Jury Instructions (2012)……………………………………......6

18 U.S.C. §1832..............................................................................................................8

18 U.S.C. §1832...................................................................................................3-8, 16

18 U.S.C. §1839............................................................................................................11

Defendant, Robert O'Rourke ("O'Rourke" or "Defendant"), by and through Kulwin, Masciopinto & Kulwin, LLP and pursuant to Federal Rule of Criminal Procedure 33, hereby submits this motion and memorandum in support of his motion for a new trial.

## I.     <u>INTRODUCTION</u>

Through his Rule 29 motion, O'Rourke submits that he is entitled to the entry of a judgment of acquittal.  Alternatively, should the Court find otherwise, O'Rourke submits, through this Rule 33 motion, that he is entitled to a new trial. Respectfully, pursuant to Rule 33 and federal law, confidence in the jury's verdict is undermined because:

(1) *<u>Attempt Charges</u>*. The government was erroneously allowed to submit to the jury novel "attempt" charges where O'Rourke did not engage in any inchoate, uncompleted conduct and the government had no obligation to prove the existence of any "trade secret" for this trade secret prosecution, resulting in O'Rourke's erroneous conviction on Counts 1-4;

(2) *<u>Substantive Charges – Knowledge of Trade Secret</u>*. The jury was erroneously instructed that it could convict O'Rourke on the substantive trade secret charges without the government having to prove beyond a reasonable doubt that he knew the information was a trade secret as required under the Economic Espionage Act ("EEA"), resulting in O'Rourke's erroneous conviction on Counts 2-4 and Counts 11-13;

(3) *<u>Unique Combination Instruction</u>*. The jury was erroneously instructed on the government's "unique combination" trade secret theory where there was insufficient evidence to allow the government's theory to go to the jury, resulting in O'Rourke's erroneous conviction on Counts 2-4 (lab reports);

(4) *<u>Unanimity</u>*.  The jury was erroneously permitted to convict O'Rourke without ensuring that all jurors unanimously agreed to what precise information, if any, they all considered to be a "trade secret" under federal law, resulting in O'Rourke's erroneous conviction on Counts 2-4 and Counts 11-13, an avoidable circumstance had the Court used O'Rourke's proposed special verdict form, some version thereof, or another alternative proposed by O'Rourke; and

(5) *<u>Cumulative Weight of the Evidence</u>*. The jury's guilty verdicts must be vacated and a new trial ordered because the complete record, particularly taking into consideration the credibility of the witnesses, leaves a strong doubt as to O'Rourke's guilt such that not doing so would be a miscarriage of justice.

Any one or more of the foregoing errors, particularly combined with the paucity of the government's evidence introduced at trial, necessitates a new trial under Rule 33.

## II.    <u>LEGAL STANDARD</u>

Rule 33 provides that a court may vacate any judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). A defendant is entitled to a new trial if a trial error or errors jeopardized his substantial rights, *U.S. v. Hester*, 08 CR 848, 2012 WL 1655950, at *5 (N.D. Ill. May 10, 2012), or if the verdict is against the manifest weight of the evidence, *U.S. v. Washington*, 184 F.3d 653, 657 (7th Cir.1999). *See generally U.S. v. Eberhart*, 388 F.3d 1043, 1048 (7th Cir.2004) (courts have interpreted Rule 33 to "require a new trial in the interests of justice in a variety of situations in which substantial rights" have been jeopardized).

### A.    <u>Weight of the Evidence Standard.</u>

Unlike a Rule 29 motion for judgment of acquittal, a court addressing a Rule 33 motion for a new trial need not view the evidence in the light most favorable to the prosecution. *Washington*, 184 F.3d at 657. In addressing a Rule 33 motion, the court may properly consider witness credibility and grant a new trial if the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice. *Id.* The focus is not whether the testimony is so incredible that the court should have excluded it but whether the verdict is against the manifest weight of the evidence, taking into account the credibility of the witnesses. *Id.* Therefore, the court must consider the weight of the evidence and credibility of the witnesses and grant a new trial if that evidence "preponderates heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *U.S. v. Reed*, 875 F.2d 107, 113 (7th Cir.1989). Per Rule 33, if the complete record "leaves a *strong doubt* as to defendant's guilt, even though not so strong a doubt as to require a judgment of acquittal," a new trial is appropriate. *U.S. v. Santos*, 20 F.3d 280, 285 (7th Cir.1994) (emphasis added). As explained below, such is the case here.

### B.    <u>"Other Errors" Standard.</u>

Rule 33 provides a broad grant of discretion. Per Rule 33, the court also may order a new

trial for virtually any reason demonstrating a miscarriage of justice. Fed. R. Crim. P. 33(a) ("Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."); 3 C. Wright et al., *Federal Practice and Procedure* §581 (4th ed. 2012) ("Rule 33 recognizes that if a trial court concludes for any reason that the trial has resulted in a miscarriage of justice, the court has broad powers to grant a new trial."). As such, the court may order a new trial based on errors involving, *inter alia*, the erroneous admission or exclusion of evidence and instructional error. Indeed, "[t]he interest of justice standard is broad enough to cover" defects that do "not constitute reversible error." *3 C. Wright et al., Federal Practice and Procedure* §581 & n.3 (4th ed. 2012) (citing *U.S. v. Vicaria*, 12 F.3d 195, 198–99 (11th Cir. 1994) (district court acted within its discretion in granting new trial based on conclusion that it should have given the defense's theory of case instruction, even if failure to do so was not legal error, considering the closeness of the case and possibility of jury confusion)).

## III.  ARGUMENT

### A.  Error in Allowing Government to Proceed on Attempt Charges.

Respectfully, the Court erred in permitting the government to proceed to the jury on its novel "attempt" charges theory. The government's indictment charged thirteen counts, which conflated alleged substantive charges and "attempt" charges. *E.g.,* Dkt. #1, p. 3 (alleging both unlawful "possession" and unlawful "attempted" possession). For instance, Count 1 charged O'Rourke with:  (1) violating §1832(a)(3) on the theory that O'Rourke "possessed" an alleged trade secret without authorization (*i.e.*, the substantive offense), and (2) violating §1832(a)(4) by "attempting" to do so. *Id.*

O'Rourke objected to the government's novel "attempt" theory, which the government only fully articulated closer to the eve of trial. Per the government's proposed jury instructions, the government claimed an ability to secure a §1832(a)(4) "attempt" conviction – even for

completed, non-inchoate offense conduct – as long as O'Rourke "reasonably believed" the information in question was a "trade secret," even if the information was not a "trade secret" as a matter of federal law. Dkt. #75, p.43. O'Rourke objected on numerous grounds in writing and orally. *E.g.*, *id.* p.45.

The Court's jury instruction permitting the government to proceed on its novel "attempt" theory was error and contrary to law. First, doing so was contrary to the plain reading of §1832. Section 1832, provides in relevant part:

> (a) Whoever, with intent to convert *a trade secret*, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of *that trade secret*, knowingly—
>
>> (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains *such information*;
>>
>> (2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys *such information*;
>>
>> (3) receives, buys, or possesses *such information*, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;
>>
>> (4) *attempts* to commit any *offense described in paragraphs (1) through (3)*; or
>>
>> (5) conspires . . . .
>
> shall, except as provided in subsection (b), be fined under this title or imprisoned . . . .

18 U.S.C. §1832(a) (emphasis added).

The word "attempts" in the foregoing (a)(4) statutory language (and as charged in the government's indictment (*e.g.,* Dkt. #1, p.3) modifies the transitive verbs of "steals," "downloads," and "possesses." As such, a §1832(a)(4) attempt violation arises only if a defendant tried, but

4

failed, to "steal," "download," or "possess" the alleged trade secret information at issue. Such a reading is entirely consistent with the traditional notion that "attempt" crimes are inchoate in nature. *E.g.*, Seventh Cir. Pattern Crim. Fed. Jury Instructions (2012) 4.09 (explaining that any "attempt" charge contemplates an inchoate or uncompleted offense conduct). Because O'Rourke completed all of his alleged offense conduct, it was improper and contrary to §1832(a)'s language to permit the government to prosecute its novel attempt theory, which excused it from proving that O'Rourke possessed an actual trade secret in this trade secret prosecution.[1]

Second, to the extent the Court deemed the statutory language ambiguous, the government was still precluded from proceeding on its novel attempt theory. Where there is such an ambiguity, courts must apply the rule of lenity and interpret the statute in favor of the defendant. *U.S. v. LaFaive*, 618 F.3d 613, 616 (7th Cir. 2010). Third, the government's attempt theory leads to absurd results and convictions unintended under the EEA. If the government need not prove the existence of a "trade secret" for a §(a)(4) attempt conviction, even when the underlying offense conduct is ***completed***, then the government would never bring a substantive §(a)(1)-(3) charge to avoid the heightened burden of proving the existence of a "trade secret." If Congress intended this to be the case, it would not have distinguished the choate offenses in §(a)(1)-(3) with the inchoate offense in §(a)(4). Likewise, it would render §1839's "trade secret" definition superfluous.

Fourth, charging documents in other EEA cases further demonstrate the error of the government's novel attempt theory. For example, in *U.S. v. Liew*, 4:11-cr-573-JSW (N.D. Cal. Mar. 12, 2013), the government's indictment (filed herein at Dkt. #80-1) charged defendant with attempting to steal one trade secret, while actually stealing and/or possessing other trade secrets such that the attempt instruction was appropriate for the inchoate conduct only:

---

[1] As argued during trial, the government's reliance on "sting" and other distinguishable fact scenarios is misplaced. The government never substituted fake trade secrets to secure O'Rourke's arrest.

| Breakdown of Relevant Charges in *Liew* | |
|---|---|
| Count 5 | Attempted Theft of Trade Secret 1 in violation of §1832(a)(4) |
| Count 6 | Possession of Trade Secret 2 in violation of §1832(a)(3) |
| Count 7 | Possession of Trade Secret 3 in violation of §1832(a)(3) |
| Count 8 | Conveying Trade Secret 5 in violation of §1832(a)(2) |
| Count 9 | Possession of Trade Secret 4 in violation of §1832(a)(3) |

*Id.* For all of the foregoing reasons, and because the government circumvented the statutory requirement of proving beyond a reasonable doubt that the information in question was a "trade secret" under federal law for its attempt convictions on Counts 1-4, this Court should grant O'Rourke a new trial to avoid a miscarriage of justice.

**B.    Erroneous Jury Instructions.**

Aside from the attempt theory issue, O'Rourke's jury instructions contained errors, the combination of which also requires granting a new trial on all counts of conviction. *U.S. v. Madoch*, 149 F.3d 596, 599 (7th Cir.1998) (new trial required where instruction inaccurately stated the law); *U.S. v. Minneman*, 143 F.3d 274, 280 (7th Cir.1998) (new trial required where instruction given despite a failure to introduce evidence to support theory of the case), *cert. denied*, 526 U.S. 1006, (1999); *U.S. v. Knight*, 800 F.3d 491, 512 (8th Cir. 2015) (instruction to jury was so defective to constitute plain error).

**1.   Government's Elements Instruction for the Substantive Offenses Was Erroneous.**

The government's tendered (and accepted) elements instruction for the charged substantive offenses in Counts 1-13 for alleged violations of 18 U.S.C. §1832(a)(1)-(3) was erroneous. This elements instruction misstated the applicable law by relieving the government of its burden of proving beyond a reasonable doubt all of the elements of the charged crimes. In particular, the instruction relieved the government of the obligation to prove beyond a reasonable doubt that O'Rourke "knew" that the information was, or contained, a trade secret. Dkt. #75, p.87.  Instead, the government merely had to prove that O'Rourke "knew or believed" that the information "contained proprietary information, meaning belonging to someone else who had an exclusive

6

right to it." *See* Dkt. #113 (Jury Instructions) at p. 21, 23, 25.

Although there is a dearth of authority for EEA cases, those that do exist indicate that the government must prove beyond a reasonable doubt that the defendant knew the information to be a trade secret to violate §1832(a). For example, in *U.S. v. Hanjuan Jin*, 833 F.Supp.2d 977 (N.D. Ill. 2012), the court rejected the government's identical argument that it need only prove that a defendant "knew the information was proprietary." *Jin*, 833 F.Supp.2d at 1012. Instead, the *Jin* court concluded that the government was required to prove "that a defendant knew, as a factual matter, that the information she possessed had the general attributes of a trade secret."[2] *Id.*

Similarly, the court in *U.S. v. Chung*, 633 F.Supp.2d 1134 (C.D. Cal. 2009), reached the same conclusion. The *Chung* court noted that the Supreme Court "has long recognized a presumption in favor of an intent requirement for 'the crucial element' that separates lawful from unlawful conduct." *Id.* at 1144-45. The *Chung* court thus held that "the government must prove that [the defendant] knew that the information he possessed was trade secret information." *Id.* at 1145; *see also U.S. v. Nosal*, 2009 WL 981336, *3 (N.D.Cal. Apr. 13, 2009) ("it is the knowledge of trade secrets, not the knowledge of illegal behavior, that the EEA requires"), *rev'd on other grounds*, 642 F.3d 781 (9th Cir. 2011); *U.S. v. Liew*, 11 CR 00573 (N.D. Cal. Feb. 25, 2015), Dkt. #792, p.34-35 (Final Jury Instructions: instructing jury that for §1832(a)(2) and (a)(3) charges, the government had to prove, *inter alia*, that "defendant knew that these items were trade secrets" and that the "defendant knew that the Basic Document was a trade secret"); *U.S. v. Shiah*, SA CR 06-92 DOC, 2008 WL 11230384, at *12 (C.D. Cal. Feb. 19, 2008) (under §1832(a), government must

---

[2] As part of its reasoning, this Court distinguished *Jin* based on the language of §1831 at issue in *Jin*. However, the statutory framework of §1831 and §1832 are substantively identical. While §1831 references "trade secret" (not "such information") in each of the "steals," "downloads," and "possesses" sub-paragraphs, §1832 does the substantive equivalent by using the phrase "such information," which clearly refers to "that trade secret" identified in §1832(a)'s opening paragraph. 18 U.S.C. §1832(a). Nor is there any good reason to treat the two statutes differently, particularly where each serves the same aim. Indeed, to do so would be contrary to the EEA's legislative history. *See* 142 Cong. Rec. 27,117 (1996) (government must show the defendant was "aware or substantially certain" he was misappropriating a trade secret).

prove that defendant knew or had a firm belief that the information in the computer data file or files was one or more trade secrets); *U.S. v. Hsu*, 40 F.Supp.2d 623, 631 & n.8 (E.D.Pa.1999) (EEA not unconstitutionally vague because it requires proof that defendant sought information the he "knew was not 'generally known to' or 'readily ascertainable through proper means by, the public'" and further reasoning that to be "convicted under the EEA, a defendant must 'knowingly' set out to violate the statute. . .Therefore, a person who takes a 'trade secret' because of ignorance, mistake, or accident should not be successfully prosecuted"); *U.S. v. Krumei*, 258 F.3d 535, 539 (6th Cir. 2001) (rejecting applied vagueness argument and holding that §1832 was constitutional as applied where defendant admitted to knowing the information was a company trade secret that he could not obtain legally except through a corrupt employee and sought to sell it anyway).

The EEA's legislative history likewise supports the conclusion that to be convicted of a substantive offense under either §1831 or §1832, the defendant must have known the information at issue was a trade secret. *See* 142 Cong. Rec. 27,117 (1996) (government must show the defendant was "aware or substantially certain" he was misappropriating a trade secret).

Additionally, the government's substantive elements instruction caused significant jury confusion, leading to an erroneous conviction on substantive Counts 2-4 and Counts 11-13. The elements instruction for the substantive offenses required the government to prove that O'Rourke "knew or believed" that the information at issue "contained proprietary information, meaning belonging to someone else who had an exclusive right to it." *See* Dkt. #113 (Jury Instructions) at p. 21, 23, 25. In contrast, the elements instruction for the attempt offenses required the government to prove that O'Rourke "reasonably believed the Information to be a trade secret." *Id*., p. 22, 24, 26. But, the word "proprietary" is nowhere mentioned or defined in the EEA. In addition, the word "proprietary" was not mentioned throughout trial prior to closing argument.

The jury's significant confusion manifested itself in its guilty verdict on the substantive

8

Counts 11-13 (alloy experiment reports) and not guilty verdict on the same attempt Counts 11-13. In so concluding, the jury somehow determined that O'Rourke did *not* reasonably believe the alloy experiment reports to be a trade secret (for the "attempt" counts), but at the same time, O'Rourke believed them to be "proprietary" (for the substantive counts). Had the jury been properly instructed on the substantive Counts 11-13 that O'Rourke needed to know that the alloy experiment report was, or contained, a trade secret, the jury would have acquitted O'Rourke on the substantive Counts 11-13 just as it did on the attempt Counts 11-13.

In sum, for all of the foregoing reasons, the government's flawed instruction on the substantive offenses requires a new trial in the interests of justice. *U.S. v. Gaudin*, 515 U.S. 506, 511 (1995) ("The Constitution gives a criminal defendant the right to demand that a jury find him guilty of all of the elements of the crime with which he is charged").

### 2. "Unique Combination" Trade Secret Jury Instruction Was Erroneous.

Another erroneously tendered (and accepted) jury instruction similarly requires a new trial. Over objection (Dkt. #81), the Court accepted the government's "unique combination" jury instruction, resulting in O'Rourke's wrongful conviction on Counts 2-4. The government's "unique combination" instruction provided:

> A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable trade secret.

Dkt. #113 (Jury Instructions), p. 29. Although this instruction was a proper statement of the law, O'Rourke objected because the evidence at trial in no way supported its use, which only confused the jury and provided the jury with an "out" to O'Rourke's significant prejudice. Dkt. #81.

The government's "unique combination" instruction was improper. First, for such an instruction to be appropriate, the government needed to identify what specific "unique combination" of information it alleged to be a trade secret, which it never did. Milgram on Trade

Secrets, §15.01 ("Where a party alleges that its trade secret resides in a combination of otherwise public information, [a] plaintiff should not merely enumerate the various components [of its trade secrets], but preferably should describe the combination and establish its trade secret status"). Indeed, the combination of otherwise known data must be delineated with some particularity in establishing its trade secret status. *E.g., Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) (it is not enough to point to broad areas of information and assert that something there must have been secret and misappropriated); *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F.Supp.3d 224, 271 (S.D.N.Y. 2014) (plaintiff asserting combination trade secret must demonstrate the way in which publically-available components fits together is unique and not publically known); *BioD, LLC v. Amnio Tech., LLC*, 2:13-CV-1670-HRH, 2014 WL 3864658, at *6 (D. Ariz. Aug. 6, 2014) ("must explain how the combination of much of what appears to be generally known information can constitute a trade secret").

Here, the government failed this standard. The government merely alleged that Dura-Bar's 667 lab reports "independently and in aggregate contain trade secrets" because they "document internal testing performed by Dura-Bar in order to develop and document quality issues, microstructure properties, mechanical properties, and/or the annealing cycle for new products" or "document the identity of [Dura-Bar] customers," "particular defects," "solutions" and/or "confirm the metallurgical composition of the product." Dkt. #45 (Bill of Particulars), p. 1-2.

However, as argued by O'Rourke, "simply pointing to a large amount of information," as the government did here, "will not demonstrate that a compilation of several elements constitutes a trade secret." *Brigham Young Uni. v. Pfizer, Inc.*, 861 F.Supp.2d 1320, 1324-24 (D. Utah 2012).[3]

---

[3] *See also Liew*, 2013 WL 2605126, at *8 (ordering government to set forth in bill of particulars, taking into account the EEA's definition of a trade secret, its theory of what defendants reasonably believed the trade secret to be, and identify with particularity: (1) the "ways and means"; and (2) the "proprietary and non-proprietary components"; and (3) the resulting compilations and combinations that formed substantial portions of the TiO2 manufacturing process).

Indeed, the government introduced no evidence or testimony to indicate that Dura-Bar compiled public information, uniquely combined it with Dura-Bar information, and kept it all secret, so as to afford Dura-Bur a competitive advantage and warrant trade secret protection. To be sure, Dura-Bar's lab reports database was nothing of the sort. Accordingly, the government's instruction was erroneous.

Not only was the government's instruction erroneous, but it also caused O'Rourke significant prejudice. By so instructing the jury, the government was permitted to wrongly argue that O'Rourke's copying of Dura-Bar's large lab reports database (amounting to 660+ lab reports) somehow satisfied its "unique combination" jury instruction, resulting in O'Rourke's erroneous conviction on the government's substantive Counts 2-4. The government's instruction effectively abrogated its obligation to prove that any of the lab reports themselves contained trade secret information. Rather, the jury was permitted to consider the sheer volume and "unique combination" of lab reports copied (not the specific information therein) to be a trade secret, contrary to federal law.

The risk that that the jury wrongly convicted O'Rourke on Counts 2-4 under this "unique combination" theory is further heightened by the fact that the instruction was incomplete. O'Rourke argued that any such instruction, if given, should have included additional language to inform the jury that even under the unique combination theory, the unique combination must still meet the other requirements of §1839. Dkt. #81, p.3 (O'Rourke proposing the following additional language, which was rejected: "the combination can only constitute a trade secret if "the combination of all such information is not generally known" and "if it meets the definition of trade secret set forth in the [Trade Secretion Definition Instruction] paragraph"). Omitting such language increased the likelihood that the jury convicted on substantive Counts 2-4 without considering whether Dura-Bar took reasonable measures to keep secret its so-called "unique combination" of

lab reports and/or whether that alleged "unique combination" derived independent economic value from being kept secret, as required under federal law. *See* 18 U.S.C. §1839. For this reason also, a new trial is required in the interests of justice. *Cobb*, 905 F.2d at 789, n.9 (reversal is appropriate where there is a "reasonable likelihood" the jury misconstrued the instruction).

### 3. Failing to Ensure Juror Unanimity for Specific Trade Secret(s) Was Error.

Further undermining confidence in the jury's verdict is the failure to ensure that the jury unanimously agreed as to what specific information the government proved to be a trade secret. Because "there can be no doubt" that the "existence of a 'trade secret' goes to the 'core criminality' of the statute," an EEA conviction cannot stand unless the jury is unanimous on the actual specific information constituting a trade secret. *U.S. v. Case*, 2007 WL 1746399, at *3 (S.D. Miss. June 15, 2007) (citing *Russell v. U.S.*, 369 U.S. 749, 771 (1962)); *see also*, 142 Cong. Rec. 27, 117 (1996) ("[A] prosecution under [the EEA] must establish a particular piece of information that a person has stolen or misappropriated" is a trade secret). It is equally clear that the Constitution guarantees O'Rourke a unanimous verdict on all elements of the charged offense. *Johnson v. Louisiana*, 406 U.S. 356 (1972) (Sixth Amendment requires unanimous verdict in federal criminal trial); *Richardson v. U.S.*, 526 U.S. 813 (1999) (jury in federal criminal case cannot convict unless it unanimously finds that the Government has proved each element of crime); *U.S. v. Canino*, 949 F.2d 928, 946 (7th Cir. 1991) (Rule 31(a) and Sixth Amendment requires that a jury verdict in a federal criminal trial be unanimous).

Here, in order to ensure a constitutionally sound and fair verdict, O'Rourke proposed three options to ensure that the jury was unanimous as to what information, if any, it concluded was a "trade secret" as defined by federal law. The government opposed, and the Court denied, each proposed option. First, O'Rourke proffered an instruction modeled after a Seventh Circuit pattern instruction, emphasizing the importance of unanimity as to what information, if any, the jury

concluded was a trade secret. *See* Dkt. #75, p. 7 ("For example, as to Count 2, if some of you were to find that the government has proved beyond a reasonable doubt that the defendant stole a trade secret found in one particular Lab Report, and the rest of you were to find that the government has proved beyond a reasonable doubt that the defendant stole a trade secret found in a different Lab Report, then there would be no unanimous agreement on which trade secret the government has proved. On the other hand, if all of you were to find that the government has proved beyond a reasonable doubt that the defendant stole a trade secret found in a particular Lab Report, then there would be a unanimous agreement on which trade secret the government proved.").

Second, O'Rourke proposed adding clarifying language to the elements instruction. Specifically, O'Rourke proposed a parenthetical after the elements instruction which required the government to prove that the information at issue contained a trade secret, stating "with all of you agreeing on which specific information constitute the trade secret or secrets." *Id.* p. 87. Given the sheer volume of information that the government insisted on charging, comprising 768 different documents and thousands of pages, such an instruction was constitutionally required to ensure jury unanimity as to the precise information, if any, that the jurors all concluded was a "trade secret."

Third, O'Rourke also proposed using a special verdict form to help ensure his constitutional right to a fair and unanimous verdict. *Id.* p.120-126. In complex cases like this one, courts have found special verdict forms to be particularly helpful and necessary to ensure a unanimous and constitutionally sound verdict. *E.g.*, *U.S. v. Ruggiero*, 726 F.2d 913, 922-923 (9th Cir.1984) (in complex RICO cases, "it can be extremely useful for a trial judge to request the jury to record their specific dispositions of the separate predicate acts charged"); *U.S. v. Acosta*, 149 F.Supp.2d 1073 (E.D. Wis. 2001) (special verdict form which included interrogatories on all elements of RICO charge was appropriate to eliminate confusion, inform jurors, and help them work through specific findings they have to make); *U.S. v. Warner,* 02 CR 506-1, 2006 WL

2583722, at *33 (N.D. Ill. Sept. 7, 2006) (special verdict forms are beneficial in certain complex criminal cases and court was not opposed to using one).

The Court should have employed one or more of O'Rourke's three unanimity proposals to ensure a constitutionally firm, fair, and unanimous jury verdict. As matters stand, the parties are unable to discern what specific information in Counts 2-4 (Lab Reports) and Counts 11-13 (Alloy Experiment Data Reports) the jury concluded was a "trade secret." As such, O'Rourke (and the Court) has no ability to test the propriety of the jury's verdict on these six counts. Given the complexity of the case and the clear confusion that resulted from the government's extremely broad allegations (submitting all 667 lab reports to the jury) but only presenting evidence as to 21 of the 667 lab reports, the Court erred in not granting one or more of O'Rourke's proposed unanimity proposals. For this reason too, O'Rourke is entitled to a new trial. *U.S. v. Tykarsky*, 446 F.3d 458, 483 (3d Cir. 2006) (failure to require a special verdict tainted the integrity and reputation of the judicial process).

**C.      The Cumulative Weight of the Evidence Does Not Support a Judgment of Guilt.**

The jury's guilty verdicts also were against the cumulative weight of the evidence such that O'Rourke is entitled to a new trial. As explained above, in deciding whether to grant a Rule 33 motion for a new trial, the court can weigh the evidence, disbelieve witnesses, and grant a new trial, even where there is evidence to sustain the verdict. In so doing, and taking into consideration the arguments outlined in O'Rourke Rule 29 motion (which O'Rourke incorporates herein), the following becomes even clearer:

- **Dura-Bar was never concerned with misappropriation of any alleged trade secrets; rather, Dura-Bar was worried about losing its best and most valuable salesperson to a foreign company.**

In the 30+ years that O'Rourke worked for Dura-Bar, the company never mentioned the phrase, or any concern about, "trade secrets." Frank Abruzzo never even saw one document

14

marked "confidential" in his 35 years at Dura-Bar. What Dura-Bar did historically express concern about was competition for its North American market share of 90%+. So, when Dura-Bar learned that O'Rourke was intent on lawfully competing against Dura-Bar in the Asian market because his non-compete agreement barred all similar employment in North America for three years, Dura-Bar panicked. Indeed, Guiterrez's September 16, 2015 text message revealed as much, exclaiming as follows about O'Rourke's decision to seek a legitimate livelihood in China: "Wow. This is ***not good for Bob nor us***. I will address ***asap***." DX Z-64 (Dura-Bar China employee responding, "[W]e need to discuss ***the threat*** if Bob provides consult to HL or any other producers ***in China***") (emphasis added). Lon Hollis also conceded that initially (before there was any suggestion of O'Rourke copying any information), Hollis was concerned about O'Rourke's competition, not any alleged Dura-Bar "trade secrets."

- **O'Rourke did not have the requisite criminal intent to steal alleged trade secrets.**

The evidence established O'Rourke lacked any intent to steal alleged trade secrets. Contrary to the government's assertions at trial, O'Rourke did not affirmatively mislead Dura-Bar about his reasons for resigning. On Sunday August 9, 2015, O'Rourke signed an employment agreement with Hualong. GX 60. Less than two days later, O'Rourke met offsite with his boss, Anthony Guiterrez, and resigned "effective immediately." DX Z-12. That fact that O'Rourke did not specifically tell his boss he had accepted a position with Hualong just two days earlier is not evidence of an intent to steal alleged trade secrets.

Moreover, O'Rourke *was* forthcoming. During his September 15, 2015 exit interview, O'Rourke stated, *inter alia*: (1) he would have stayed at Dura-Bar had it agreed to allow him to continue with Dura-Bar China's operation; (2) he was unhappy with Dura-Bar's direction as to its China operation; (3) he was looking at new opportunities to have more control over plant metallurgy but still stay in his sales role, more management opportunities, and more international

travel; and (4) he was waiting on a few things to pan out before deciding on his next move. GX 19-B. Similarly, that same day, and one week before leaving for China, O'Rourke told Dura-Bar's HR Director, Lon Hollis, that he was leaving the following week to work for Hualong in China. When Hollis thereafter informed O'Rourke about needing to tell Dura-Bar's President about his plans, O'Rourke responded with indifference, reflecting his lack of any knowledge (or intent) that he converted trade secrets, stating, "Sorry to put you in a bad spot but ***do what you need to do. It is all good with me***." DX HH-3 (emphasis added). Such conduct reflects a mindset of someone who believes he did nothing wrong and has nothing to hide, contrary to the intent and knowledge requirements of §1832.

- **The government's purported experts, all Dura-Bar employees, failed to provide credible testimony sufficient to support a conviction.**

The government's purported expert witnesses, all Dura-Bar employees, ultimately supported O'Rourke's claims that he possessed no Dura-Bar trade secret but otherwise lacked credibility. First, Joe Richards and Bradley Steinkamp conceded that the information in O'Rourke's possession lacked independent economic value to any competitor because it was insufficient to recreate or come close to Dura-Bar's product. In particular, O'Rourke lacked tooling designs for the myriad of Dura-Bar's graphite dies, cooling jacket systems, bar machine crucibles, and bar machine drive assembly, as well as many production run parameters like stroke profiles, start-up stroke delays, production stroke delays, exit temperatures, inoculation ingredients and methodology, and starting molten "recipes."

Second, Richards' "expert" testimony about why Dura-Bar's 1993 Machine Preheat Startup document ("1993 document") was nevertheless "valuable" to a competitor was not credible. As a threshold matter, Richards admitted he never toured or visited any other continuous cast iron foundry (overseas or otherwise) and never operated a bar machine. Moreover, Richards ultimately acknowledged that much of the content of the 1993 document was obsolete, publicly

available, incomplete, and unusable. Richards was not at Dura-Bar in the mid-1990's, did not know who authored the 1993 document, who received the 1993 document, how long it was used, if ever, how and where it was stored, the purpose for its creation, or where any original or copy currently existed, which could not be found by anyone at Dura-Bar (although Richards found other manuals from the 1970's and 1980's). Based on the foregoing, Richards' "expert" testimony that the 1993 document nevertheless would be valuable to a competitor was not credible. Indeed, the jury seemingly agreed by finding O'Rourke not guilty on the government's substantive Count 1.

The same is true for the testimony of Bradley Steinkamp, the government's expert on Dura-Bar's lab reports, IR camera folders, and alloy experiment reports data. Steinkamp's labored testimony that Dura-Bar's lab reports "could be" potentially of value to a competitor is insufficient to support a criminal conviction on Counts 2-4. Taking into account Steinkamp's demeanor, hesitation, and use of the phrase "could be valuable," this Court should substantially discount his testimony. Moreover, Steinkamp clearly had a motive to fabricate his testimony and was impeached on a number of occasions. Indeed, despite working for Dura-Bar for 17 years, Steinkamp only received his first promotion after his cooperation began after O'Rourke's departure. Moreover, with respect to the Alloy Experiment reports, Steinkamp unequivocally conceded on cross-examination that they were "valueless" to a competitor, rendering the jury's conviction on substantive Counts 11-13 clearly erroneous.

Similarly, Steinkamp's "value to a competitor" opinions were undermined by his own testimony. Steinkamp conceded he never toured or visited another continuous cast iron manufacturer's foundry (overseas or otherwise) and never operated a bar machine. As such, like Richards, Steinkamp admitted to possessing no knowledge regarding Hualong's capabilities, its laboratory, or its business in general. In sum, Steinkamp and Richards offered no credible evidence to establish beyond a reasonable doubt that Dura-Bar's 1993 document, lab reports, or alloy

17

experiment reports were trade secrets or that O'Rourke reasonably believed them to be the same.

- **The testimony of O'Rourke's experts, on the other hand, was credible, substantial, and believable and cast a strong doubt as to the jury's guilty verdicts.**

By contrast, O'Rourke's experts were credible and believable, casting a strong doubt as to the jury's guilty verdicts on Count 1 (attempt only), Counts 2-4 (substantive and attempt), and Counts 11-13 (substantive only). First, Naomi Fine's expert testimony that Dura-Bar failed to even come close to employing reasonable measures to protect the secrecy of the information at issue was entirely credible, thorough, consistent, and believable. Ms. Fine's qualifications are unimpeachable, including working for the government in similar criminal cases. In fact, Ms. Fine's expert testimony stood unrebutted. Ms. Fine never once wavered in her expert opinion that Dura-Bar's security measures were entirely lacking. Ms. Fine's testimony required a jury finding that the government failed to prove beyond a reasonable doubt that any "trade secret" existed or that O'Rourke "reasonably believed" one to exist.[4]

Likewise, the expert testimony of John Keogh on the 1993 Machine Preheat document, the IR camera reports, and the alloy experiment reports, was similarly credible, straightforward, and well informed. Keogh explained that the contents of the 1993 document were meaningless and valueless in the hands of a competitor. Keogh explained that the contents of the 1993 document was obsolete, publicly available, and not useful to a competitor with different tooling designs, different manufacturing run parameters, and different raw materials, inoculants, and "starting recipes." Absent a competitor exactly duplicating everything used by Dura-Bar (which was impossible because, *inter alia*, Dura-Bar designed its tooling equipment and O'Rourke had no

---

[4] The government's only ability to undermine her credibility was by falsely telling the jury during rebuttal closing that O'Rourke "purchased Ms. Fine's expert opinion," a wholly improper, inflammatory, false, and prejudicial statement. Fed. R. Evid. 403. The defense timely objected, but the Court overruled the objection. Without any ability to respond to the government's improper rebuttal closing argument, the damage was done. Nevertheless, that the government was only able to undermine Ms. Fine's testimony by resorting to inflaming the jury speaks volumes to the weight and credibility that should be afforded to her testimony.

tooling design drawings, although he apparently could have copied such material had he really wanted to injure Dura-Bar), the 1993 document was worthless, which is another reason why the jury's conviction on the government's attempt Count 1 was clearly erroneous.

The reliability of Keogh's opinions was further bolstered by his vast experience, knowledge, and testimony. Keogh impeccably explained the continuous casting process through Dura-Bar's own commercial video. Keogh has 40+ years of significant commercial, industrial, and academic experience in the field of metals. He is a recognized expert in the field of cast iron metallurgy and casting methods. Keogh obtained degrees in Mechanical Engineering and Materials and Metallurgical Engineering from the University of Michigan and holds ten metal casting related patents. He spent 35 years with a company called Applied Process, Inc., a company that specializes in heat treatment for various metals, including cast iron metals, initially as president, then CEO, then chairman, and finally as a board member and executive consultant. For the past 10 years, Keogh has taught metal casting laboratory modules to engineering students as an Adjunct Professor at the University of Michigan. In 2005, he also established a design and prototype casting studio called Joyworks, which provides a platform for research, teaching, and commercial endeavors relating to metals, including alloy development, casting prototypes, and sculpture. Further, Keogh has extensive experience with technical associations including, by way of example, the American Foundry Society, ASM International, and the American Gear Manufacturer Association. He also has authored numerous technical publications and presentations, and has received many technical association awards recognizing his significant contribution and work in the industries.

More importantly, unlike Richards and Steinkamp, Keogh has significant experience with cast iron manufacturers well beyond Dura-Bar and has visited several manufacturing foundries around the world, including Dura-Bar's and Hualong's. Also unlike Richards and Steinkamp,

Keogh has actually operated cast iron machines and has done extensive business in China. The relative value of Keogh's testimony against Richards and Steinkamp was not close. In sum, the combination of Naomi Fine and Keogh's expert testimony casts significant doubt on the jury's guilty verdicts on Counts 1-4 and Counts 11-13.

Taking all of the above together, along with the arguments outlined in O'Rourke's Rule 29 motion for acquittal, which are incorporated herein as if stated in full, the weight of the evidence leaves a "strong doubt" as to O'Rourke's guilt. As such, absent a judgment of acquittal, justice requires the Court to vacate the verdicts and order a new trial on all counts of conviction.

### IV.  CONCLUSION

In light of the foregoing, should the Court deny O'Rourke's motion for judgment of acquittal, O'Rourke respectfully requests that this Court grant his Rule 33 motion and order a new trial to avoid what would otherwise be a manifest injustice.

## <u>CERTIFICATE OF SERVICE</u>

I, Anthony J. Masciopinto, an attorney, hereby certify that *Defendant's Motion and Memorandum in Support of his Rule 33 Motion* was served upon all counsel of record via ECF Filing on March 28, 2019.

By:   */s/ Anthony J. Masciopinto*
One of Defendant's Attorneys