UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

ROBERT O'ROURKE

No. 17 CR 495

Hon. Andrea R. Wood

**GOVERNMENT'S CONSOLIDATED RESPONSE TO
DEFENDANT'S RULE 33 MOTION FOR A NEW TRIAL
AND RULE 29(c) MOTION FOR JUDGMENT OF ACQUITTAL**

The United States of America, by JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby submits its consolidated response to defendant ROBERT O'ROURKE's Rule 33 Motion for a New Trial (Dkt. No. 123) and Rule 29(c) Motion for Judgment of Acquittal (Dkt. No. 125).

**TABLE OF CONTENTS**

I.      BACKGROUND ................................................................................. 1

II.     THIS COURT SHOULD DENY THE DEFENDANT'S RULE 33 MOTION
        FOR A NEW TRIAL BECAUSE THERE WERE NO ERRORS AT TRIAL
        THAT JEOPARDIZED DEFENDANT'S SUBSTANTIAL RIGHTS ................. 2

        A.      Legal Standard ........................................................................ 2

        B.      Argument ................................................................................. 3

                1.      The Court Properly Instructed the Jury on the Attempt
                        Charges ......................................................................... 3

                2.      The Court Properly Instructed the Jury on the Elements for the
                        Substantive Offenses ................................................... 5

                3.      The Unique Combination Instruction Was Proper ...................... 8

                4.      The Unanimity Instruction Was Proper ................................... 10

                5.      The Government Presented Ample Evidence at Trial that
                        Defendant Stole and Attempted to Steal Trade Secrets ............ 11

III.    THIS COURT SHOULD DENY THE DEFENDANT'S MOTION FOR A JUDGMENT OF
        ACQUITTAL BECAUSE THE EVIDENCE PRESENTED AT TRIAL IS SUFFICIENT TO
        SUSTAIN A CONVICTION ................................................................. 16

        A.      Argument ............................................................................... 16

                1.      The Evidence Presented at Trial Is Sufficient to Sustain a
                        Conviction ................................................................. 16

                2.      Defendant's Arguments Are Unavailing ................................... 24
                        a.      Dura-Bar Employed Reasonable Security Measures ...... 24
                        b.      Categories 1, 2, and 5 had Economic Value .................... 26
                        c.      Defendant Intended to Convert the Trade Secrets to the
                                Benefit of Hualong and to Injure Dura-Bar .................... 28

                3.      The Counts Were Not Multiplicitous ......................................... 29

IV.     CONCLUSION ................................................................................. 30

i

## **TABLE OF AUHORITIES**

*United States v. Delatorre*, 581 F. Supp. 2d 968 (N.D. Ill. 2008) ................................. 9

*United States v. DeLeon*, 603 F.3d 397 (7th Cir. 2010) ...................................... 4

*United States v. Eberhart*, 388 F.3d 1043 (7th Cir. 2004).............................................. 2

*United States v. Feinberg*, 89 F.3d 333 (7th Cir. 1996) ..................................... 5

*United States v. Hernandez*, 330 F.3d 964 (7th Cir. 2003) ............................... 9

*United States v. Hsu*, 155 F.3d 189 (3d Cir. 1998) ..................................... 3

*United States v. Hsu*, 4 F.Supp.2d 623 (E.D. Pa. 1999) ........................................ 6, 7

*United States v. Jin*, 833 F.Supp.2d 911 (N.D. Ill. 2012)........................................ 5, 6

*United States Krumrei*, 258 F.3d 535 (6th Cir. 2010) ............................................. 6, 7

*United States v. Kruse*, 606 F.3d 404 (7th Cir. 2010) ................................................. 16

*United States v. Lange*, 312 F.3d 263 (7th Cir. 2002) ................................... 4

*United States v. Liew*, 856 F.3d 585 (9th Cir. 2017) .................................... 3

*United States v. Linwood*, 142 F.3d 418 (7th Cir. 1998). .............................. 3

*United States v. Moses*, 513 F.3d 727 (7th Cir. 2008) ............................... 16

*United States v. Nosal*, 2009 WL 981336 (N.D. Cal. Apr. 13, 2009)....................... 6, 7

*United States v. Orlando*, 819 F.3d 1016 (7th Cir. 2016).......................................... 16

*United States v. Peterson*, 823 F.3d 1113 (7th Cir. 2016) .......................................... 2

*Richardson v. Marsh*, 481 U.S. 200 (1987)) ................................................. 9

*United States v. Song*, 934 F.2d 105 (7th Cir. 1991) ................................................. 29

ii

*United States v. Summit Refrigeration*, No. 05 CR 151, 2006 WL 3091115 (E.D. Wis. Oct. 26, 2006) ........................................................................................................ 5, 29

*United States v. Swan*, 486 F.3d 260 (7th Cir. 2007) ................................................... 2

*United States v. Yang*, 281 F.3d 534 (6th Cir. 2002) .................................................. 3

<u>Statutes</u>

18 U.S.C. § 1832 ......................................................................................................*passim*

18 U.S.C. § 1831 ........................................................................................................... 6

18 U.S.C. § 1839 ........................................................................................................... 8

<u>Rules</u>

Federal Rule of Criminal Procedure 29 .......................................................... 2, 24, 30

Federal Rule of Criminal Procedure 33 .......................................................... 2, 15, 30

## I.  BACKGROUND

On July 19, 2017, a grand jury returned an indictment charging defendant with thirteen counts of theft of trade secrets, in violation of Title 18, United States Code, Section 1832(a). Dkt. No. 1. More specifically, the indictment charged defendant as follows:[1]

| Count | Date | Statute | Charge | Category |
|-------|------|---------|--------|----------|
| One | 9/21/15 | § 1832(a)(3) & (4) | Possession & Attempt | 1 (Operations) |
| Two | 9/13/15 | § 1832(a)(1) & (4) | Steal & Attempt | 2 (Lab Reports) |
| Three | 9/13/15 | § 1832(a)(2) & (4) | Download & Attempt | 2 (Lab Reports) |
| Four | 9/21/15 | § 1832(a)(3) & (4) | Possession & Attempt | 2 (Lab Reports) |
| Five | 9/13/15 | § 1832(a)(1) & (4) | Steal & Attempt | 3 (IR Camera) |
| Six | 9/13/15 | § 1832(a)(2) & (4) | Download & Attempt | 3 (IR Camera) |
| Seven | 9/21/15 | § 1832(a)(3) & (4) | Possession & Attempt | 3 (IR Camera) |
| Eight | 9/13/15 | § 1832(a)(1) & (4) | Steal & Attempt | 4 (IR2) |
| Nine | 9/13/15 | § 1832(a)(2) & (4) | Download & Attempt | 4 (IR2) |
| Ten | 9/21/15 | § 1832(a)(3) & (4) | Possession & Attempt | 4 (IR2) |
| Eleven | 9/13/15 | § 1832(a)(1) & (4) | Steal & Attempt | 5 (Alloy Exper.) |
| Twelve | 9/13/15 | § 1832(a)(2) & (4) | Download & Attempt | 5 (Alloy Exper.) |
| Thirteen | 9/21/15 | § 1832(a)(3) & (4) | Possession & Attempt | 5 (Alloy Exper.) |

*Id.* On February 4, 2019, a jury trial commenced. Dkt. No. 93. As part of its jury instructions, the Court instructed the jury that it would be asked to make two findings for each Count: one for the substantive offense charged in that Count (possession, theft, or downloading) and one for attempting to carry out that same offense. Dkt. No. 113 at 20 (Categories of Trade Secrets).

On February 25, 2019, after a three-week trial, the jury returned guilty verdicts on seven counts of the indictment, as follows:

---

[1] References to the trade secrets in this case are made using the Categories identified by the Court in its instructions to the jury. Dkt. No. 113 at 20 (Categories of Trade Secrets).

| Count | Date | Statute | Charge | Category |
|-------|------|---------|--------|----------|
| One | 9/21/15 | § 1832(a)(3) & (4) | Attempt | 1 (Operations) |
| Two | 9/13/15 | § 1832(a)(1) & (4) | Steal & Attempt | 2 (Lab Reports) |
| Three | 9/13/15 | § 1832(a)(2) & (4) | Download & Attempt | 2 (Lab Reports) |
| Four | 9/21/15 | § 1832(a)(3) & (4) | Possession & Attempt | 2 (Lab Reports) |
| Eleven | 9/13/15 | § 1832(a)(1) | Steal | 5 (Alloy Exper.) |
| Twelve | 9/13/15 | § 1832(a)(2) | Download | 5 (Alloy Exper.) |
| Thirteen | 9/21/15 | § 1832(a)(3) | Possession | 5 (Alloy Exper.) |

Dkt. No. 112. On March 28, 2019, defendant filed a Rule 33 Motion for a New Trial (Dkt. No. 123) and a Rule 29(c) Motion for Judgment of Acquittal (Dkt. No. 125).

## II. THIS COURT SHOULD DENY THE DEFENDANT'S RULE 33 MOTION FOR A NEW TRIAL BECAUSE THERE WERE NO ERRORS AT TRIAL THAT JEOPARDIZED DEFENDANT'S SUBSTANTIAL RIGHTS

### A. Legal Standard

A "court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a); *United States v. Peterson*, 823 F.3d 1113, 1122 (7th Cir. 2016). "Courts should grant a motion for a new trial only if the evidence preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Swan*, 486 F.3d 260, 266 (7th Cir. 2007) (alteration in original; internal quotations and citations omitted). "[C]ourts have interpreted [Rule 33] to require a new trial in the interests of justice in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Eberhart*, 388 F.3d 1043, 1048 (7th Cir. 2004) (internal citations and quotation marks omitted, *overruled* on other grounds, 546 U.S. 12 (2005)). Rule 33 motions are disfavored and courts generally

should grant them only in "the most extreme cases." *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998).

**B.    Argument**

**1.    The Court Properly Instructed the Jury on the Attempt Charges**

The Court properly instructed the jury on the attempt elements, and thus correctly permitted the government to proceed on the indictment returned by the grand jury, including both the substantive and attempt theories. Nothing about the government's theory was novel as it was consistent with the law.

The attempt jury instruction was consistent with the language of the statute. A violation of Section 1832(a)(4) "do[es] not require proof of the existence of an actual trade secret, but, rather, proof only of one's attempt [] to steal a trade secret." *United States v. Hsu*, 155 F.3d 189, 198 (3d Cir. 1998) ("The government can satisfy its burden under § 1832(a)(4) by proving beyond a reasonable doubt that the defendant sought to acquire information which he or she believed to be a trade secret, regardless of whether the information actually qualified as such."); *see also United States v. Liew*, 856 F.3d 585, 600 (9th Cir. 2017) (affirming attempt to steal trade secret jury instruction that "the government was not required to prove that Trade Secret 1 was, in fact, a trade secret but was required to prove the defendant reasonably believed that the information the defendant intended to convert was a trade secret."); *United States v. Yang*, 281 F.3d 534, 543-44 (6th Cir. 2002) (affirming attempt to steal trade

3

secret conviction when the defendants believed the information was a trade secret and the "fact that they actually did not receive a trade secret is irrelevant.").

In grounding his objections in the statutory construction of Section 1832, defendant continues in his unavailing argument that the attempt language contemplates only "inchoate" conduct. However, it is not unusual for an attempt to fail because of impossibility (the stolen information was not a trade secret) as opposed to unsuccessfully "stealing" or "possessing" (*i.e.* inchoate conduct). For example, in the narcotics context, a defendant can be convicted of attempting to possess cocaine even if he purchased a kilogram of flour if he believed the substance contained cocaine. *See United States v. Lange*, 312 F.3d 263, 263 (7th Cir. 2002) (noting similarity between person who intends to buy drugs but actually gets sugar, and person "walks out of his former company with a computer diskette full of engineering schematics" but actually gets the collected works of Shakespeare); *United States v. DeLeon*, 603 F.3d 397, 399 (7th Cir. 2010) (affirming sentence for attempt to possess with intent to distribute cocaine conviction when defendant purchase $100,000 worth of sham cocaine). As there is no ambiguity in the statute, defendant's invocation of the rule of lenity is misplaced.

Defendant also argues that the government's attempt theory should mean that the government would only charge attempt—and not substantive charges—to avoid what defendant characterizes as a heightened burden to prove the existence of a trade secret. If that were true, then the government would not have charged (and received convictions) on substantive charges in this case. Nevertheless, what defendant refers

to as "absurd" is in fact common as the attempt theory is a lesser-included offense to substantive charges, including Section 1832. *See, e.g.*, *United States v. Summit Refrigeration*, No. 05 CR 151, 2006 WL 3091115, at *5 (E.D. Wis. Oct. 26, 2006) (finding Counts that each charged both substantive and attempt charges under Section 1832 were proper and not duplicitous) (citing *United States v. Feinberg*, 89 F.3d 333, 339 (7th Cir. 1996) ("certain lesser included offenses, such as attempt . . . need not appear in the indictment") (citations and quotation omitted)). Indeed, the charges in *Summit Refrigeration* included both the attempt and substantive violations in each of Counts Two-Five, defeating defendant's conclusory argument that this charging theory is novel. *Id.* at *1-2. The Court properly instructed the jury on the attempt theory as to each Count of the indictment.

### 2. The Court Properly Instructed the Jury on the Elements for the Substantive Offenses

The elements jury instructions for the substantive offenses were proper. The Court correctly held that the government need not prove that defendant knew the information he stole was a trade secret, and instead instructed the jury that the government must prove beyond a reasonable doubt that "defendant knew or believed the Information constituting the trade secret was proprietary information, meaning belonging to someone else who had an exclusive right to it." Dkt. No. 113 at 21, 23, 25 (Element 6).

Defendant continues to improperly rely on *United States v. Jin*, 833 F.Supp.2d 911 (N.D. Ill. 2012) to support his position that the government must prove that

defendant knew what he stole was a trade secret. In *Jin* the court specifically held that the government was required to prove the defendant knew the stolen information had the *general attributes* of a trade secret for the Section 1831 economic espionage charges, not that the government had to prove defendant knew she had stolen a trade secret. *Id.* at 1013-14 (emphasis added). Nevertheless, the court in *Jin*, noted that Section 1832 was distinguishable from Section 1831 because it "requires knowledge of 'such information' instead of 'a trade secret,'" but did not ultimately decide this issue as it was unnecessary on the facts of that case. *Id.* at 1015.

A plain reading of the statutes highlight this distinction: Section 1831(a)(1) charges someone who knowingly "steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains a trade secret," while Section 1832(a)(1) charges someone who knowingly "steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information." 18 U.S.C. §§ 1831(a)(1), 1832(a)(1). Here, the Court correctly held that because the words "trade secret" do not follow the word "knowingly" in Section 1832, as they do in Section 1831, the government need not prove that defendant knew what he stole was a trade secret.

Defendant is correct that there is no clear answer in the jurisprudence as courts have used a range of jury instructions in Section 1832 cases. However, defendant attempts to overstate the support for his position by citing cases not on point. For example, the cited *Hsu* and *Krumrei* cases address the constitutionality of Section 1832, and not the knowledge element; while the court in *Nosal* rejected

6

defendant's argument that Section 1832 required the government to prove willfulness (that defendant knew he was doing something the law forbade) rather than knowledge, but did not specifically address the knowledge element of the crime. Dkt. No. 123 at 8 (citing *United States Krumrei*, 258 F.3d 535, 539 (6th Cir. 2010); *United States v. Nosal*, 2009 WL 981336, at *3 (N.D. Cal. Apr. 13, 2009); *United States v. Hsu*, 4 F.Supp.2d 623, 631 & n.8 (E.D. Pa. 1999)). Indeed, the Sixth Circuit in *Krumrei* held that Krumrei could not claim the statute was unconstitutional when he admitted "he knew the information was proprietary but that he sought to sell the information anyway, in order to profit personally, at the expense of the true owner of the information." *Krumrei*, 258 F.3d at 539. Defendant was not required to admit he knew the information at issue was a trade secret, only that it was proprietary, to meet the knowledge element of Section 1832. *Id.*

Finally, and contrary to defendant's argument, the substantive elements instruction did not lead to any jury confusion. Just as it was permissible for the jury to conclude that the government proved, beyond a reasonable doubt, that defendant reasonably believed Category 1 was a trade secret while simultaneously finding that Category 1 was not a trade secret; it was likewise permissible for the jury to conclude that the government proved, beyond a reasonable doubt, that Category 5 was a trade secret while simultaneously finding that defendant did not believe Category 5 was proprietary. These are not inconsistent verdicts.

The jury found that the Category 5 information met the three elements to show it was a trade secret, and that defendant believed the Category 5 information

exclusively belonged to Dura-Bar; but did not find the evidence was sufficient to show defendant reasonably believed the Category 5 information was a trade secret. The proof about whether certain information was a trade secret lie in the evidence supporting the elements of Section 1839, set forth in the "Definition of a Trade Secret" jury instruction (Dkt. No. 113 at 27), while the proof about defendant's belief or knowledge lie to in the evidence presented on that issue, such as his emails, statements to others, and actions, among other evidence. For these reasons, the Court properly instructed the jury on the elements for the substantive offenses.

### 3.    The Unique Combination Instruction Was Proper

The Court properly instructed the jury that a trade secret may be in the form of a unique combination. Dkt. No. 113 at p. 29. Defendant concedes that the instruction was a proper statement of law, but argues this instruction was improper on the evidence presented at trial. Ironically, the propriety of this instruction lie in part on defendant's evidence.

The unique combination instruction only applied to Category 2. The government argued that the Lab Reports were, independently and in combination, trade secrets. Defendant presented evidence that various pieces of information contained in the Lab Reports were in the public domain, including the testing methods and metallurgy, along with the fact that the customer-specific reports were shared with the relevant customers. The government's argument was that the Lab Reports were trade secrets, even if components of the Lab Reports were in the public

domain, because the unique combination of information contained in each Lab Reports and in the 667 aggregate Lab Reports were trade secrets. The jury agreed.

Defendant complains that the government improperly argued the volume of lab reports he stole, thus purportedly abrogating the government's obligation to prove that any one of the lab reports contained a trade secret. Defendant also complains that the Unique Combination instruction was incomplete because it did not include language instructing the jury that the information at issue must also meet the definition of a trade secret. These arguments show an inherent lack of faith in the jury's ability to follow instructions, which is not a basis for a new trial. *United States v. Hernandez*, 330 F.3d 964, 972–73 (7th Cir. 2003) (there is "an almost invariable assumption of the law that jurors follow their instructions") (citing *Richardson v. Marsh*, 481 U.S. 200, 206–07 (1987)); *United States v. Delatorre*, 581 F. Supp. 2d 968, 979 (N.D. Ill. 2008) (the fact that the jury returned a mixed verdict indicated the jury carefully considered the evidence). As instructed, the jury was required to find each Category contained at least one trade secret, and to unanimously agree on which particular information in each Category was a trade secret. Dkt. No. 113 at 28 (Unanimity on Trade Secret). This instruction alleviates any concern that the jury was misled into believing the lab reports were a trade secret under the Unique Combination instruction. Moreover, nothing in the Unique Combination instruction indicated it was to be considered in place of the Definition of Trade Secret instruction, which is why the additional language proposed by defendant was unnecessary. The Unique Combination instruction as given was proper.

9

### 4. The Unanimity Instruction Was Proper

The Court properly instructed the jury on unanimity. As detailed above, to find defendant guilty, the jury was required to find each Category contained at least one trade secret, and to unanimously agree on which particular information in each Category was a trade secret. Dkt. No. 113 at 28 (Unanimity on Trade Secret). The Court carefully considered each of defendant's proposals and ultimately crafted an elegant and simple solution to the question of unanimity.

Defendant's proposals were complicated and confusing. The given instruction cut through that confusion, while achieving the goal of requiring unanimity. Defendant's first proposal used eight lines to instruct the jury that they needed to unanimously agree that a particular piece of information was a trade secret, while the Court crafted a clear instruction in four lines that achieved the same purpose. Dkt. No. 75 at 86 (Defendant's Proposed Jury Instructions). The second proposal added a duplicative unanimity instruction within the elements instruction, which would have created more confusion and would nonetheless be duplicative of the given Unanimity Instruction. Dkt. No. 75 at 87. The third proposal suggested a special verdict form requiring the jury to identify exactly which document the jury unanimously agreed was a trade secret, which the Court correctly found to be cumbersome and unnecessary under the law. Dkt. No. 75 at 120-26. The Unanimity Instruction as given was proper.

### 5. The Government Presented Ample Evidence at Trial that Defendant Stole and Attempted to Steal Trade Secrets

The cumulative weight of the evidence presented at trial was more than sufficient to support the jury's verdict. As a result, defendant has not shown, and cannot show, that the evidence presented at trial preponderated heavily against the verdict such that it would be a miscarriage of justice to let the verdict stand.

Defendant's first argument that Dura-Bar was purportedly more concerned about losing its employee to a foreign competitor than with his theft of trade secrets is factually inaccurate and nevertheless irrelevant to defendant's liability to the charged offense. In support of his argument, defendant cites Anthony Guiterrez's September 16, 2015 text messages lamenting the risk of defendant's defection, and Lon Hollis's initial concerns about defendant's competition rather than any trade secrets. Defendant conveniently ignores the critical fact that these statements were made before they knew defendant had stolen trade secrets. Indeed, these conversations were had one day after defendant revealed *for the first time* his plans to move to China to work for the competitor Hualong, and thus *before* Dura-Bar and its employees learned that defendant had stolen over 1,900 documents from the secure Dura-Bar network on September 13, 2015. Nevertheless, Dura-Bar's concerns about defendant's defection as an employee are not germane to defendant's theft of Dura-Bar's trade secrets, particularly when those concerns were expressed before they even knew about the theft.

11

Defendant argues that the government failed to prove he had the requisite criminal intent to steal the trade secrets. Contrary to defendant's inaccurate recitation of the timeline, the evidence presented at trial overwhelmingly supported the conclusion that defendant intended to steal trade secrets.

Indeed, the evidence presented at trial was that defendant was anything but "forthcoming" with Dura-Bar. In December 2013, defendant began secret negotiations to join Hualong. Over the next close to two years, all while hiding his plans from Dura-Bar, defendant sent a litany of emails and letters to Hualong representatives demonstrating his true intent, which was to help Hualong improve its quality in order to compete directly with Dura-Bar in the U.S. and globally. On August 9, 2015, he signed an employment agreement with Hualong, which he failed to mention when he gave his resignation notice on August 12, 2015, and indeed never disclosed to anyone at Dura-Bar before his resignation on September 15, 2015. It was only after defendant had resigned, after having a drink at the bar with his Dura-Bar friends, and after Mr. Hollis indicated his surprise that defendant was not moving to China did defendant, for the first time, disclose his plans to work for Hualong in China. However, defendant did not mention that he had gone into Dura-Bar the prior Sunday and downloaded over 1,900 documents from Dura-Bar's secure network, which included the close to 700 Lab Reports and Alloy Experiment documents the jury concluded were trade secrets. The fact that defendant did not balk at Mr. Hollis's plan to tell defendant's bosses of his defection is hardly an indication that he did not have criminal intent. Instead, it revealed defendant's arrogance that he believed he

12

had already escaped detection for his actual crime, which was stealing Dura-Bar's trade secrets.

The jury concluded that Category 2 and Category 5 were trade secrets, and that defendant believed Category 1 and Category 2 were trade secrets. The government's experts provided credible and reliable testimony, which coupled with the other evidence presented at trial, supported the jury's verdict. Throughout the trial, defendant attempted to confuse the jury with bloated cross examinations involving reference to myriad materials of little relevance to the issues at hand. Despite these tactics, the jury correctly convicted defendant of seven counts of the indictment.

First, Joseph Richards testified clearly and credibly concerning the import of the run parameters contained in Category 1 to Dura-Bar's proprietary manufacturing process. He further explained that while the Category 1 document was no longer in use as the parameters were stored in an electronic database, many of the specific data points contained in that document were still accurate and relevant today. Indeed, he explained that having these Dura-Bar run parameters would be critical to a competitor seeking to learn Dura-Bar's proprietary process.

Brad Steinkamp likewise testified clearly and credibly concerning the import of the many lab experiments performed by his department, including the Category 2 and 5 documents to Dura-Bar's proprietary manufacturing process. Contrary to defendant's characterizations, Mr. Steinkamp's "demeanor" was that of an engineer, careful and precise in his responses. Defendant's attempts to contort the facts to serve

13

his argument are not availing. For example, defendant did not and cannot establish that Mr. Steinkamp's promotion was remotely linked to his testimony in this case, and at no time during the lengthy and meandering cross examination was Mr. Steinkamp impeached. With respect to the Category 5 documents, Mr. Steinkamp explained that he did not believe they would be of use to a competitor since a competitor would not have access to Dura-Bar's proprietary manufacturing process, and thus they would not understand the value of these documents. When permitted an opportunity to explain this answer, he expounded that if a competitor understood the Dura-Bar continuous cast iron manufacturing process, the Category 5 materials would be of value to a competitor. The jury agreed in finding the Category 5 materials were trade secrets.

Finally, neither engineer was asked to testify about Hualong's capabilities, thus their lack of exposure to Hualong's or any other competitor's facility had no impact on their testimony. Instead, their testimony was elicited to provide the jury with an understanding of Dura-Bar's proprietary manufacturing process, and the economic value of the specific material defendant stole. Their testimony on those subjects was clear and credible and thus supported the jury's verdict.

On the other hand, defendant's experts were not credible or reliable. Naomi Fine was a hired gun, paid $30,000 in order to provide her conclusory testimony that Dura-Bar did not employ reasonable security measures. However, Ms. Fine acknowledged that she had never visited Dura-Bar's facility, never interviewed even one Dura-Bar employee, and rendered her opinion based solely on information

14

provided to her by defense counsel. Indeed, she revealed her myopia when she complained about the lack of employee handbook trainings, later revealing she did not actually know that that there were such trainings, and in fact trainings for Dura-Bar hourly employees (the majority of its employees) was mandatory. More troubling is that Ms. Fine failed to tailor her opinion to Dura-Bar; thus failing to take into account Dura-Bar's long history as a close-knit and trusting family owned company, Dura-Bar's employee loyalty, and Dura-Bar's positon in the market—namely zero competition in North America.

John Keough's testimony was of no value to the jury. Mr. Keough admitted that he had no experience in the continuous cast iron industry, and had never even participated in making a continuous cast iron bar. He revealed his clear bias when he admitted his close friendship with defendant, and the critical fact that it was he, John Keough, who first introduced defendant to Hualong. Finally, and equally troubling, was Mr. Keough's reticence to admit that he was paid for his testimony and combative refusal to disclose how much he was paid. For these reasons, the jury correctly discounted Ms. Fine and Mr. Keough's unreliable, incredible, and paid testimony in rendering its verdict.

Because the Court did not commit any errors at trial that warrant a new trial, and the evidence presented at trial did not preponderate heavily against the verdict such that it would be a miscarriage of justice to let the verdict stand, this Court should deny defendant's Rule 33 motion.

15

**III.** **THIS COURT SHOULD DENY THE DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL BECAUSE THE EVIDENCE PRESENTED AT TRIAL IS SUFFICIENT TO SUSTAIN A CONVICTION**

**A.** **Legal Standard**

"A district court should grant a motion for a judgment of acquittal only when there is insufficient evidence to sustain a conviction." *United States v. Moses*, 513 F.3d 727, 733 (7th Cir. 2008). Evidence is insufficient to sustain a conviction when "no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See United States v. Orlando*, 819 F.3d 1016, 1021 (7th Cir. 2016). When considering a motion for a judgment of acquittal, courts view the evidence "in the light most favorable to the government" and do not "weigh the evidence or second-guess the jury's credibility determinations." *See United States v. Kruse*, 606 F.3d 404, 408 (7th Cir. 2010).

**B.** **Argument**

**1.** **The Evidence Presented at Trial Is Sufficient to Sustain a Conviction**

The government presented ample evidence that defendant attempted to possess Category 1 (Count 1), attempted to and did steal, download, and possess the Category 2 trade secrets (Counts 2-4), and did steal, download, and possess the Category 5 trade secrets (Counts 11-13), based upon the testimony of Dura-Bar employees, defendant's friends and family, and law enforcement witnesses, along with significant documentary evidence..

First, the government presented testimony from two Dura-Bar engineers who explained Dura-Bar's proprietary manufacturing process and the purpose and value

16

of the stolen trade secrets. Both witnesses explained their experiences as long-term employees of Dura-Bar, including the familial and trusting culture of the company, and the fact that they would never share any of Dura-Bar's proprietary manufacturing process with anyone outside of the company, let alone a competitor.

Mr. Richards explained the nature and purpose of the continuous cast iron bar, how it is engineered and manufactured, and how Dura-Bar's process has been developed and refined over decades into a unique and proprietary process that results in a very high quality bar. He explained that there are three critical parts to Dura-Bar's proprietary process. First, the design of its manufacturing system, including the crucible and cooling die. Second, the run parameters for each type of bar—based on metal composition, diameter, and length—such as the heating and cooling temperatures and stroke length. Third, the laboratory analyses, which ensure the customized products are consistently of a superior quality; identify defects, causes, and potential solutions; and test the viability of future products. He further explained how Dura-Bar's engineers use a data-driven system to continuously perfect the processes in order to continue to achieve the high quality expected by Dura-Bar's customers.

Finally, he explained the value and purpose of the Category 1 document, namely that it outlined Dura-Bar's start up procedures and run parameters for a range of Dura-Bar products; which is the second the three parts critical to Dura-Bar's process. More specifically, he explained that while the Category 1 document was no longer in use because the information is now stored in an electronic database, much

of the data is still in use today. More critically, he explained that a competitor could use the contents of the Category 1 document to recreate Dura-Bar's proprietary process from 1993, which would be valuable to a competitor behind in the technology and be a pathway to understanding Dura-Bar's current process.

Mr. Steinkamp testified about the last of the three parts critical to Dura-Bar's process, the laboratory analysis, which as explained above, are essential to maintain superior quality, resolving defects, and testing new products. He explained a range of different lab experiments performed in furtherance of these goals, including the experiments documented in the Category 2 trade secrets, and the Category 5 trade secrets. With respect to Category 2, he explained the tests performed for a range of specific Lab Reports, including experiments done for the research and development of new products; along with experiments done to identify defects, causes, and potential solutions for current products. With respect to Category 5, he explained that the experiments were performed to test different inoculations in order to reduce defects in the alloy composition, thus ultimately providing significant value and intelligence to Dura-Bar on what would and would not work in their efforts to improve the product quality.

The testimony of these expert witnesses provided sufficient evidence on which a rational jury could find that (1) the Category 2 and 5 materials were not generally known or readily ascertainable, derived economic value to Dura-Bar by not being publicly known, and would have economic value to a competitor, such as Hualong; and (2) defendant reasonably believed the Category 1 and 2 materials were not

18

generally known or readily ascertainable, derived economic value to Dura-Bar by not being publicly known, and would have economic value to a competitor, such as Hualong.

The government also presented testimony and evidence of defendant's 30-year history as a Dura-Bar employee, post-acquisition devolution into a disgruntled employee, and recruitment by Hualong. Frank Abruzzo, defendant's supervisor for the majority of his career at Dura-Bar, testified about defendant's exceptional skill and talent as a Dura-Bar salesman, and his affinity for China. Abruzzo explained the history of Dura-Bar's failed joint venture negotiations with Hualong due to Hualong's low quality product and underdeveloped manufacturing facilities, along with his opinion that Hualong was not in a position to compete with Dura-Bar in the U.S. in light of its poor quality product and lack of a local distribution network.

Defendant's ex-wife then explained the evolution of Hualong's recruitment of defendant beginning in December 2013, including the many meetings at which defendant discussed his goals of improving Hualong's product quality and testing laboratory. She also explained a series of text messages she exchanged with defendant in February 2015 (over a year after he began his secret negotiations with Hualong), during which defendant expressed his significant dissatisfaction with Charter after its acquisition of Dura-Bar, including that he was "planning a huge fuck over for Charter," and about "the damage" he could "potentially do to the [Dura-Bar] business." Notably, both of these witnesses' testimony revealed defendant's consciousness of guilty when he lied to them about what he stole from Dura-Bar,

19

having told Mr. Abruzzo that he took materials that were publicly available on the company website, and Ms. O'Rourke that Dura-Bar lost one of two thumb drives containing presentation materials he provided Dura-Bar on his last day. The testimony of these witnesses and associated evidence provided a sufficient basis on which a rational jury could find that defendant intended to convert the trade secrets to the economic benefit of himself and Hualong, and that he intended for his offense to injure Dura-Bar.

The government presented evidence from additional Dura-Bar employees, each of whom echoed the fact of Dura-Bar's familial culture of trust and loyalty. Lon Hollis, walked the jury through the policies and procedures in place at Dura-Bar governing employee conduct regarding Dura-Bar's confidential information, along with the agreements entered with departing employees and employees at Dura-Bar's facility in China, which required employees to return all Dura-Bar material and keep confidential Dura-Bar confidential information and trade secrets. He also explained the employment contracts between Dura-Bar and defendant, in which defendant agreed that upon his departure, he would return all Dura-Bar materials to Dura-Bar, including any "confidential information," or "trade secrets." Indeed, as part of the 2012 Retention Agreement, defendant was paid $127,000 for his compliance with that agreement, including working for Dura-Bar through December 2014, which he did while negotiating his future employment with Hualong.

Mr. Hollis and former employee Lindsay Olson both explained that during employee exit interviews, employees were asked to confirm that they had returned

all Dura-Bar material. Ms. Olson testified about defendant's exit interview, during which defendant stated he was considering taking a job at a steel company she knew was located in North Carolina; but that he never revealed that he had already signed an employment agreement with Hualong and was planning to travel to China the following Monday, or that he stole over 1,900 documents from Dura-Bar's secure network only two days prior to the exit interview. Mr. Hollis also testified about his long friendship with defendant, which culminated in him and a few others taking defendant out for a drink to wish him well after his resignation. He made clear his shock and disappointment at learning, for the first time at the bar, of defendant's plans to move to China to work for the competitor company Hualong.

Anthony Guiterrez, testified about Dura-Bar's significant success in the U.S. and global continuous cast iron market, including the Dura-Bar's over 90% market share because it is the only continuous cast iron manufacturer in North America. He explained the timeline of defendant's notice and resignation from Dura-Bar, that defendant never revealed his plans to move to China to work for Hualong, that in fact defendant stated he intended to take time off to spend time with his elderly parents. Adam Krause testified about Dura-Bar's physical security, including when and how the facility could be accessed by employees or visitors, the surveillance cameras, and security guards; along with the information technology security, including the network firewalls and restricted access to Dura-Bar's computers and secure network.

The testimony of these witnesses and associated evidence, including the policies, contracts, physical and technical security, nature of the business, and culture

of the organization, provided a sufficient basis on which a rational jury could find that Dura-Bar used reasonable security measures to protect its trade secrets (from both outside and inside threats) and that defendant believed that Dura-Bar's security measures were reasonable. In addition, defendant's breach of his employment agreement by stealing Dura-Bar material, and lies about his plans to work for Hualong, were evidence sufficient for a reasonable jury to find the trade secrets had economic value, defendant's reasonable belief that the trade secrets were valuable to Dura-Bar and would be valuable to a competitor, and defendant's intent to convert the trade secrets to the economic benefit of himself and Hualong and to injure Dura-Bar.

The government also presented evidence of the timeline of defendant's theft from Dura-Bar through the seizure of the stolen trade secrets from his luggage at the airport on September 21, 2015. More specifically, the jury heard and saw evidence that on August 9, 2015, defendant signed an employment agreement with Hualong in which he was hired as the Vice President of Technology, Quality, and Research & Development for Hualong (a title he did not have at Dura-Bar), and with a higher salary than what he received at Dura-Bar; on August 12, 2015, defendant gave notice of his intent to resign from Dura-Bar to Anthony Guiterrez (without revealing his intent to work at Hualong); on September 13, 2015, a Sunday, defendant used his key to enter the Dura-Bar facility, logged into the secure Dura-Bar network with his employee credentials, and downloaded over 1,900 documents from the secure Dura-Bar network to his personal hard drive; on September 15, 2015, defendant went to

the above-referenced exit interview (when he lied about his post-resignation plans) and drinks with colleagues (when he finally revealed his true plans); and on September 21, 2015, defendant went to the airport with the Category 1-5 materials in his luggage with the intent to bring them with him on his flight to China. While at the airport, he made an unsolicited comment that the "trade secrets" were backed up at home, indicating he knew he was in possession of Dura-Bar trade secrets while at the airport. This timeline of events, particularly with respect to his lies, was sufficient evidence on which a rational jury could find that defendant knew and reasonably believed the economic value of the trade secrets to Dura-Bar and a competitor, intended to convert Dura-Bar trade secrets to the benefit of himself and Hualong, and intended to injure Dura-Bar.

Finally, the evidence of defendant's malicious thoughts, plans, and intentions were fully documented in his emails, letters, and text messages. The government presented page after page of defendant's writings, which clearly and plainly detailed his frustration with Dura-Bar after he was passed over for a promotion he believed he deserved, his low opinion of the Charter executives that took the reins of Dura-Bar post-acquisition, his plans to stay at Charter Dura-Bar long enough to collect his $127,000 retention bonus, his negotiations with Hualong to obtain the title and salary he did not get at Dura-Bar, his opinion that Hualong needed to improve its quality and laboratory testing facility in order to compete in the U.S. marketplace, his efforts to help Hualong create viable marketing material for their U.S.-based entity H-Bar, and his promises to Hualong to improve their quality in order to compete directly

with Dura-Bar in the U.S. By his own words, defendant revealed evidence sufficient for a rational jury to conclude that defendant knew and/or reasonably believed what he stole were trade secrets, that he intended to convert those trade secrets to the benefit of himself and Hualong, and that he intended to injure Dura-Bar.

Based upon all of this evidence, a rational trier of fact could conclude that the defendant attempted to and/or did possess, steal, and download the Category 1, 2, and 5 trade secrets. This is particularly true when viewed in the light most favorable to the government. Accordingly, this Court should deny defendant's Rule 29(c) motion for a judgment of acquittal.

### 2.    Defendant's Arguments Are Unavailing

Defendant argues that the evidence at trial was insufficient to sustain a conviction because the government failed to prove beyond a reasonable doubt that Dura-Bar implement reasonable security measures, that defendant reasonably believed Category 1 or 2 had independent economic value, that Categories 2 or 5 had independent  economic value, that defendant intended to convert Categories 1, 2, or 5 to the benefit of Hualong, or that defendant intended to injury Dura-Bar. Defendant's arguments fail based upon all of the facts detailed above and for the reasons stated below.

### a.    Dura-Bar Employed Reasonable Security Measures

First, the evidence that Dura-Bar employed reasonable security measures was clear.  The law does not require perfect security measures, but reasonable security measures, which must be analyzed under the circumstances. The litany of Dura-Bar's

security measures, taking into account the fact that Dura-Bar is a small company based in a rural town, enjoying a trusting and loyal culture and zero competition in the U.S., were reasonable. Nevertheless, defendant's recitation of the security measures is factually inaccurate based upon the testimony at trial.

For example, the lack of confidentiality stamps was of no moment as every Dura-Bar employee to testify made clear they understood the confidential and proprietary nature of the relevant documents, that they would never share that information with a competitor, that they did not need a stamp or log to tell them what was important or confidential. The share drive access was appropriate based upon how Dura-Bar functioned. The information contained in the F-drive was restricted access by department, while information contained in the S-drive was restricted to employees with computer access but needed by multiple departments.

Dura-Bar implemented the use of non-disclosure agreements with certain employees with great sadness and reticence (per Tom Wells' email) because of the defection by an employee in 2002. However, in order to avoid disrupting the trusting and loyal culture, the NDAs were only put in place with customer-facing employees, such as defendant, who posed the greatest risk of joining a competitor. Employees at Dura-Bar typically stayed for their careers, as evidenced by the 20-30 year employees that testified. This is a precise example of how security measures must take into account a company's history and culture. All employees were offered training on the employee manual (which governed confidential materials), which was *mandatory* for the hourly employees. Dura-Bar did not need NDAs for departing employees because

they, like the current and former employees that testified, would not even consider stealing from Dura-Bar to benefit a competitor.

Dura-Bar permitted employees to use remote access and portable electronic devices in order to more efficiently perform their work on behalf of Dura-Bar, which is a business. Security measures cannot be so strict as to protect a company out of being successful or profitable, particularly as Dura-Bar was historically able to trust its employees' loyalty to the company. Tours of the facility were always escorted and limited in scope, and photographs were not permitted of areas or documents containing confidential information. Lab reports shared with distributors were governed by contracts restricting the disclosure of confidential Dura-Bar information. In aggregate, taking the evidence in the light most favorable to the government, a rational jury could find that the security measures implemented at Dura-Bar were reasonable.

### b. Categories 1, 2, and 5 had Economic Value

The evidence was likewise clear that defendant reasonably believed Categories 1 and 2 had independent economic value, and that Categories 2 and 5 had independent economic value, based upon the testimony of the Dura-Bar engineers, and defendant's own words and actions. Defendant reasonably believed the Category 1 run parameters were valuable because he kept them for decades, affirmatively chose to pack them in his bag before *moving* to China, and did so because he knew that 20-year old Dura-Bar's run parameters would be exactly what a company 20-years behind in the technology (defendant's own words), such as Hualong, needed.

Category 2 and 5 had independent economic value, and defendant reasonably believed Category 2 had independent economic value for the following reasons: (1) Mr. Steinkamp explained the purpose of the experiments documented in Categories 2 and 5 in order to achieve the goals of developing new products and improving the quality of current products, all of which was critical to Dura-Bar's success in the market; (2) none of the 667 Lab Reports are publicly available anywhere; (3) defendant repeatedly highlighted Hualong's need to improve its lab during meetings and in emails and letters; (4) defendant promised Hualong that he would improve its product quality and testing when he joined the company, which he promise he needed to keep in order to justify his new title and higher salary; (5) defendant stole; and (6) defendant lied. Indeed, if defendant really did not believe this information was valuable, then he would have been honest about his plans to join Hualong and he would have asked Dura-Bar for permission to bring the entire contents of the Lab Report Database with him. He did not do that. Instead, he stole Category 2 and 5 two days before he resigned, lied about his plans for close to 2 years, and lied about what he stole after he was caught. Defendant fully understood the value of the material he stole.

Defendant also argues that Hualong could have recreated Categories 2 and 5 by purchasing Dura-Bar products and running the same tests performed by Mr. Steinkamp and his team. It would be absurd to conclude the 667 Lab Reports and 25 Alloy Experiment Data have no economic value because Hualong could have spent *hundreds of thousands of dollars* in resources, time, and money to recreate what

27

defendant stole in less than *20 minutes*. Based upon the evidence presented at trial, and taken in the light most favorable to the government, a rational jury could conclude that Categories 2 and 5 had independent economic value, and that defendant reasonably believed the Category 1 and 2 materials had economic value.

### c. Defendant Intended to Convert the Trade Secrets to the Benefit of Hualong and to Injure Dura-Bar

The evidence defendant intended to convert Categories 1, 2, and 5 to the benefit of Hualong and injure Dura-Bar was clear from defendant's own words and actions, including all of his plans to improve Hualong's product quality, compete directly with Dura-Bar in the U.S., and do "damage" to Dura-Bar.

Defendant makes much of the fact that the government did not produce evidence of Hualong's knowledge or participation in defendant's offense conduct. Hualong's knowledge and intent is not an element of the crime and is irrelevant. Indeed, the fact that defendant did not explicitly tell Hualong in his emails what he was stealing, and that Hualong was savvy enough to document its prohibition on defendant stealing anything from Dura-Bar in order to protect itself from liability, has no bearing on defendant's intent. If defendant did not intend to benefit Hualong and injure Dura-Bar, he would not have engaged in this offense conduct. He would not have stolen. He would not have lied. But he did steal. He did lie. He lied for years. He lied to every one of his fellow Dura-Bar colleagues. He lied to his 30-year employer. He lied to his family. He lied to his friends. Based upon the evidence presented at trial, and taken in the light most favorable to the government, a rational jury could

28

conclude that defendant intended to convert Categories 1, 2, and 5 and to the benefit of Hualong and to injure Dura-Bar.

### 3.    The Counts Were Not Multiplicitous

The counts of conviction are not multiplicitous. Defendant raises for the first time in his post-trial motion that the charges contained in Counts 2-4 and 11-13 in the indictment were multiplicitous. More specifically, defendant argues that charging various execution theories for the same trade secrets results in improper multiplicity.

"An indictment is multiplicitous when it charges the same defendant with the same offense in several different counts." *Summit Refrigeration*, 2006 WL 3091115, at *6 (citing *United States v. Song*, 934 F.2d 105, 108 (7th Cir. 1991)). An indictment is improperly multiplicitous when "the indictment exposes a defendant to the threat of receiving multiple punishment for the same offense." *Song*, 934 F.2d at 108 (citations omitted). "The determination is made by means of statutory construction." *Summit Refrigeration*, 2006 WL 3091115, at *6. To the extent the statutory construction test is inconclusive, then "the test to be employed is whether each count requires proof of a fact which the other does not." *Id.*

The court in *Summit Refrigeration*, held that "the plain language of 18 U.S.C. § 1832 does not [ ] suggest that Congress intended that there by just one penalty for violating any one or more of the subsections contained therein . . . the plain language suggests that more than one penalty can be imposed." *Id.* The statutory construction test is conclusive and the conviction here is not multiplicitous.

Nevertheless, each count required a proof of fact that the other did not. Defendant was convicted of stealing, downloading, and possessing each of the Category 2 and 5 trade secrets in violation of each of Sections 1832(a)(1), (2), and (3). The facts supporting each execution were different. Defendant downloaded Categories 2 and 5 from the Dura-Bar secure network to his external hard drive on September 13, 2015, from approximately 9:30 a.m. to 9:47 a.m. Defendant stole, without Dura-Bar's authorization, Categories 2 and 5 on September 13, 2015, at approximately 10:02 a.m., when he exited the Dura-Bar facility and drove away with this stolen material. Defendant possessed Categories 2 and 5 on September 21, 2015, at O'Hare airport in his luggage before the materials were seized by law enforcement. In other words, the facts required to prove the separate downloading, stealing, and possessing were different and not required for the other charges. Accordingly, the charges in Counts 2-4 (Category 2) and 11-13 (Category 5) were not multiplicitous.

## IV. CONCLUSION

For the foregoing reasons, the government respectfully requests this Court deny defendant's Rule 33 Motion for a New Trial and Rule 29(c) Motion for Judgment of Acquittal.

Respectfully submitted,
JOHN R. LAUSCH, JR.
United States Attorney

By:    /s/ *Shoba Pillay*
SHOBA PILLAY
Assistant United States Attorneys
219 South Dearborn Street 5th Floor
Chicago, Illinois 60604