## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES | ) | Case No. 17 CR 495 |
| | ) | |
| v. | ) | Judge Andrea R. Wood |
| | ) | |
| ROBERT O'ROURKE | ) | |

### DEFENDANT'S REPLY IN SUPPORT OF
### RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL

Respectfully Submitted,

KULWIN, MASCIOPINTO & KULWIN, LLP

By: _/s/ Anthony J. Masciopinto_
    One of Defendant's Attorneys

Anthony J. Masciopinto & Rachel A. Katz
Kulwin, Masciopinto & Kulwin, LLP.
161 N. Clark Street, Suite #2500
Chicago, Illinois 60601
T: 312.641.0300; F: 312.855.0350
amasciopinto@kmklawllp.com
rkatz@kmklawllp.com

# TABLE OF CONTENTS
### *United States v. O'Rourke*, Case No. 17 CR 495

I.   INTRODUCTION ..........................................................................................................1

II.  ACQUITTAL IS REQUIRED ON ALL COUNTS OF CONVICTION .................................2

    A.  The Government Failed to Prove Beyond a Reasonable Doubt That The Lab Reports (Count 2-4) or Alloy Experiment Reports (Count 11-13) Were "Trade Secrets" Or That O'Rourke "Reasonably Believed" The 1993 Document (Count I) Or Lab Reports (Counts 2-4) To Be The Same ..........................................................................................2

        1.  The Government Failed to Prove Beyond a Reasonable Doubt That Dura-Bar Took Reasonable Measures to Maintain the Secrecy of the Information ..............................3

        2.  The Government Failed to Prove Beyond a Reasonable Doubt The Other Definitional Elements of "Trade Secret" Under the EEA..................................................9

            a.  The Government Failed to Prove Beyond a Reasonable Doubt That The    Lab Reports Information (Counts 2-4) Was Not Generally Known Or Ascertainable By The Public Or Was Of Economic Value To A Competitor (or That O'Rourke Reasonably Believed the Same As To This Information)…...……………………..10

            b.  The Government Failed To Prove Beyond A Reasonable Doubt That The Alloy Experiment Data Reports (Counts 11-13), If Known, Would Provide Economic Value To A Third Party…………………………………………………………….13

            c.  The Government Failed To Prove Beyond A Reasonable Doubt That O'Rourke Reasonably Believed The 1993 Document (Count 1) Information    Was Not Generally Known Or Readily Ascertainable, Or, If Known, Would Provide Economic Value To A Third Party…………………………………………….14

    B.  The Government Failed To Prove Beyond a Reasonable Doubt That O'Rourke Intended to Covert the Information At Issue For the Economic Benefit of Someone Other Than Dura-Bar Or That O'Rourke Intended to Injure Dura-Bar ........................................................17

III. ALTERNATIVELY, THE COURT MUST VACATE MULTIPLICITOUS COUNTS………………………………………………………………………………20

IV. CONCLUSION………………………………………..…………………………………..23

## TABLE OF AUTHORITIES
*United States v. O'Rourke*, Case No. 17 CR 495

**Federal Cases**                                                    **Pages**

*BDT Prods., Ltd. v. Lexmark Int'l, Inc.*
274 F.Supp.2d 880 (E.D. Ky. 2003) ........................................................ 11

*Bell v. U.S.*
349 U.S. 81 (1955) ................................................................................. 22

*CMBB LLC v. Lockwood Mfg., Inc.*
628 F.Supp.2d 881 (N.D. Ill. 2009) ......................................................... 6

*Cumulus Radio Corp. v. Olson*
80 F.Supp.3d 900 (C.D. Ill. 2015) ............................................................ 8

*EarthCam, Inc. v. OxBlue Corp.*
49 F.Supp.3d 1210 (N.D. Ga. 2014) ...................................................... 11

*Hamer Holding Grp., Inc. v. Elmore*
202 Ill.App.3d 994 (1st Dist. 1990) ....................................................... 12

*Incase Inc. v. Timex Corp.*
488 F.3d 46 (1st Cir. 2007) ...................................................................... 5

*Jackson v. Virginia*
433 U.S. 307 (1979) .................................................................................. 1

*Maxpower Corp. v. Abraham*
557 F.Supp.2d 955 (W.D. Wis. 2008) ....................................................... 5

*Opus Fund Servs. (USA) LLC v. Theorem Fund Servs. LLC*
17-cv-923, 2018 WL 1156246 (N.D. Ill. Mar. 5, 2018) ............................ 8

*Piakowski v. Bett*
256 F.3d 687 (7th Cir. 2001) .............................................................. 1, 16

*Sanabria v. U.S.*
437 U.S. 54 (1978) ................................................................................. 21

*Smart & Assocs., LLC v. Indep. Liquor (NZ) Ltd.*
226 F.Supp.3d 828 (W.D. Ky. 2016) ...................................................... 10

*U.S. v. Cureton*
739 F.3d 1032 (7th Cir. 2014) ............................................................... 21

*U.S. v. Elashyi*
554 F.3d 480 (5th Cir. 2008) ............................................................................... 15, 18

*U.S. v. Garcia*
919 F.3d 489 (7th Cir. 2019) ........................................................................ 1, 3, 9, 16

*U.S. v. Hanjuan Jin*
833 F.Supp.2d 977 (2011) ................................................................................... 16

*U.S. v. Harris*
942 F.2d 1125 (7th Cir. 1991). .............................................................................. 1

*U.S. v. Johnson*
592 F.3d 749 (7th Cir. 2010) ............................................................................. 15, 18

*U.S. v. Jones*
713 F.3d 336 (7th Cir. 2013) ............................................................................... 11

*U.S. v. Kimbrough*
69 F.3d 723 (5th Cir. 1995) ................................................................................ 21

*U.S. v. Lovern*
590 F.3d 1095 (10th Cir.2009) ......................................................................... 15, 18

*U.S. v. Marbella*
73 F.3d 1508 (9th Cir. 1996) ................................................................................ 21

*U.S. v. McLaughlin*
164 F.3d 1 (D.C. Cir. 1998) ................................................................................. 21

*U.S. v. Munoz-Romo*
989 F.2d 757 (5th Cir. 1993) ............................................................................... 21

*U.S. v. Ravel*
930 F.2d 721 (9th Cir. 1990) ............................................................................... 20

*U.S. v. Sing*
No. 2:14 CR 00212 (C.D. Cal. Aug. 32, 2015)................................................... 21, 22

*U.S. v. Summit Refrigeration Grp.*
2006 WL 3091115 (E.D. Wis. Oct. 26, 2006) ...................................................... 22

*Unisource Worldwide, Inc. v. Carrara*
244 F.Supp.2d 977 (C.D. Ill. 2003) ...................................................................... 10

Defendant, Robert O'Rourke ("O'Rourke"), by his attorneys, Kulwin, Masciopinto & Kulwin, LLP, respectfully submits this reply in support of his Rule 29(c) motion for judgment of acquittal on the jury's verdict on Count 1 (1993 document attempt charge), Counts 2-4 (lab reports attempt and substantive charges) and Counts 11-13 (alloy experiment data substantive charges).

## I.  __INTRODUCTION__

Nothing in the government's response (Dkt. 135) undermines the conclusion that O'Rourke is entitled to a judgment of acquittal on all counts of conviction. Dkt. 112 (10 counts of conviction; 16 counts of acquittal). For these ten charges, the government's evidence fell seriously short of proving beyond a reasonable doubt each element of a criminal trade secret violation under 18 U.S.C. §1832.  Dkt. 125.  Indeed, the government's response confirms that the jury convicted on mere speculation, conjecture, and in contravention of the very purpose of the Economic Espionage Act (EEA) and cases that interpret it.

In the context of this acquittal motion, this Court must determine whether a reasonable jury could have found O'Rourke guilty beyond a reasonable doubt. The reasonable doubt standard requires a "'quantum and quality of proof' that permits a judge to 'distinguish between criminal and civil cases.'" *U.S. v. Garcia*, 919 F.3d 489, 497 (7th Cir. 2019) (quoting *Jackson v. Virginia*, 433 U.S. 307, 318, n.11 (1979)). A court must reverse a conviction that is "based solely upon the piling of inference upon inference." *U.S. v. Harris*, 942 F.2d 1125, 1129 (7th Cir. 1991). A strong suspicion that a defendant committed a crime is no substitute for proof of guilt beyond a reasonable doubt. *Piakowski v. Bett*, 256 F.3d 687, 692 (7th Cir. 2001). Here, while the government's evidence may have been sufficient to expose O'Rourke to possible civil liability for breach of contract, the evidence was not sufficient to establish criminal guilt under the EEA, where O'Rourke's life and civil liberties are at stake. *Garcia*, 919 F.3d at 497 ("the judge is [] responsible for enforcing outer

limits on reasonable inferences, guided by the relevant standard of proof"). Accordingly, this Court should acquit O'Rourke on Count 1 (1993 document attempt charge), Counts 2-4 (lab reports attempt and substantive charges) and Counts 11-13 (alloy experiment data substantive charges).

## II.  ACQUITTAL IS REQUIRED ON ALL COUNTS OF CONVICTION

**A.      The Government Failed To Prove Beyond A Reasonable Doubt That The Lab Reports (Count 2-4) or Alloy Experiment Reports (Count 11-13) Were "Trade Secrets" Or That O'Rourke "Reasonably Believed" The 1993 Document (Count 1) Or Lab Reports (Counts 2-4) To Be The Same.**

This Court must enter judgment of acquittal on Counts 1, 2-4, and 11-13 because the government did not prove beyond a reasonable doubt that the 1993 document, the lab reports, or the alloy experiment reports were "trade secrets" under the EEA or that O'Rourke "reasonably believed" them to be "trade secrets." The EEA gives rise to criminal liability only if the information at issue qualifies as a "trade secret" (and/or, for this case's "attempt" charges, where defendant "reasonably believed" the information to be a "trade secret").

The EEA precisely defines "trade secret," a definition that the government never satisfied beyond a reasonable doubt. Per the EEA, not all business knowledge is a "trade secret," not all proprietary information is a "trade secret," and not everything generally "valuable" to a company is a "trade secret." Rather, to prove a "trade secret" under the EEA, the government here had to prove beyond a reasonable doubt: (1) that Dura-Bar took "reasonable measures to keep [the information at issue] secret"; (2) the information at issue was "not generally known or readily ascertainable through proper means by the public"; and (3) the information at issue "derived independent economic value . . . from not being generally known or readily ascertainable through proper means" by another person "who could obtain economic value from the disclosure or use of the information." 18 U.S.C. §1839. Because the government did not prove these elements beyond a reasonable doubt, the Court must enter judgment of acquittal on Counts 1, 2-4, and 11-13.

2

1.    **The Government Failed to Prove Beyond a Reasonable Doubt That Dura-Bar Took "Reasonable Measures to Maintain the Secrecy" of the Information.**

As a matter of factual evidence and law, the government failed to prove beyond a reasonable doubt that Dura-Bar undertook "reasonable measures to maintain the secrecy" of the information at issue. O'Rourke presented unrebutted expert testimony on the topic, which was compelling and credible by a nationally renowned expert, Naomi Fine. Moreover, O'Rourke presented evidence of at least 15 separate security measures that Dura-Bar easily could have adopted (and which companies routinely employ) that Dura-Bar failed to employ for no good reason. *See generally*, Dkt. 125, p.15-17, 33-34 (identifying minimal baseline security measures that Dura-Bar failed to employ or employed but affirmatively refused to follow for the information at issue). Under such circumstances, this Court must acquit O'Rourke on each of the counts of conviction. *Garcia*, 919 F.3d at 491 ("If the evidence ***would not allow a civil case to survive a motion for summary judgment or a directed verdict***, then the case has ***no business being given to a jury*** in a criminal trial") (emphasis added).

The government's response ignores many of O'Rourke's proffered reasonable security measures to maintain secrecy, thereby seemingly conceding the reasonable nature of these proffered measures. For instance, the government's response does not address Dura-Bar's failure to: (1) provide written/oral communications to employees as to what information Dura-Bar considered to be confidential, sensitive, proprietary or trade secret; (2) comply with its own 2014 Employee Manual that required Dura-Bar confidential information to be labeled and restricted on a need to know basis; (3) employ software security features to block employees from remotely accessing and saving to personal devices the information at issue; (4) employ software security measures to detect when its employees used laptops and/or personal devices to access and copy the information at issue; (5) require compliance with its own portable memory device policy; (6)

3

require departing employees, as a matter of practice, to return all external memory devices; (7) implement two factored password protection policies; (8) require the actual use of Exit Interview Checklist Form (DX A-20); or (9) prohibit competitors from taking pictures of Dura-Bar's foundry. Dkt. 125, p.15-17. For these reasons alone, acquittal is proper on all counts of conviction.

The government's disingenuous characterization of Dura-Bar as some type of "mom and pop" operation to try to justify Dura-Bar's lack of reasonable security measures is a telling admission and should be rejected. Dkt. 135, p.24 (arguing Dura-Bar was "a small company based in a rural town, enjoying a trusting and loyal culture"). In reality, during the time in question, Dura-Bar employed between 250 and 350 employees. Moreover, Dura-Bar was, and is, the world's largest producer of continuous cast iron bar products, serving over 3,000 global customers[1]. Since 2012, Dura-Bar's annual sales totaled approximately $100 million. In 2015, Charter Mfg., inclusive of all its divisions and subsidiaries, including Dura-Bar, earned over $1 billion in sales.[2]

Furthermore, the unrebutted testimony was that Dura-Bar did not have a "trusting and loyal culture" for its 300 or so employees (many of whom did not know each other). Rather, Dura-Bar locked up vendor gifts, locked up HR documents, and segregated sensitive electronic information on a restricted computer network drive. Moreover, in 2015, Dura-Bar started marking certain documents as "confidential," although not making as confidential any of the information at issue here. Accordingly, Dura-Bar's nominal security measures – like locking its I.T. server room and requiring passwords and user names – were unreasonable because they amounted to nothing but basic measures typical to any company regardless of whether the company used "trade secrets." *E.g., Maxpower Corp. v. Abraham*, 557 F.Supp.2d 955 (W.D. Wis. 2008) (It is not enough simply to restrict access to facility and require passwords; these are normal business practices in any

---

[1] *See* https://www.charterdura-bar.com/about.
[2] *See* https://www.owler.com/company/chartermfg.

4

business. An employer must use additional measures to protect the confidentiality of information he considers to be a trade secret); *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 53 (1st Cir. 2007) ("The fact that [plaintiff] kept its work [] private from the world is not sufficient; discretion is a normal feature of a business relationship).

The Court also should reject the government's claim that reasonable security measures for the information at issue would somehow debilitate Dura-Bar's business. Dkt. 135, p.30. This argument is a red herring. O'Rourke never suggested, through Naomi Fine or any other witness or evidence, that Dura-Bar had to implement extraordinary security measures that could impede Dura-Bar's business, efficiency, or profit. To the contrary, O'Rourke advocated "reasonable" security measures, such as labeling confidential materials, using restricted computer networks, employing technology safeguards, requiring NDAs for all implicated employees and third parties, and providing employee training on confidentiality expectations. Furthermore, the government certainly did not introduce any evidence (only speculative and factually baseless arguments) that any one of O'Rourke's proffered reasonable security measures would unduly interfere with Dura-Bar's ability to run its business.

This Court also should reject the government's conclusory argument that Dura-Bar somehow did not have to employ reasonable security measures because its hundreds of employees all understood the confidential and proprietary nature of the information at issue. Dkt. 135, p.29. First, the government's argument is again an admission that Dura-Bar *did not* employ reasonable measures to maintain the secrecy of the information at issue, which is the death knell under §1832.

Second, the government's position here is wrong as a matter of law. Dura-Bar cannot rely solely on notions of trust and loyalty and run of the mill security for protecting alleged "trade secrets." *E.g., Maxpower Corp.,* 557 F.Supp.2d at 955 (It is not enough simply to restrict access

to facility and require passwords; these are normal business practices in any business. An employer must use additional measures to protect the confidentiality of information he considers to be a trade secret); *Incase Inc.*, 488 F.3d at 53 ("The fact that [plaintiff] kept its work [] private from the world is not sufficient; discretion is a normal feature of a business relationship. Instead, there must be affirmative steps to preserve the secrecy of the information as against the party against whom the misappropriation claim is made.").

Indeed, to be entitled to trade secret protection under the EEA, a company *must take affirmative steps* to protect the information it maintains is a trade secret. *See* Dkt. 125, p.13-15 (citing cases where courts have held evidence insufficient to establish company took reasonable measures to keep its information confidential where company did not label information confidential, did not convey to its employees information was confidential, and did not apply established policies and procedures to safeguard information). By failing to address even one of these 20 plus cases cited by O'Rourke, the government concedes their applicability. Accordingly, Dura-Bar's "trust" that its employees understood the alleged confidential nature of the information at issue fails as a matter of law.

Third, the government also asks this Court to improperly substitute inference for direct proof in arguing that Dura-Bar's hundreds of employees all understood the confidential nature of the information at issue so no reasonable security measures were needed. The fact that three government witnesses, current Dura-Bar employees, testified that they would not share the information at issue is insufficient to establish beyond a reasonable doubt that the remaining 300 or so Dura-Bar employees actually understood the information at issue to be confidential (as opposed to an act that would be unethical, unseemly, or disloyal, but not criminal). Moreover, that Dura-Bar trusted its employees to "do the right thing" actually proves that Dura-Bar failed to take

reasonable security measures to maintain secrecy, as required under the EEA. *CMBB LLC v. Lockwood Mfg., Inc.*, 628 F.Supp.2d 881, 884 (N.D. Ill. 2009) (no reasonable jury could find CMBB took reasonable efforts to keep information confidential to warrant protection where CMBB did not convey to employees that information was confidential, did not apply established policies and procedures to safeguard information, and hard copies were not marked in any way to indicate information was confidential or a trade secret). As expert Naomi Fine testified, and as made clear in the relevant case law, an employer cannot fairly expect its employees to understand what is "secret" unless their employer properly and adequately communicates these expectations (*e.g.*, through labeling, training/communication, policies, and reasonable specificity).

Fourth, the evidence at trial conclusively established that Dura-Bar employees did not, in fact, understand that the information at issue was confidential, sensitive, or a trade secret. For example, in 30+ years, Frank Abruzzo never heard the phrase "trade secret" and maybe once heard the term "confidential" as it related to Dura-Bar's business (but not as it related to the information at issue). Moreover, Dura-Bar never labeled the information at issue as "confidential" or restricted it on a "need to know" basis, ***even after passing a 2014 company policy requiring confidential materials to be so marked and so restricted***. More generally, Dura-Bar never stored the electronic information at issue on a restricted computer network, although Dura-Bar did restrict sensitive company information (not the information at issue in this case). Similarly, in 2015, Dura-Bar finally began to label some company documents as "confidential" but never the information at issue. *E.g.*, DX V-7 (Competitive Analysis report marked "Company Confidential" and password protected); DX A-34 (Dura-Bar "Management Report – 2015" labeled "Company Confidential"); Trial Testimony (HR files and vendor gifts stored in locked filing cabinets).

This Court also should reject the government's alternative baseless argument that Dura-

Bar appropriately stored its alleged "trade secrets" on the company's shared S: drive, as opposed to its restricted F: drive, because multiple Dura-Bar departments needed access to the information at issue. Dkt. 135, p.30. The evidence at trial belies the government's position. The government's own witnesses (*e.g.*, Steinkamp, Krause, Richards, Guiterrez, and Hollis) testified that numerous Dura-Bar employees, including those in the HR, warehouse, accounting departments, as well as Dura-Bar interns, all had access to the alleged "trade secret" information at issue, none of whom needed access to that information to do their job. Moreover, Krause testified how Dura-Bar had the technological capability to – rather easily and cheaply – restrict this information on a "need to know basis" on the restricted F: drive to groups of employees based on computer privileges.

The Court also should reject the government's untenable claim that Dura-Bar properly and reasonably required NDAs for only 7 of its hundreds of employees, because those 7 employees "posed the greatest risk of jointing a competitor." Dkt. 135, p.29. The government introduced absolutely no evidence whatsoever to establish, or even reasonably infer, this proposition. Moreover, as Naomi Fine testified, and as the relevant case law makes clear, Dura-Bar acted unreasonably by requiring an NDA for only some, but not all, of its pertinent employees who had access to the information at issue. *See Cumulus Radio Corp. v. Olson*, 80 F.Supp.3d 900, 911 (C.D. Ill. 2015) (even where company had non-disclosure agreements with some employees, company failed to take sufficient efforts to maintain information's secrecy when same information was readily accessible "on a shared computer network that could have been reviewed by anyone who had access to the computer system"); *Opus Fund Servs. (USA) LLC v. Theorem Fund Servs. LLC*, 17-cv-923, 2018 WL 1156246, at *3 (N.D. Ill. Mar. 5, 2018) ("While 'an agreement restricting the use of information may be considered a reasonable step to maintain secrecy of a trade secret,' such an agreement, without more, is not enough.").

This Court also should reject the government's claim that Dura-Bar took reasonable measures to secure the secrecy of its lab reports by only sharing them with distributors who supposedly could not disclose them to third parties. Dkt. 135, p.26. As an initial matter, the government only introduced a handful of Distributor Agreements, only beginning in 2011, with some (but not all) of its distributors. Moreover, Dura-Bar's Distribution Agreements do not bar distributors from sending lab reports to their customers. *See* GX 10A-10E. Certainly, the government introduced no testimony or evidence that any distributor believed lab reports were confidential and/or could not be freely shared with their customers (which would make no business sense). Finally, and most importantly, the government conveniently ignores its own witnesses' testimony that Dura-Bar freely shared its lab reports with its end users without any restrictions whatsoever (*e.g.*, no "confidential" labeling, NDA, or prohibition on sharing the lab reports with third parties).

Lastly, this Court should reject the government's arguments opposing acquittal because the government ignores O'Rourke's cited cases which establish the government's failure to prove beyond a reasonable doubt the EEA's "reasonable measures to maintain secrecy" element. Dkt. 125, p.13-14 (comparing security measures implemented by Dura-Bar to those implemented by victim companies in *Lange*, *Jin* and *Shah*). As the Seventh Circuit recently articulated, in assessing the sufficiency of the evidence, this Court should compare the government's evidence against O'Rourke to the amount and type of evidence that courts have previously found to be sufficient or insufficient to carry the government's burden. *Garcia*, 919 F.3d at 498. Accordingly, as established in O'Rourke's opening brief and cases cited therein (ignored by the government), this Court should acquit O'Rourke on each count of conviction because no ***reasonable jury could conclude that the government proved beyond a reasonable doubt*** that Dura-Bar undertook reasonable measures to

maintain the secrecy of the information at issue.

> **2.     The Government Failed to Prove Beyond a Reasonable Doubt The Other Definitional Elements of "Trade Secret" Under the EEA.**

Acquittal also is appropriate because the government failed to prove beyond a reasonable doubt the other required definitional elements of a "trade secret" under the EEA.  Aside from failing to prove reasonable security measures, the government similarly failed to prove beyond a reasonable doubt that: (1) the information at issue was "not generally known or readily ascertainable through proper means by the public," and (2) the information at issue "derived independent economic value…from not being generally known or readily ascertainable through proper means" by another person "who could obtain economic value from the disclosure or use of the information" (or, for the attempt charges, that O'Rourke reasonably believed the same to be true). 18 U.S.C. §1839. At best, the government's arguments in support of these definitional elements represent a distortion of the testimony of Steinkamp and Richards and a complete disregard of the relevant legal framework.  Dkt. 135, p.22-23.

> **a.     The Government Failed to Prove Beyond a Reasonable Doubt That The Lab Reports Information (Counts 2-4) Was Not Generally Known Or Ascertainable By The Public Or Was Of Economic Value To A Competitor (or That O'Rourke Reasonably Believed the Same As To This Information).**

This Court should reject the government's demonstrably wrong argument that Dura-Bar's lab reports were not generally known, or readily ascertainable, by the public, because "none of the 667 lab reports are publically available anywhere." Dkt. 135, p.22. As the government well knows, and as discussed in great detail in O'Rourke's opening brief (Dkt. 125, p.22-23), the witnesses' undisputed testimony, including the government's own witnesses, established that Dura-Bar's external lab reports were routinely shared with end users who were under no obligation to keep the information contained in the lab reports confidential (*e.g.*, no "confidential" labeling, no customer NDAs, and no other restriction of any kind). In fact, pursuant to an early governmental

interview, Dura-Bar, as a company, affirmatively stated that it did not consider its external lab reports to be confidential, sensitive, or a trade secret for this very reason.

Pursuant to the relevant case law, this fact alone requires entry of acquittal on Counts 2-4. *See Unisource Worldwide, Inc. v. Carrara*, 244 F.Supp.2d 977, 987 (C.D. Ill. 2003) (courts routinely hold that information which is disclosed by a business to its customers does not constitute trade secret information); *Smart & Assocs., LLC v. Indep. Liquor (NZ) Ltd.*, 226 F.Supp.3d 828, 855 (W.D. Ky. 2016) (if plaintiff publishes or otherwise makes available information asserted to be trade secret, thereby making it readily ascertainable to many people through proper means, then information does not qualify for protection); *BDT Prods., Ltd. v. Lexmark Int'l, Inc.*, 274 F.Supp.2d 880, 891 (E.D. Ky. 2003) (complete failure of plaintiff to require party receiving disclosure to enter into confidentiality agreement to protect alleged trade secrets has been held to be "one clear way to waive any trade secret protection that might exist."); *EarthCam, Inc. v. OxBlue Corp.*, 49 F.Supp.3d 1210, 1237 (N.D. Ga. 2014) (information that customer may share with third party, like customer needs, specific customer-provider relations problems, pricing, etc., cannot be a trade secret).

As for the definitional element of economic value, the government also failed to prove beyond a reasonable doubt that the disclosure of Dura-Bar's external lab reports, individually or together, would provide economic value to Hualong or any other third party or that O'Rourke reasonably believed the same to be true. First, the undisputed evidence (even by the government's witness Richards) established that Dura-Bar's external lab report information regarding Dura-Bar's own products (*e.g.*, defects, possible causes, and possible proposed solutions) would not "transfer over" to assist Hualong's (or some other competitor's) product quality or manufacturing process. As Richards (and Keough) testified, Dura-Bar's manufacturing process and product

quality depended on its own *sui generis* proprietary tooling designs and unique manufacturing run parameters (which were vast), such that Dura-Bar's lab report information regarding its product defects, causes, and possible solutions would provide no value to a competitor's wholly different product which was manufactured using different equipment tooling designs, and different manufacturing run parameters.

Second, the government's implication that Hualong would obtain "value" from the Dura-Bar lab reports (or that O'Rourke reasonably believed Hualong would obtain value from the lab reports) because Hualong lacked its own lab is baseless and senseless. Dkt. 135, p.31. Indeed, the government's claim is factually incorrect. Frank Abruzzo testified that Hualong did have laboratory equipment. Joint venture documents too established that Hualong possessed laboratory equipment. DX Z-43 (Hualong lab equipment). Also, the undisputed testimony was that Hualong (having been established by University professors) commonly used University laboratory equipment for some laboratory testing.

Third, the government's related alternative argument that Dura-Bar's lab reports provided value because O'Rourke's email communications emphasized the need to improve Hualong's product quality and laboratory processes also should fail. Dkt. 135, p.31 (arguing O'Rourke's emails in which he emphasized improving product quality and lab process sufficient to establish "independent economic value."). The government did not introduce any evidence to even suggest that Dura-Bar's lab reports about Dura-Bar products could in any way be helpful to Hualong in its attempt to improve its product quality or laboratory processes. *Jones*, 713 F.3d at 347 ("evidence that calls for inferences that are "motivated or made possible by speculation…will fail to car the government's burden"). Hualong's possession of Dura-Bar lab reports would not ameliorate deficiencies in its product quality or lab processes. In short, knowing Dura-Bar's lab report

information – particularly given the lack of specificity and omissions therein – would not help a competitor make a better product or otherwise provide economic value.

Finally, Dura-Bar's external laboratory report information also cannot qualify as a "trade secret" because Hualong (or some other third party) could readily ascertain such information through legitimate means. Dura-Bar routinely runs laboratory tests on competitor products and even has an entire room at Dura-Bar devoted to its competitors' products. Hualong, just like Dura-Bar, could test any Dura-Bar product to generate a substantively identical lab report (or ask a Dura-Bar customer for Dura-Bar's laboratory report). The government wrongly claims that this argument is "absurd" because it would cost Hualong "hundreds of thousands of dollars in resources, time and money to recreate" the lab reports, but the government did not introduce any evidence to support that inference. Dkt. 135, p.31. Moreover, the government's argument is based on Hualong performing 667 lab reports, which vastly overstates the number needed. Dura-Bar has a handful of core products that make up the vast majority of its sales. Also, the government only introduced at trial evidence and testimony regarding 21 lab reports. Accordingly, the minimal amount of time and resources needed to create this number of lab reports is not sufficient, as a matter of law, to constitute "independent economic value." *See Hamer Holding Grp., Inc. v. Elmore*, 202 Ill.App.3d 994, 1011–12 (1st Dist. 1990) (if information can be readily duplicated without involving considerable time, effort or expense, then it is not secret or a trade secret).

As for Dura-Bar's *internal* laboratory reports (GX 200 [report nos. 3145, 3275, 3282, 3504, and 3593]), the government likewise failed to prove beyond a reasonable doubt that this information qualified as a "trade secret" under the EEA's definition. For instance, contrary to the government's claim, no reasonable juror could conclude that Dura-Bar's internal laboratory reports could provide value to Hualong (or some other third-party), if known, by revealing Dura-

13

Bar's pre-production "development of new products." Dkt. 135, p.31. Several witnesses, including Steinkamp, admitted that Dura-Bar's internal lab reports conferred no economic value to a third-person because: (1) the reports documented only "trial" or non-production products that were of substandard quality, and (2) such non-production (substandard) products could not be reproduced anyway given the lack of manufacturing information in the external lab reports, including but not limited to the absence of any tooling design information for the manufacturing equipment used, manufacturing run parameters, inoculant, inoculant methodology, and "starting recipe" of the molten and raw materials. Further, at least two of five internal lab reports addressed Dura-Bar's preproduction of cast iron tubes (as opposed to bars), a process originally invented in China and, according to Abruzzo, known to Hualong.

For all these reasons, the government failed to prove beyond a reasonable doubt that Dura-Bar's lab reports were a "trade secret" because they, and the information therein, were not "secret," and, in any event, would not confer "economic value" to any third-person, if known. For this reason as well, this Court should enter a judgment of acquittal on Counts 2-4.

b. *The Government Failed To Prove Beyond A Reasonable Doubt That The Alloy Experiment Data Reports (Counts 11-13), If Known, Would Provide Economic Value To A Third Party.*

This Court must enter a judgment of acquittal on Counts 11-13 because the government failed to prove beyond a reasonable doubt that Dura-Bar's Alloy Experiment Data reports, if known, would provide economic value to a third party. Nowhere in the government's response brief is there any argument to the contrary. In fact, the government's response wholly ignores how any third party could obtain value from knowing the alloy experiment data information. And this is because the government's own witness, Mr. Steinkamp, admitted that the alloy experiment reports were valueless to a third party because the reports concealed and omitted the very inoculant

14

being tested. Likewise, O'Rourke's expert, John Keough, testified that Dura-Bar's alloy experiment reports were useless because it was impossible to discern what inoculant Dura-Bar was using for its experiment, what inoculation method Dura-Bar was using for its experiments, and how Dura-Bar manufactured its product. Accordingly, acquittal is required on Counts 11-13, which the government should concede in the interests of fairness and justice.

> c.    *The Government Failed To Prove Beyond A Reasonable Doubt That O'Rourke Reasonably Believed The 1993 Document (Count 1) Information Was Not Generally Known Or Readily Ascertainable, Derived Economic Value From Not Being Known, And Would Provide Economic Value To A Third Party.*

With respect to the its "attempt" Count 1 charge, the government failed to prove beyond a reasonable doubt that O'Rourke reasonably believed that Dura-Bar's 22+ year-old 1993 document "would provide economic value," if known. Again, the government's "value" argument – that much of the information in the 1993 document is still used today by Dura-Bar – is baseless. Dkt. 135, p.18, 22. The evidence overwhelming established that the 22+ year-old 1993 information provided no value to Dura-Bar.  The government's own witness, Mr. Richards, conceded that the 1993 document was obsolete because Dura-Bar made thousands of changes to its equipment tooling designs and manufacturing run parameters between 1993 and 2015, such that the 1993 information was no longer useful or optimized. *See* DX A-41 (COPs showing hundreds of changes per year in Dura-Bar run parameters and manufacturing processes); DX A-28 & A-29 (Dura-Bar Bar Machine Logs indicating, among others, differences in exit water temperatures, gripper pressure, and stroke delays used in 2015 and 1993 document); DX ZZ-6 (establishing difference between 2015 ladle weights and 1993 document). Similarly, the undisputed testimony was that Dura-Bar did not know where to find the 1993 "trade secret" document, did not know who authored the 1993 document, did not know how it was stored or to whom it was circulated, and

did not know how long it was used, if ever. Furthermore, Mr. Richards conceded that O'Rourke's copy was not labeled "confidential" and had no "issue date."

Although the government liked referring to the 1993 document as Dura-Bar's "operational playbook," the evidence wholly rejected this fabricated characterization. In fact, the government presented no evidence that Dura-Bar even used the 1993 document at any time. *Garcia*, 919 F.3d at 500 ("Filling an evidentiary void with guesswork and speculation is impermissible.").

The government also failed to establish beyond a reasonable doubt that O'Rourke reasonably believed that the 1993 document would, if known, confer "economic value to a third party," like Hualong. The government's argument that Richards testified that a competitor could use the contents to recreate Dura-Bar's 1993 process fails. Dkt. 135, p.30. In fact, Mr. Richards' testimony established the contrary point. On cross-examination, Richards conceded that the 1993 document alone would not provide value or the ability of a third party to recreate Dura-Bar's 1993 manufacturing process because a competitor also would need: (1) the exact same 1993 equipment tooling designs; (2) all of the various 1993 manufacturing run parameters (many of which are omitted from the 1993 document); and (3) the 1993 iron recipes, inoculation ingredients, and inoculant methodology. Likewise, John Keough testified the 1993 document was valueless to anyone who did not possess all of the other extremely necessary and relevant information (*e.g.*, graphite die designs, cooling designs, drive assembly designs, etc.), none of which O'Rourke had in his possession.

The government's alternative "economic value" argument for the 1993 document – emphasizing O'Rourke's possession of the document for 22 years, including on his day of travel to China – similarly fails. Dkt. 135, p.30. As a threshold matter, the government failed to produce any evidence as to when O'Rourke first came into possession of the document or that O'Rourke

possessed the 1993 document for 2+ decades. Moreover, O'Rourke boarded his flight to China with numerous Dura-Bar hard copy documents and work files, none of which the government charged as "trade secrets" with the exception of the 1993 document. For instance, O'Rourke travelled with Dura-Bar's Resource Manual, which O'Rourke wrote and which the government never charged as a trade secret. Accordingly, the mere fact that O'Rourke kept the 1993 document with other work files and traveled with it on the day in question does not establish proof beyond a reasonable doubt that he reasonably believed the 1993 document would provide economic value to a third party. *Garcia*, 919 F.3d at 500 ("Filling an evidentiary void with guesswork and speculation is impermissible."); *Piaskowski*, 256 F.3d at 693 (In criminal cases, "[a]lthough a jury may infer facts from other facts that are established by inference, each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation."); *Hanjuan Jin*, 833 F.Supp.2d at 1016 (mere possession of a trade secret is not unlawful).

Even assuming all of the government's arguments supported an inference of "economic value" (they do not), the government still failed to satisfy its burden of proof beyond a reasonable doubt in light of all of the evidence introduced at trial, noted above. *See U.S. v. Elashyi*, 554 F.3d 480, 492 (5th Cir. 2008) ("When the evidence is essentially in balance, a reasonable jury must necessarily entertain a reasonable doubt."); *U.S. v. Johnson*, 592 F.3d 749, 755 (7th Cir. 2010) ("In this situation, the evidence is essentially in equipoise; the plausibility of each inference is about the same, so the jury necessarily would have to entertain a reasonable doubt on the conspiracy charge."); *U.S. v. Lovern*, 590 F.3d 1095, 1106–07 (10th Cir.2009) (When "the evidence ... gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, we must reverse the conviction, as under these circumstances a reasonable jury must necessarily entertain a reasonable doubt.").

17

Finally, the government also failed to prove beyond a reasonable doubt that O'Rourke reasonably believed the information in the 1993 document was "secret" and/or "not readily ascertainable" by a third party. In fact, the evidence introduced at trial established that information in the 1993 document was, and is, known throughout the industry and ascertainable by the public through trade journals, third-party vendor manuals, and websites. *See e.g.*, DX ZZ-4 (demonstrative showing start-up ladle temperatures in 1993 document to be nearly identical to those in public documents); DX M-14 (DIS publication identifying industry ladle temperature range); DX A-6 (Technica Guss Handbook identifying nearly identical ladle temperatures to 1993 document); DX Q-4 (Dura-Bar website publication identifying stroke length in 1993 document); DX A-6 (Technica Guss Manual identifying nearly identical stroke length).

Accordingly, in sum, for all the foregoing reasons, this Court should enter judgment of acquittal on the government's "attempt" Count 1 charge.

**B.    The Government Failed To Prove Beyond A Reasonable Doubt That O'Rourke Intended To Covert The Information At Issue For The Economic Benefit Of Someone Other Than Dura-Bar Or That O'Rourke Intended To Injure Dura-Bar.**

The government devotes less than one page to responding to O'Rourke's arguments that it failed to introduce sufficient evidence on two other elements necessary for a reasonable jury to convict. Specifically, the government largely ignores O'Rourke's arguments that the government failed to sufficiently prove that he intended to (1) covert the information at issue for the economic benefit of someone other than Dura-Bar, and (2) injure Dura-Bar. Dkt. 135, p.23-24.

For instance, the government wholly ignores, and therefore concedes, that O'Rourke's affirmative conduct in August and September 2015 clearly evidenced his lack of intent to injure Dura-Bar and his lack of intent to covert the alleged trade secrets for the economic benefit of Hualong or some other third party. *See* Dkt. 125, p.26-28 (discussing O'Rourke's conduct, which

included, *inter alia*, not taking with him Dura-Bar's most valuable information, which he had access to and would need if he really wanted to recreate Dura-Bar's product; not accessing and downloading the information in question remotely without Dura-Bar being the wiser and instead accessing and downing the information in the one place where Dura-Bar could record him on video, using the only device for which Dura-Bar could track his network activity; resigning from Dura-Bar offsite, effective immediately, without first having accessed and downloaded the information at issue; and. at Dura-Bar's request, agreeing to stay on for an additional few weeks to assist with the transition period). Based on this affirmative evidence, this Court should enter a judgment of acquittal on Counts 1, 2-4, and 11-13. *See, Elashyi, Johnson, Lovern, supra.*

Similarly, just as it did with respect to the other elements of the offense, the government ignores the various cases cited by O'Rourke that establish why the evidence introduced at trial was insufficient to allow a reasonably jury to find, beyond a reasonable doubt, that O'Rourke intended to injure Dura-Bar or convert the information at issue for the economic benefit of another. *See* Dkt. 125, p.29-30 (comparing and contrasting evidence against O'Rourke to the amount and type of evidence introduced against other defendants where the courts found the evidence sufficient to establish criminal intent elements). In comparing the evidence the government introduced against O'Rourke with the type of evidence introduced in cases in which the court found the evidence sufficient to establish an intent to injure and an intent to convert a trade secret to the economic benefit of a third-party, it is clear that the government has not met its burden here. For this reason also, O'Rourke is entitled to acquittal on Counts 1-4 and 11-13.

This Court should reject the government's cursory arguments as to these two required elements. For instance, the government wrongly gives short shrift to what its evidence ***did not establish***, particularly as it relates to O'Rourke's lack of intent to covert information for the

economic benefit of a third party and/or injure Dura-Bar.[3] On the one hand, the government implores this Court to give great weight to the language of O'Rourke emails to infer certain elements. Dkt. 135, p.23-24. Yet, on the other hand, the government asks this Court to disregard the fact that nowhere in any of these emails does O'Rourke once reference anything whatsoever for which an intent to convert Dura-Bar information for the economic benefit of Hualong or any other person or an intent to injure Dura-Bar can be inferred. Quite to the contrary. In particular, O'Rourke's emails do not reference any alleged Dura-Bar "trade secrets," confidential information, the 1993 document, the lab reports, or the alloy experiment reports. Not one email suggests any bride, financial compensation in exchange for an improper act, or *quid pro quo*. That O'Rourke's expansive email communications are entirely silent on such matters is probative of O'Rourke's lack of criminal intent as to these two elements and reflects why the government failed its burden of proof on these points, as well.

Likewise, the government wrongly claims the evidence establishes that O'Rourke's intended to benefit Hualong and injure Dura-Bar because he stole and "lied for years" to his colleagues, friends and family.[4] Dkt. 135, p.32. To the contrary, the government's evidence failed

---

[3] The government contends it matters not that it produced no evidence regarding Hualong's knowledge or participation in O'Rourke's offense conduct because Hualong's knowledge and intent in not an element of the crime and is irrelevant. Dkt. 135, p.32. But of course, if the government had evidence of Hualong agreeing to pay O'Rourke money in exchange for the information at issue or Hualong discussing Dura-Bar's lab reports in any one of the emails introduced at trial, it would have no doubt introduced such evidence because Hualong's knowledge and conduct directly informs O'Rourke's intent. As such, this insincere argument must be rejected.

[4] The government submits that O'Rourke lied to both Lindsay Olson and Anthony Guiterrez when he failed to tell them he had accepted a job with Hualong. Specifically, the government argues that O'Rourke told Ms. Olsen during his exit interview that he was considering going to work for a steel company in North Carolina. Dkt. 135, p.25. That is inaccurate. Ms. Olsen testified that O'Rourke stated he was considering his future employment options and would be making a decision by the end of the week as is reflected in Ms. Olson's exit interview notes. GX 19B ("waiting for a few things to make a decision, will decide end of this week."). Guiterrez likewise testified that O'Rourke informed him he was considering other employment opportunities, including a position with a steel company. But, as this Court recognized, there is nothing

to prove beyond a reasonable doubt that O'Rourke lied for years to his colleagues and friends, such that a jury could not reasonably infer that O'Rourke intended to injure Dura-Bar or provide Hualong with an economic benefit.

Indeed, Abruzzo and Lorna O'Rourke never testified that O'Rourke lied to them about the information he took from Dura-Bar. The government incorrectly states that Lorna O'Rourke testified that O'Rourke told her that "Dura-Bar lost one of the two thumb drives containing presentation materials he provided Dura-Bar on his last day." *Id*., p.24. Rather, Lorna testified that O'Rourke called her, upon arriving in China, to inform her that she might be contacted by the FBI in light of the FBI's search of his person, luggage and home the previous day. Lorna testified that O'Rourke, in response to her question as to why he was stopped and searched by the FBI, seemed confused and unsure and guessed as to why Dura-Bar had gone to the FBI, stating something about not turning over a portable thumb drive and the fact that he took with him his Dura-Bar Resource Manual and documents to help a Dura-Bar China employee. As for Abruzzo, he testified that O'Rourke told him that he took information that was publically available, which, is of course, exactly what O'Rourke believed, not, as the government now claims, a lie.

### III. **ALTERNATIVELY, THE COURT MUST VACATE MULTIPLICITOUS COUNTS**

As outlined in O'Rourke's opening brief, because the government essentially charged three different methods of committing the same offense, this Court is required to determine the "unit of prosecution" to prevent a multiplicitous and constitutionally infirm conviction. Dkt. 125, p. 36-38.

The government incredibly responds that this Court need not determine the appropriate

---

unusual about an employee not informing a former employer that he has accepted a position with another company. It is not the kind of blatant lie sufficient to establish criminal intent. Moreover, O'Rourke was under no obligation, contractual or otherwise, to inform anyone at Dura-Bar that he was in fact considering other employment options, but chose to do so anyway. In sum, this evidence does not support the government's theory that O'Rourke lied about his true intentions because he knew he had stolen trade secrets and was intending to use them to help Hualong compete with Dura-Bar. Quite to the contrary.

unit of prosecution because the convictions do not stem from one "single act or transition." Dkt. 135, p.34 (arguing that O'Rourke did not engage in a "single act or transition" because he "downloaded" the files on September 13, 2015, between 9:30 am and 9:47 am, "stole" them on September 13, 2015 at 10:02 am fifteen minutes later, and "possessed" them on September 21, 2015).  The government's position here borders on the frivolous. Indeed, the government would be hard-pressed to argue with a straight face that O'Rourke did not "possess" the alleged trade secrets at the same time that he "downloaded" them to his portable hard drive and "stole" them while walking out of the building with them. *See U.S. v. Ravel*, 930 F.2d 721, 724 (9th Cir. 1990) ("[T]he crime of possession of stolen goods cannot be fragmented, either on the basis of when the government elects to seize a particular portion of the goods or when the defendant disposes of a portion."); *see also*, *U.S. v. Sing*, *infra* ("the Court is unconvinced that simply because the trade secrets were found in different areas of defendant's home and in different mediums (i.e. paper-form versus electronic form), they were not simultaneously possessed.").

Nor does it matter, as the government suggests, "that facts required to prove the separate downloading, stealing and possessing were different and not required for the other charges." Dkt. 135, p.34. Congress' use of the disjunctive term "or" between the several means of committing a §1832 offense signifies Congress' intent that there be multiple ways of committing a single offense and not multiple punishments. *See e.g.*, *Sanabria v. U.S.*, 437 U.S. 54, 65 (1978) (presence of disjunctive "or" between differing means of "gambling" in statute supported conclusion that each was a means of violating gambling statute and not separate offense); *U.S. v. Marbella*, 73 F.3d 1508, 1514 (9th Cir. 1996) (relying on disjunctive language in separate mental states to support conclusion that promotion of specified unlawful activity or concealing the source of the funds are two different means of violating a single offense of money laundering iand not two separate

offenses); *U.S. v. Kimbrough*, 69 F.3d 723, 729 (5th Cir. 1995) (two violations of 18 U.S.C. §2252(a)(4)(B) were two different means of committing the same offense and not two offenses where disjunctive was used); *U.S. v. Munoz-Romo*, 989 F.2d 757, 759 (5th Cir. 1993) ("Congress, by rooting all the [firearm possession] offenses in a single legislative enactment and including all the offenses in subsections of the same statute, signaled that it did not intend multiple punishments for the possession of a single weapon."); *U.S. v. McLaughlin*, 164 F.3d 1, 15-16 (D.C. Cir. 1998) (reluctance to find multiple offenses and multiple punishments in "situations involving provisions within a single statutory scheme"); *U.S. v. Cureton*, 739 F.3d 1032 (7th Cir. 2014) (Defendant could not receive multiple convictions for using firearm in connection with violent felony, *although each predicate offense contained element that other did not*, and neither was lesser included offense of other).

In arguing the counts are not multiplicitous, the government also ignores the EEA case cited by O'Rourke, which is on point. In *U.S. v. Sing*, No. 2:14 CR 00212 (C.D. Cal. Aug. 32, 2015), the court was tasked with determining the appropriate unit of prosecution under §1832. *See* Dkt. 125, Ex. B. The government argued the appropriate unit of prosecution was the individual trade secret. *Id*. The defendant argued the appropriate unit prosecution was the act of transmitting the trade secret, *i.e*., possession, downloading or stealing. *Id*. After determining that the statutory language of §1832 did not clearly delineate the appropriate unit of prosecution, and finding the arguments made in support of the defendant's and the government's positions to be equally persuasive, the court adopted the defendant's position based on the rule of leniency. Further, as stated by the Supreme Court, when determining issues of multiplicity, "doubt will be resolved against turning a single transaction into multiple offenses." *Bell v. U.S*. 349 U.S. 81, 83-84 (1955).

Finally, the government's reliance on *U.S. v. Summit Refrigeration Grp*., 2006 WL

3091115 (E.D. Wis. Oct. 26, 2006), for its position that the statutory construction test conclusively establishes that the counts here are not multiplicitous is misplaced. Dkt. 135, p.33. First, the court's opinion in *Summit* relates solely to a motion to dismiss an indictment. And despite denying the motion to dismiss, the court specifically stated any issues with respect to multiplicity could be resolved at trial, which is exactly what O'Rourke is doing here. *Id*., *6. Moreover, even the government in *Summit* acknowledged that there was authority for the defendant's position that a defendant cannot be convicted of stealing an item and also possessing an item after it was stolen, a position that the government here, for no good reason, refuses to concede.

For all these reasons, should the Court not acquit O'Rourke of Counts 2-4 and 11-13, the Court should vacate the multiplicitous counts with only one count of conviction from each grouping to remain.

## IV. CONCLUSION

For all the foregoing reasons, and all the reasons stated in his opening brief, Robert O'Rourke respectfully requests that his Honorable Court enter a Rule 29(c) judgment of acquittal on Counts 1, 2-4, and 11-13. Alternatively, the Court must vacate all multiplicitous counts of conviction among the groupings of Counts 2-4 and 11-13.

## <u>CERTIFICATE OF SERVICE</u>

       I, Anthony J. Masciopinto, an attorney, hereby certify that the above *Defendant's Reply In Support of Rule 29 Motion for Judgment of Acquittal* was served upon all counsel of record via ECF Filing on May 22, 2019.

By:    */s/ Anthony J. Masciopinto*
                      One of Defendant's Attorneys