**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES | ) | Case No. 17 CR 495 |
| | ) | |
| v. | ) | Judge Andrea R. Wood |
| | ) | |
| ROBERT O'ROURKE | ) | |

**<u>DEFENDANT'S REPLY IN SUPPORT OF RULE 33 MOTION
FOR A NEW TRIAL</u>**

Respectfully Submitted,

KULWIN, MASCIOPINTO & KULWIN, LLP

By: <u>     */s/ Anthony J. Masciopinto*          </u>
          One of Defendant's Attorneys

Anthony J. Masciopinto & Rachel A. Katz
Kulwin, Masciopinto & Kulwin, LLP.
161 N. Clark Street, Suite #2500
Chicago, Illinois 60601
T: 312.641.0300; F: 312.855.0350
amasciopinto@kmklawllp.com
rkatz@kmklawllp.com

**TABLE OF CONTENTS**
***United States v. O'Rourke*, Case No. 17 CR 495**

I.  O'ROURKE IS ENTITLED TO A NEW TRIAL ..................................................................1

    A.  In Light of the Uncontested Facts and Circumstances, the Court Erred in Allowing the Government to Proceed Simultaneously on its Attempt and Substantive Charges ............1

    B.  Respectfully, The Court's Erroneous Jury Instructions Require a New Trial...............2

        1.  The Court's Elements Instruction for Substantive Offenses was Erroneous ................2

        2.  The Court Erred In Providing Its Unique Combination Jury Instruction .....................6

        3.  Failing to Ensure Jury Unanimity for Specific Trade Secret(s) was Erroneous..........8

    C.  The Cumulative Weight of the Evidence Does Not Support a Judgment of Guilt .............9

        1.  The Government's Arguments in Opposition are Unavailing............................10

II.  CONCLUSION...........................................................................................20

## TABLE OF AUTHORITIES
### *United States v. O'Rourke*, Case No. 17 CR 495

**Federal Cases**                                                      **Pages**

*Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*
1 F.Supp.3d 224 (S.D.N.Y. 2014) .................................................................. 7

*BioD, LLC v. Amnio Tech., LLC*
No. 2:13-CV-1670-HRH, 2014 WL 3864658 (D. Ariz. Aug. 6, 2014) ......................... 7

*Brigham Young Uni. V. Pfizer, Inc.*
861 F.Supp.2d 1320 (D. Utah 2012) ............................................................. 7

*IDX Sys. Corp. v. EPIC Sys. Corp.*
285 F.3d 581 (7th Cir. 2002) .................................................................... 8

*U.S. Gypsum Co. v. LaFarge N. Am., Inc.*
508 F. Supp. 2d 601 (N.D. Ill. 2007) ........................................................... 8

*U.S. v. Chung*
633 F.Supp.2d 1134 (C.D. Cal. 2009) ............................................................ 4

*U.S. v. DeLeon*
603 F.3d 397 (7th Cir. 2010) .................................................................... 2

*U.S. v. Hsu*
40 F.Supp.2d 623 (E.D.Pa.1999) ................................................................. 5

*U.S. v. Hughes*
505 F.3d 578 (6th Cir. 2007) ................................................................... 20

*U.S. v. Jin*
833 F.Supp.2d 911 (N.D. Ill. 2012) ........................................................... 3,

*U.S. v. Jin*
833 F.Supp.2d 970 (N.D. Ill. 2011) ............................................................. 8

*U.S. v. Krumei*
258 F.3d 535 (6th Cir. 2001) .................................................................... 5

*U.S. v. Lange*
312 F.3d 263 (7th Cir. 2002) .................................................................... 1

*U.S. v. Liew*
11 CR 00573 (N.D. Cal. Feb. 25, 2015) .................................................... 4, 6, 9

*U.S. v. Nosal*
No. 08 CR 237, 2009 WL 981336 (N.D. Cal. Apr. 13, 2009)...................................................... 5, 9

*U.S. v. Nosal*
No. 08 CR 237, 2013 WL 4504652 (N.D. Cal. Aug. 15, 2013) ..................................................... 5

*U.S. v. Richardson*
No. 90 CR 345, 1990 WL 91514 (N.D. Ill. 1990) ......................................................................... 8

*U.S. v. Roberts*
No. 08 CR 175 (E.D. Tenn) ........................................................................................................... 9

*U.S. v. Shiah*
No. SA CR 06-92 DOC, 2008 WL 11230384 (C.D. Cal. Feb. 19, 2008) ............................... 4, 11

*U.S. v. Summit Refrigeration Grp., Inc.*
No. 05-CR-151, 2006 WL 3091115, (E.D. Wis. Oct. 26, 2006) .................................................. 2

*U.S. v. Zhang*
No. 05 CR 812 (N.D. Cal.) ............................................................................................................ 9

Defendant Robert O'Rourke ("O'Rourke"), through his attorneys, Kulwin, Masciopinto & Kulwin, LLP, respectfully submits this reply in support of his Rule 33 motion for a new trial.

## I. O'ROURKE IS ENTITLED TO A NEW TRIAL

**A.  In Light of the Uncontested Facts and Circumstances, the Court Erred in Allowing the Government to Proceed Simultaneously on its Attempt and Substantive Charges.**

Respectfully, the Court erred in allowing the government to proceed on *both* its attempt and substantive charges simultaneously, which was contrary to the statutory text of §1832 and federal common law principles. Dkt. 123, p.8-11 (arguing generally, *inter alia*, that O'Rourke engaged in no *inchoate* ("not completed" or "imperfectly formed") conduct that would justify a simultaneous "attempt" charge under §1832 because he downloaded and possessed everything he intended to download and possess without interruption or mistake). The government's arguments to the contrary should be rejected.

First, the Court should reject the government's claim that *choate* (defined as "completed" or "perfected") conduct can support §1832 attempt charges. Dkt. 135, p.4 (government analogizing to distinguishable context where a defendant seeks a legal impossibility defense after being arrested for possessing flour when he mistakenly believed it to be cocaine). Contrary to the government's suggestion, the issue is not whether an attempt charge is proper under §1832, since the statute expressly permits such a charge when appropriate. 18 U.S.C. §1832(a)(4). Rather, the issue is whether the government can proceed on *both* a §1832 attempt (based on theory of legal impossibility) and substantive charge simultaneously for identical underlying conduct when it is uncontested that the defendant completed the alleged conduct without interruption or mistake.

The government's cases fail to address or support proceeding simultaneously in this manner under such circumstances. For instance, in *U.S. v. Lange*, 312 F.3d 263 (7th Cir. 2002), the defendant was charged with the substantive, *choate* offense of **theft** of trade secrets, and a

different, *inchoate* offense of **attempted sale** of trade secrets. He was not, like O'Rourke, simultaneously charged with theft and attempted theft of trade secrets arising from the identical, completed, perfected conduct. *Id.* Likewise, the government's reliance on *U.S. v. DeLeon*, 603 F.3d 397 (7th Cir. 2010), too is misplaced. In *DeLeon*, the government presented only an attempt charge, specifically, attempting to possess with the intent to distribute more than 500 grams of cocaine. *DeLeon*, 603 F.3d at 400. As such, the government's cases do not establish its right to present to a jury attempt and substantive charges simultaneously, where the government premises each charge on the identically "perfected," uninterrupted, and completed conduct without mistake.

The government's citation to *U.S. v. Summit Refrigeration Grp., Inc.*, No. 05-CR-151, 2006 WL 3091115, (E.D. Wis. Oct. 26, 2006), also is misplaced. As a threshold matter, the *Summit* court rendered its decision in an entirely different procedural context. *Id.* *3 (ruling on whether the *indictment* was duplicitous where it charged a substantive §1832 violation and attempted violation in the same count). In denying the defendant's pre-trial motion, the *Summit* court did *not* conclude, or in any way suggest, that the government could submit to the jury both the substantive and attempt charges where each was premised on the same underlying perfected, completed, and uninterrupted conduct, as is presented here.

**B.** **Respectfully, The Court's Erroneous Jury Instructions Require a New Trial.**

**1.** **The Court's Elements Instruction for Substantive Offenses Was Erroneous.**

Respectfully, the Court erroneously instructed the jury on the substantive offenses by stating the government only needed to prove that O'Rourke "knew or believed" the information at issue was "proprietary information, meaning belonging to someone else who had an exclusive right to it." Dkt. 113, p.21, 23, 25. The instruction was erroneous because it misstated the applicable law and relieved the government of having to prove beyond a reasonable doubt that

O'Rourke *knew* the information at issue to be a *trade secret*. Dkt. 123, p.11-14.

The government's attempt to distinguish *U.S. v. Jin*, 833 F.Supp.2d 911 (N.D. Ill. 2012), should be rejected. Dkt. 135, p.9 (arguing that *Jin* only requires the government to prove the defendant *knew* the stolen information had the *general attributes* of a trade secret). The government's parsing is a distinction without a difference. Indeed, the *Jin* court expressly held that the government is required to prove that defendant "*knew* that Moto 1, Moto 2 and Moto 3 *contained trade secrets*…." *Jin*, 833 F.Supp.2d at 1015 (emphasis added). Moreover, the fact that the *Jin* court declined to decide whether this knowledge element applied to a §1832 charge does not diminish its relevancy here. Nothing in §1832's statutory language or legislative history suggests that Congress intended to employ a different knowledge standard for §1831 and §1832.

In fact, the government's argument here runs afoul of its own DOJ Criminal Resource Manual ("DOJ Manual"), which confirms that this knowledge requirement is identical for §1831 and §1832. With respect to "Element Two" of §1831, the DOJ Manual states, "[I]n order for the defendant to be convicted, the government must establish that the defendant was aware or substantially certain that he was misappropriating a trade secret."[1] Significantly, with respect to a §1832 offense, the DOJ Manual provides that §1832 "shares the first three elements with §1831."[2] Accordingly, under DOJ's own interpretation of §1831 or §1832, the government must prove that the defendant *knew or was "substantially certain"* (not "believed") that the information at issue was a "*trade secret*" (not some different undefined "proprietary information").

Aside from its own DOJ Manual, this Court also should reject the government's attempt to cling to the slightly different language in the two statutes for another reason. As the *Jin* court noted,

---

[1] *See* U.S. Dep't of Justice, Criminal Resource Manual §1126, https://www.justice.gov/jm/criminal-resource-manual-1126-18-usc-1831-element-two-defendant-knew-information-was (May 20, 2019).

[2] *Id.*, §1129, https://www.justice.gov/jm/criminal-resource-manual-1129-elements-offense-under-18-usc-1832 (last accessed May 20, 2019).

any such slight differences "may be a distinction without a difference." 833 F.Supp.2d at 1015. This is so because the statutory framework of §1831 and §1832 is substantively identical. While §1831 references "trade secret" (not "such information"), in each of its "steals," "downloads," and "possesses" sub-paragraphs, §1832 does the substantive equivalent by using the phrase "such information," which clearly refers to "that trade secret" identified in §1832(a)'s opening paragraph (and, in any event, certainly not some other unmentioned statutory term, such as "proprietary information"). 18 U.S.C. §1832(a). The EEA's own legislative history likewise supports this conclusion. 142 Cong. Rec. 27, 117 (1996) (government must establish defendant was aware or substantially certain he was misappropriating a trade secret). Also, there is no good reason to treat the two statutes differently where Congress enacted both to serve the same aim.

Finally, the Court should reject the government's attempt to distinguish O'Rourke's cited EEA cases. As an initial matter, the government does not discuss, let alone distinguish, three directly on point cases. *See U.S. v. Chung*, 633 F.Supp.2d 1134, 1444-45 (C.D. Cal. 2009) (in holding "the government must prove that [the defendant] knew that the information he possessed was trade secret information," the court noted the Supreme Court "has long recognized a presumption in favor of an intent requirement for 'the crucial element' that separates lawful from unlawful conduct"); *U.S. v. Shiah*, No. SA CR 06-92 DOC, 2008 WL 11230384, at *12 (C.D. Cal. Feb. 19, 2008) (under §1832(a), government must prove that defendant knew or had a firm belief that the information in the computer data file or files was one or more trade secrets); *U.S. v. Liew*, 11 CR 00573 (N.D. Cal. Feb. 25, 2015), Dkt. 792, p.34-35 (final filed jury instructions instructing jury that for §1832(a)(2) and (a)(3) charges, the government had to prove, *inter alia*, that "defendant knew that these items were trade secrets" and that the "defendant knew that the Basic Document was a trade secret"). By ignoring these cases, the government implicitly, if not

4

explicitly, concedes that this Court's jury instruction for the substantive §1832 offenses was error.

This Court also should reject the government's attempt to distinguish *Hsu* and *Krumei*, claiming they only address the constitutionality of §1832 and not its knowledge element. Dkt. 135, p.10. The government's argument wrongly ignores these courts' critical reasoning: that §1832 was constitutional as applied *because* it required proof that the defendant knew the information at issue to be a trade secret. *E.g.*, *U.S. v. Krumei*, 258 F.3d 535, 539 (6th Cir. 2001) (rejecting applied vagueness argument to §1832 and holding that the statute was constitutional as applied where defendant admitted to knowing the information was a company trade secret that he could not obtain legally except through a corrupt employee and sought to sell it anyway).

Lastly, this Court should reject the government's mistaken attempt to distinguish *Nosal,* claiming *Nosal* did not address §1832's knowledge element. Dkt. 135, p.10-11. In fact, the *Nosal* court did address §1832's knowledge element when it concluded "it is *knowledge* of trade secrets, not the knowledge of illegal behavior, that the EEA requires." *U.S. v. Nosal*, No. 08 CR 237, 2009 WL 981336, *3 (N.D. Cal. Apr. 13, 2009) (emphasis added); *see also U.S. v. Nosal,* No. 08 CR 237, 2013 WL 4504652, at *13 (N.D. Cal. Aug. 15, 2013) (jury instructions on both substantive EEA counts required the government to prove beyond a reasonable doubt that "Defendants *knew* (not just firmly believed) that the source list or information was a *trade secret* [not proprietary information]) (emphasis added).

In sum, §1832's text, its legislative's history and intent, the DOJ Manual, and EEA case law all establish the Court erred in instructing the jury on the government's burden of proof as to its substantive charges. Contrary to O'Rourke's jury instructions, the government was required to prove beyond a reasonable doubt that O'Rourke knew (not "believed") the information at issue to be a "trade secret" (not "proprietary information"). Thus, O'Rourke is entitled to a new trial.

**2. The Court Erred In Providing Its Unique Combination Jury Instruction.**

Respectfully, the Court erred in providing to the jury the government's proffered "unique combination instruction," which, according to the government's response, apparently applied only to the lab reports counts. Dkt. 135, p.12. As a threshold matter, the jury was never instructed that the unique combination instruction applied only to the lab report counts, as opposed to the 1993 document which also contained publically available information.

This Court also should reject the government's claim that this jury instruction was proper because O'Rourke introduced trial evidence that some public information existed in Dura-Bar's lab reports. Dkt. 135, p.12-13. Even if true, the jury instruction was still error because a unique combination instruction is only appropriate where the government specifically identifies at trial the alleged "unique combination of information" claimed to be a trade secret, which the government never did. *E.g., U.S. v. Liew*, 2013 WL 2605126, at *8 (N.D. Cal. June 11, 2013) (ordering governmental bill of particulars for its trade secret claim, including: (1) the "proprietary and non-proprietary components," and (2) the resulting compilations and combinations that formed substantial portions of the TiO2 manufacturing process).

Even now, the government cannot specifically articulate the alleged "unique combination of publically available information" within Dura-Bar's laboratory reports that qualified as a "trade secret." Simply stating that it is the "unique combination of information contained in the 667 aggregate lab reports" is not enough. Dkt. 135, p.13. A unique combination trade secret theory requires the government to establish at trial the *way* in which publically available components of information *fit together to make that combination unique* and not publically known. Dkt. 123, p.14-17. Thus, for the jury instruction to be proper, the government had to introduce evidence that Dura-Bar's lab reports 1-667 included public information *uniquely combined* in a manner not

known to the public to qualify as a "trade secret." *See Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co*., 1 F.Supp.3d 224, 271 (S.D.N.Y. 2014) (plaintiff asserting combination trade secret must demonstrate how publically available components fit together in unique and not publically known way); *BioD, LLC v. Amnio Tech., LLC*, No. 2:13-CV-1670-HRH, 2014 WL 3864658, at *6 (D. Ariz. Aug. 6, 2014) (proponent "must explain how the combination of much of what appears to be generally known information can constitute a trade secret"). Because it is uncontested that the government did not delineate with any particularity at trial the specific unique combination of otherwise known data in Dura-Bar's lab reports, it was not entitled to proceed on a unique combination trade secret theory.[3] *See Brigham Young Uni. V. Pfizer, Inc*., 861 F.Supp.2d 1320, 1324-24 (D. Utah 2012) ("simply pointing to a large amount of information will not demonstrate that a compilation of several elements constitutes a trade secret.").

The government's argument that O'Rourke suffered no prejudice from its unique combination instruction because jurors are presumed to follow instructions also fails. Dkt. 135, p.13. As an initial matter, the government's argument can proceed only if it first establishes the propriety of the unique combination instruction, which it has not and cannot do. Second, that the jury was instructed regarding unanimity is of no consequence to O'Rourke's position that the unique combination jury instruction permitted the jury to convict if it considered just the sheer volume (*i.e.*, "combination") of lab reports taken (not the unique combination of specific information therein) to be a trade secret. The government's game plan was essentially to throw as many documents as it could against the wall hoping that the jury would convict on "something." For these reasons and the reasons stated in O'Rourke's opening brief, the unique combination trade

---

[3] It should be further noted that the government only introduced evidence and testimony about 21 of Dura-Bar's 667 lab reports. Thus, although allowed to argue its unique combination theory, the government was even relieved of having to establish any of the information within those other 646 lab reports, and whether that information, alone or in combination, constituted a trade secret.

secret instruction was erroneous and prejudicial.

**3.** **Failing to Ensure Jury Unanimity for Specific Trade Secret(s) was Erroneous.**

The government mistakenly argues the Court properly rejected O'Rourke's three proposals to ensure the jury unanimously agreed on what, if anything, the government proved to be a "trade secret." The government's argument ignores the atypical nature of its own EEA prosecution. Here, the government submitted to the jury 768 separate documents, alleging each to be, or contain, a "trade secret." The sheer volume of alleged trade secrets and lack of governmental specificity made the jury's task (and O'Rourke's) insurmountable. *See U.S. Gypsum Co. v. LaFarge N. Am., Inc.*, 508 F. Supp. 2d 601, 636 (N.D. Ill. 2007) ("USG cannot simply point to an 11,000-page document covering many diverse topics and assert that the entire document constitutes a trade secret that defendants must refute page-by-page"); *U.S. v. Richardson*, No. 90 CR 345, 1990 WL 91514, at *3 (N.D. Ill. 1990) (barring government's criminal charges at trial because it never "adequately particularized the stolen property that is the subject of Counts Two and Three" by failing to identify "any specific portions of the RC memoranda that the government contends are stolen trade secrets"); *IDX Sys. Corp. v. EPIC Sys. Corp*., 285 F.3d 581, 583 (7th Cir. 2002) (43-page description of "methods and processes underlying and the inter-relationships among various features making up its software package" was "both too vague and too inclusive" because plaintiff was "effectively asserting that all information in and about its software is a trade secret," and plaintiff had to engage in a "serious effort to pin down the secrets" or a "court cannot do its job").

In most trade secret cases, the risk that a jury might convict without unanimously agreeing on what "trade secret," if any, the government proved is far lower. In the vast majority of prosecutions, the government identifies a handful of specific trade secrets contained within a discrete number of documents segregated in distinct counts. *E.g., U.S. v. Jin*, 833 F.Supp.2d 970,

8

1006 (N.D. Ill. 2011) (government properly "highlighted specific information in each document…that qualifies as trade secrets," such as pointing to "information contained in Table 2" of a particular document, instead of improperly "asserting that something there must have been secret"); *U.S. v. Nosal*, No. 08 CR 237 (N.D. Cal) (three specific source lists charges as EEA trade secret); *U.S. v. Liew*, No. 11 CR 573 (N.D. Cal.) (government identified 5 specific trade secret documents, including *inter alia*, "Trade Secret 2: DuPont Drawing No. W1245258, titled "Edge Moor Plan Oxidation W/RPS System Drawing" and Trade Secret 4: DuPont Flow Sheet No. EK2411, titled "Edge Moor Pigments Plant Flow Sheet B Reaction Area"); *U.S. v. Roberts*, No. 08 CR 175 (E.D. Tenn) (specific photographs of roll over-ply down machine charged as alleged trade secret); *U.S. v. Zhang*, No. 05 CR 812 (N.D. Cal.) (trade secret information identified as "hardware design guide for Prestera and hardware specification for Prestera").

Had the government elected to do the same here, O'Rourke's three proposals aimed at ensuring a constitutionally unanimous verdict would have been unnecessary. However, in light of the way in which the government prosecuted its case with vast amounts of poorly identified alleged "trade secrets," the Court erred in failing to employ at least one, if not all, of O'Rourke's proposed jury instructions aimed at protecting the integrity and constitutionality of the jury's verdict. By way of just one example, the Court and parties have no idea if the jury unanimously agreed that one or more Dura-Bar lab report contained a "trade secret," which has monumental repercussions for sentencing and any appeal. For this reason also, a new trial is required.

**C.** **The Cumulative Weight of the Evidence Does Not Support a Judgment of Guilt.**

As made clear in O'Rourke's Rule 33 and Rule 29 motions, this Court also should order a new trial because the jury's convictions (on 10 of the government's 26 total charges, Dkt. 112) are against the cumulative weight of the evidence. Indeed, after weighing the evidence and considering

the credibility of the witnesses, there can be only one rational conclusion: grave doubts exist as to the accuracy and integrity of these guilty verdicts so the interests of justice require a new trial.

1. **The Government's Arguments in Opposition are Unavailing.**

This Court should reject the government's arguments that the evidence rationally supports O'Rourke's convictions. Dkt. 135, p.11. Below, we address each government argument in turn.

- **Dura-Bar was never concerned with misappropriation of any trade secrets; rather, Dura-Bar was worried about losing its most valuable salesperson to a foreign company.**

The Court should reject the government's contention that Dura-Bar's concerns regarding losing O'Rourke as an employee is not germane to its trade secret prosecution. Dkt. 135, p.11. Dura-Bar's real concerns and motives in imploring the government to pursue this case go directly to the credibility of the government's Dura-Bar witnesses and, more generally, the merits of the government's criminal prosecution, which had all the earmarks of a civil (not criminal) litigation. Indeed, it suggests governmental overreach at the insistence of a private company pursuing a vendetta against a former employee deemed to be its biggest asset.

One court recently recognized the dangers of private companies conducting their own investigations and then subsequently presenting the evidence to the government in an effort to convince the government to pursue criminal charges and how such conduct runs contrary to Congress' intent in enacting the EEA:

> When the investigation is driven by a private entity, the process is deprived of the same level of prosecutorial judgment and discretion that accompanies a typical Government investigation conducted from scratch. In a highly competitive market, there is strong incentive for a private entity to present evidence to the Government in the light most favorable to that entity, rather than viewing the evidence objectively. The private entity may place significant pressure on the Government to pursue criminal prosecution. If such an approach is condoned, then criminal investigations may fall substantially in the hands of civil organizations, and the prosecutorial role may become tainted.

10

*U.S. v. Shiah*, No. SA CR 06-92 DOC, 2008 WL 11230384, at * 25 (C.D. Cal. Feb. 19, 2008). Indeed, "when incarceration is at stake, the investigation should be conducted by law enforcement, not law enforcement and a private corporation together." *Id.*

The *Shiah* court's concerns are implicated here. There was ample evidence that Dura-Bar officials panicked that O'Rourke's departure, although entirely appropriate, would jeopardize Dura-Bar's future success. In fact, O'Rourke's supervisor exclaimed "this is not good for Bob" when he was informed that O'Rourke was leaving to work for another company in China, although O'Rourke was perfectly within his rights to seek employment outside of North America under his employment agreement. GX 5 (2012 Agreement). Moreover, Dura-Bar made wild allegations to mobilize the government quickly (and indefinitely incapacitate O'Rourke's ability to work for another company) before O'Rourke left for overseas, including misrepresenting that O'Rourke's nearly imminent departure to China implicated national security considerations (not true). *See* FBI_001-000005 (documenting information Dura-Bar communicated to FBI on September 18, 2015 to persuade government to initiate an investigation). Dura-Bar also falsely claimed that O'Rourke had stolen millions and millions of dollars' worth of Dura-Bar trade secrets (not true) for a Chinese company supposedly with significant ties to the Chinese government (not true). *Id.* After nearly two years of investigating, Dura-Bar's representations proved false. However, rather than yielding the matter back to Dura-Bar to pursue in a civil arena, the government nevertheless pushed forward with its criminal prosecution.

- **O'Rourke did not have the requisite criminal intent to steal alleged trade secrets.**

The government also makes several untenable arguments that O'Rourke possessed the requisite criminal intent to steal trade secrets, none of which is supported by exhibits introduced

at trial or credible evidence.[4]

First, the Court should reject the government's invitation to infer nefarious intent because O'Rourke communicated with Hualong while employed at Dura-Bar. The undisputed trial testimony was that O'Rourke had a legitimate long-standing, collegial relationship with Hualong that began when O'Rourke investigated, with other Dura-Bar officials, a joint venture with Hualong. Further, there is nothing illegal or nefarious about an employee communicating with a prospective employer to consider a new job opportunity. O'Rourke was free to leave Dura-Bar at any time. GX 5. And, pursuant to the terms of his Dura-Bar employment agreement (presuming it was enforceable), O'Rourke could resign and immediately work for any Dura-Bar competitor outside of North America. *Id*. at 8.

Second, the Court should disregard the government's claim that O'Rourke's nefarious intent -- to help Hualong improve its product in order to compete with Dura-Bar in the United States -- is reflected in his "close to two year" email correspondence. A review of O'Rourke's email correspondence establishes the government's reliance on them is misplaced. In fact, they establish the contrary proposition. In particular, O'Rourke's two years of email correspondence establish that he did not intend to criminally, or even wrongly, injure Dura-Bar or benefit Hualong. *See* GX 102, 108, 110, 121, 132 & 133. Throughout his correspondence, O'Rourke anguishes over the *possibility* of leaving Dura-Bar, notes the "risk" in leaving for Hualong, and never once mentions any improper financial exchange, Dura-Bar confidential information, or any trade secrets.

Rather, O'Rourke's emails emphasize his motivation to leave only if it was clear that Dura-

---

[4] The government claims O'Rourke's timeline as outlined in his opening brief is inaccurate but does not identify what specifically is inaccurate. Dkt. 135, p.16. In light of the government's inability to actually point to any purported inaccuracies, the Court should disregard the government's argument.

Bar would abandon the Chinese market, which was O'Rourke's passion. For example, on September 2, 2014 (one year before deciding to leave Dura-Bar), O'Rourke emailed a Hualong representative, stating, in relevant part:

> I am interested in the *possibility* of leaving Dura-Bar to pursue something else but I have to be completely sure that I am leaving here for all of the right reasons and to get a better picture of what my opportunities are with Charter and Dura-Bar. I have a great deal of respect for Frank [Abruzzo] and I owe him a great deal both professionally and personally and I won't leave Dura-Bar as long as he is working here and we have a *common goal of growing our Dura-Bar China business.* I have equal respect for Jason and our China team and I very much enjoy working with them and watching everyone develop in their positions and seeing our business grow. I think that in the next couple of months I will know a lot more about the *future for China*, *Charter's commitment to the business* and Frank's retirement plans. I will also get a much clearer picture of what my future is within Charter Dura-Bar and whether or not I will have an opportunity to take over Frank's current position. As I have said all along, I have concerns and feelings about what is going to happen but until I start to see that my concerns are valid I cannot feel comfortable about making a decision to leave here. I can't leave a 30 year career because of a fear of what I think will happen.

GX 121 (emphasis added).

Third, the Court also should reject the government's reliance on the fact that O'Rourke did not specifically inform Dura-Bar that he signed an employment agreement with Hualong on August 9, 2015. Dkt. 135, p.16. As this Court previously acknowledged, when an employee resigns, it is not uncommon for that employee to omit telling his current employer that he has accepted a new position. There is nothing nefarious or illegal about keeping that information secret. Moreover, prior to leaving the company, O'Rourke did tell at least two Dura-Bar employees, Guiterrez and Olson, he was considering other employment opportunities. GX 19B. Further, on his last day of work, O'Rourke freely volunteered to three different high-ranking Dura-Bar officials that he was going to work for Hualong and leaving for China the following week.

This Court should reject the government's attempt to minimize the significance of this latter conduct. Dkt. 135, p.16 (arguing that O'Rourke informing Lon Hollis, Rhett Meal, and one

other Dura-Bar official that he was leaving the following week to work for Hualong in China and informing Hollis and Meat that he had no problem with them informing Dura-Bar's president of his plans is "hardly" indicative of a lack of criminal intent). O'Rourke's freely given statement to these Dura-Bar officials one week before leaving for China is highly probative of his mindset: one of an individual who believes he did nothing wrong and had nothing to hide.

O'Rourke likewise established his lack of nefarious, criminal intent through other, undisputed evidence. O'Rourke copied no files from Dura-Bar's restricted F drive, including but not limited to highly sensitive engineering tooling design drawings, although he had access to those restricted files. Similarly, O'Rourke used his Dura-Bar computer to download the electronic files at issue, despite having the capability to do so with a non-Company owned computer, even one belonging to a hotel. Likewise, O'Rourke downloaded the electronic files at issue in broad daylight at Dura-Bar's surveilled premises, although he could have done so remotely without detection from any location, even a Chinese hotel. Moreover, O'Rourke at no time, shared any alleged trade secrets with Hualong, including between December 2013 and his last day of employment, despite having ample opportunity to do so. Nor did O'Rourke attempt to deliver any alleged Dura-Bar trade secrets to Hualong between the time he copied the Dura-Bar information and the date of his flight to China. In sum, for all of these and previously stated reasons, the weight of the evidence does not support a finding of the requisite criminal intent.

- **The government's declared experts, all Dura-Bar employees, failed to provide credible testimony sufficient to support a conviction beyond a reasonable doubt**.

Richards' testimony not only failed to establish that 1993 document was a trade secret or that O'Rourke reasonably believed the 1993 to be a trade secret, but also lacked sufficient credibility and the government's response does not establish otherwise.

This Court should reject the government's claim that Richards supposedly testified that the

14

information in the 1993 document was accurate and relevant today. Dkt. 135, p.17-18. First, Richards did not testify (and could not have testified) as to the 1993 document's accuracy. Rather, Richards conceded that: (1) Dura-Bar did not employ him in 1993; (2) he did not create, author, or contribute to the 1993 document; and (3) he never saw the 1993 document at any time between his 1998 hire date and this prosecution. Moreover, Richards had no knowledge how Dura-Bar derived the information in the 1993 document or when it was used, if ever.

Second, Richards never testified that the 1993 document was relevant today or in 2015. Instead, Richards acknowledged that Dura-Bar no longer used the information in the 1993 document because it became obsolete by Dura-Bar's thousands of process changes between 1993 and 2015, some 2+ decades with hundreds of "changes in process" occurring yearly. *See* DX A-41 (COPs showing hundreds of changes per year in Dura-Bar run parameters and manufacturing processes); DX A-28 & A-29 (Dura-Bar Bar Machine Logs indicating, among others, differences in exit water temperatures, gripper pressure, and stroke delays used in 2015 and 1993 document); DX ZZ-6 (establishing difference between ladle weights in 2015 and 1993 document). Richards specifically testified Dura-Bar needed to re-optimize and recalculate every manufacturing process variable with every "change of process," rendering the 1993 information out dated and obsolete.

This Court also should reject the suggestion that Richards' testimony as to the value of the 1993 document was credible. Richards conceded he has no knowledge or experience with any other continuous cast iron manufacturers, including Hualong, such that he could not possibly have a basis for stating that the 1993 document would provide value to a competitor.[5]

Moreover, Richard's own testimony affirmably established that the information in the 1993

---

[5] Contrary to the government's position (Dkt. 135, p.18), based on Richards' admission of a lack of knowledge, the defense was not obligated to ask Richards specific questions about Hualong's capabilities or any other competitor's foundry.

document would not allow a competitor to learn or recreate Dura-Bar's 1993 manufacturing process (assuming the processes identified in the document were actually used in 1993, to which there is no evidence). Richards testified that a competitor could only arguably recreate Dura-Bar's process in 1993 if the competitor also had access to: (1) the exact same 1993 equipment tooling designs; (2) all of the various 1993 manufacturing run parameters (many of which are omitted from the 1993 document); and (3) the 1993 iron recipes, inoculation ingredients, and inoculant methodology, not of which O'Rourke possessed.[6]

This Court should similarly reject the government's reliance on its other identified expert, Bradley Steinkamp. Steinkamp presented as a biased, long-time employee of Dura-Bar who Dura-Bar only first promoted (after 17 years of service) after Steinkamp assisted the government in its investigation and shortly before trial. Contrary to the government's claim, O'Rourke need not present a direct *quid pro quo*. Dkt. 135, p.18. Rather, O'Rourke needed only to introduce circumstantial evidence to allow the Court to make such an inference, which is exactly what O'Rourke did. Likewise, and despite the government's protestation to the contrary, the defense did in fact twice impeach Steinkamp. Through this impeachment, the defense established that Steinkamp had a personal dislike of O'Rourke, so a personal bias as well.

The government's second expert, Bradley Steinkamp, was likewise not credible. The Court should reject the government's meritless arguments to the contrary. First, the government mistakenly suggests the Court cannot consider the fact that Dura-Bar promoted Steinkamp during the pendency of this case because O'Rourke cannot establish that Steinkamp's promotion was in any way related to his testimony in this case. Dkt. 135, p.18. O'Rourke, however, is not required

---

[6] The credibility of Richards' testimony in general, is further undermined by the fact that he wrongly testified that Dura-Bar shared its external lab reports with a customer only if the customer executed an NDA, which numerous witnesses established was patently and demonstrably wrong.

to introduce such direct evidence. Rather, O'Rourke need only introduce circumstantial evidence to allow the Court to make such an inference, which is exactly what O'Rourke did. The evidence established that Steinkamp, despite having worked for Dura-Bar for 17 years, did not receive a promotion until his cooperation in this case began. Such evidence is sufficient to allow the Court to infer that Steinkamp had a motive to fabricate his testimony.

Likewise, and despite the government's protestation to the contrary, Steinkamp was twice impeached on cross-examination with FBI 302s regarding his dislike of O'Rourke and Dura-Bar's prior admission that it did not consider any of its external lab reports to be proprietary or trade secrets.

Further, like Richards, Steinkamp's lack of experience undermined the credibility of his "expert" testimony. Contrary to the government's false recitation of the testimony, like Richards, Steinkamp conceded never touring, visiting, or working at another continuous cast iron foundry, never having operated a bar machine, and having no knowledge regarding Hualong's capabilities or operation. Also contrary to the government's claim, based on Steinkamp's admissions, the defense was not obligated to ask Steinkamp specific questions about Hualong's capabilities or any other competitor's foundry.

This Court also should reject the government's argument that Steinkamp provided credible testimony that established the economic value of Dura-Bar's alloy experiment data. As a threshold matter, Steinkamp admitted exactly the oppositeSteinkamp conceded that Dura-Bar's alloy experiment data was "valueless" to a third party because the reports omitted the inoculant being tested, rendering the reports meaningless to a person who did not know the inoculant being tested.

Moreover, the government misquotes Steinkamp's testimony on this value issue, claiming he testified, "If a competitor understood the Dura-Bar continuous cast iron manufacturing process

17

[*i.e.*, the inoculant being tested in the alloy experiment data], the [alloy experiment data] would be valuable to competitor." Dkt. 135, p.18. Even assuming, *arguendo*, he did testify that the alloy experiment data would be valuable to a competitor if it understood Dura-Bar's continuous cast iron manufacturing process, such testimony conclusively establishes that the alloy experiment data, alone, is not a trade secret. In order for the alloy experiment data to be valuable to a competitor, that alloy experiment data would have to be combined with some other information, *i.e.*, "someone with an understanding of the Dura-Bar continuous cast iron manufacturing process." But someone's general understanding or experience can never be a trade secret. *See* H.R. Rep. 104–788, 1996 U.S.C.C.A.N. 4021, 4026 (EEA not "intended to be used to prosecute employees who change employers... using general knowledge and skills developed while employed."). The question is whether the alloy experiment data was valuable to a competitor and thus a trade secret, not whether the alloy experiment data in combination with something else was valuable to a competitor and thus a trade secret. And more importantly, the government did not introduce evidence to establish that someone a general understanding of Dura-Bar's process would somehow be able to determine what specific unidentified inoculant was being tested.

- **The testimony of O'Rourke's experts, on the other hand, was credible, substantial and believable and cast on strong doubt as to the jury's guilty verdicts**.

O'Rourke's independent expert witnesses, Naomi Fine and John Keough, were credible, consistent, unwavering, and wholly believable, further casting a strong doubt on the jury's guilty verdicts. This Court should reject the government's untenable attempts to establish otherwise.

First, the Court should reject the government's meritless argument that Ms. Fine was not credible because she never interviewed any Dura-Bar employee and supposedly based her opinions solely on information from the defense. Dkt. 135, p.18-19. As the government well knows, Dura-Bar refused defense counsel's request to make its employees available for pretrial interviews with

18

the defense. Moreover, Ms. Fine testified that she reviewed all of the FBI 302s consisting of the government's own interviews of numerous Dura-Bar employees so it matters not that Ms. Fine did not personally interview those same employees. Further, as evidenced in Ms. Fine's expert disclosures, defense counsel provided Ms. Fine with the government's discovery bearing on whether Dura-Bar undertook reasonable measures to protect the secrecy of the information at issue (not some smattering of defense-selected documents, as the government wrongly claims), totaling almost 1,000 pages. Likewise, contrary to the government's claim, Ms. Fine's testimony regarding Dura-Bar's lack of training on its 2014 employee handbook was based on the government's discovery, which indicated that Dura-Bar employee training was optional for many employees, including O'Rourke. Indeed, both Steinkamp and Richards testified that Dura-Bar never trained them on its 2014 employee handbook or its confidentiality policy. Steinkamp went further, testifying he had no idea whether the 2014 employee handbook even contained a confidentiality provision. Abruzzo likewise testified he was unaware of any Dura-Bar "confidentiality" policy.

The Court should similarly reject the government's claim that Ms. Fine's testimony failed to take into consideration Dura-Bar's so-called close-knit and trusting family culture. To the contrary, Ms. Fine specifically testified that even in a family owned company, the company must still identify and communicate to its employees what is and is not confidential. She also testified that she has advised small company in the metallurgy industry and that she considered Dura-Bar's trusting family culture in analyzing the facts and forming her expert opinions.

This Court also should reject the government's arguments that Keough's expert testimony was of "no value" because he has no experience with continuous cast iron and because he allegedly refused to identify how much he was being paid. Dkt. 135, p.19. The government conveniently ignores that Keough, under intense and hostile cross-examination, testified that static cast iron

19

manufacturing, in which he is irrefutably experienced and highly knowledgeable, is all but identical to continuous cast iron manufacturing. The only difference being the mold used (also referred to as the die), a distinction that he testified (unrebutted) has no effect on metallurgy principles, in general, or the accuracy of his expert opinions, in particular. Moreover, Keough toured, and worked closely with, many continuous cast iron foundries, including Hualong's and Dura-Bar's foundries. This stands in stark contrast to the government's expert witnesses, Richards and Steinkamp, who never toured, or worked with, any other continuous cast iron foundry other than Dura-Bar's foundry.

The government's alternative argument regarding Keough's compensation also unfairly distorts Keough's testimony. When asked on cross-examination how much he was being paid for his time (not his opinions, as government counsel later improperly argued in her rebuttal closing argument), Keough truthfully answered that he did not know. When allowed to elaborate, Keough explained that he was being paid for his time but did not know the exact dollar amount, which had yet to be determined or invoiced. Contrary to the government's assertion, Keough did not resist admitting that he was being paid for his time. Rather, he admitted outright that the defense would pay him. The fact he could not provide the specific dollar amount is of little, if any, consequence.

## II. <u>CONCLUSION</u>

In light of the forgoing and previously asserted reasons, Robert O'Rourke respectfully submits, should this Honorable Court not grant his Rule 29 motion for acquittal in full, the Court should exercise its discretion under Rule 33 and grant a new trial as required by the interests of justice. *U.S. v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007) (a judge ruling on a Rule 33 new trial motion "may act as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence," in furtherance of the interests of justice and fairness).

## CERTIFICATE OF SERVICE

I, Anthony J. Masciopinto, an attorney, hereby certify that the above *Defendant's Reply in Support of Rule 33 Motion For A New Trial* was served upon all counsel of record via ECF Filing on May 22, 2019.

By:    */s/ Anthony J. Masciopinto*
                One of Defendant's Attorneys

1