**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | **No. 17 CR 495** |
| **v.** | ) | |
| | ) | **Hon. Andrea R. Wood** |
| **ROBERT O'ROURKE** | ) | |
| | ) | |

**DEFENDANT'S POSITON PAPER AS TO SENTENCING**

Respectfully Submitted,

KULWIN, MASCIOPINTO & KULWIN, LLP

By:    */s/ Anthony J. Masciopinto*
        One of Defendant's Attorneys

Anthony J. Masciopinto
Rachel A. Katz
Kulwin, Masciopinto & Kulwin, LLP.
161 N. Clark Street, Suite #2500
Chicago, Illinois 60601
T: 312.641.0300; F: 312.855.0350
amasciopinto@kmklawllp.com
rkatz@kmklawllp.com

## **Table of Contents**

I.    INTRODUCTION………………………………………………………………………1

II.   FACTUAL AND PROCEDURAL OVERVIEW……………………………………..…2
   A. Bob's Family Values……………………………………………………..……..…..3
   B. Bob's 30+ Years with Dura-Bar…………………………………………………….4
   C. Bob's Legitimate Interest in the Chinese Market……………………………………6
   D. The Offense……………………………………………………………………….…7
   E. Bob's Regret, Remorse, and Responsibility…………………………………....…..9

III. LEGAL FRAMEWORK…………………………………………………………….…10
   A. Bob's Personal History and Characteristics Support a Non-Custodial Sentence…………12
      1.  Bob's Dedication to Dura-Bar Colleagues and Peers……………………………13
      2.  Bob's Family Values and Devotion to Family……………………………………16
      3.  Bob's Lifetime of Kindness, Generosity and Compassion to Others……………..19
   B. The Nature and Circumstances of the Offense Support a Non-Custodial Sentence………23
   C. Considerations of Just Punishment, Specific Deterrence,
      General Deterrence, and Rehabilitation Support a Non-Custodial Sentence…………..31
   D. A Non-Custodial Sentence Would Avoid an Unwarranted
      Sentencing Disparity……………………………………………………………….37
   E. The Court Should Reject an Advisory Guideline Total Offense Level 24………………42
      1.  This Court Should Reject Any Two-Level "Abuse of Trust" Enhancement…………43
      2.  The Government Has Failed to Prove Any Actual or Intended Loss…………………45
      3.  Bob Should Receive a Two-Level Reduction for Acceptance of Responsibility……..54

IV. RESTITUTION, FINES, AND FORFEITURE……………………………...……………57
   A. This Court Should Reject the Government's $181,875 Restitution Figure…………….57
   B. The Court Should Reject the Government's Forfeiture Claim…………………..……61
   C. The Court Should Not Impose an Above-Guideline Range Fine…………………………62

V.  RDAP/FACILITY RECOMMENDATION…………………………………………… 65

VI. CONDITIONS OF SUPERVISED RELEASE…………………………………………… 65
   A. Mandatory Conditions……………………………………………………………65
   B. Discretionary Conditions…………………………………………………………… 65
   C. Special Conditions………………………………………………………………… 66

VII.    PROPOSED CORRECTIONS TO PSR……………………………………………66

VIII.   CONCLUSION………………………….…………………………………....……69

NOW COMES the Defendant, Robert O'Rourke ("Defendant" or "Bob"), by and through his attorneys Kulwin, Masciopinto & Kulwin, LLP, and respectfully submits this position paper as to sentencing. Based on the nature and circumstances of the offense, Bob's personal characteristics, and other relevant sentencing considerations, Defendant respectfully requests the Court to impose a non-custodial sentence with conditions that the Court deems appropriate (such as community service and/or home detention).

## I.     __INTRODUCTION__

The government prosecuted Bob on 26 charges of alleged trade secret misappropriation pursuant to 18 U.S.C. §1832(a). The government's 26 charges were broken down into 13 "substantive" charges and 13 "attempt" charges, all subsumed in thirteen counts. Dkt. 1. The government's 13 counts charged five categories of alleged trade secrets: (i) Count 1, a 1993 Document; (ii) Counts 2-4, Lab Reports; (iii) Counts 5-7, IR Camera Reports; (iv) Counts 8-10, IR2 Camera Reports; and (v) Counts 11-13, Alloy Experiment Reports. Dkt. 1.

After a three week trial involving complicated evidence and contested legal issues (over some but not all of the §1832 elements), the jury acquitted Bob on 16 of the government's 26 charges. Dkt. 112. With respect to the 16 acquittals, the jury unanimously concluded that Bob was not guilty as to: (i) Count 1, 1993 Document, substantive trade secret charge; (ii) Counts 5-7, IR Camera Reports, substantive and attempt trade secret charges; (iii) Counts 8-10, IR2 Camera Reports, substantive and attempt trade secret charges; and (iv) Counts 11-13, Alloy Experiment Reports, attempt trade secret charges. *Id.* The 10 counts of conviction included: (i) Count 1, 1993 Document attempt charge; (ii) Counts 2-4, Lab Reports attempt and substantive charges; and (iv) Counts 11-13, Alloy Experiment Reports substantive charges. *Id.*

As explained below, based on all of the circumstances, defense counsel requests a non-custodial sentence with conditions that the Court deems appropriate. The government, on the other

hand, seeks a sentence of 60 months' incarceration, which is at the high end of its advisory guideline calculation (51-63 months), total offense level 24, which calculation is disputed. Gov. Memo., p.11.[1] Meanwhile, Probation recommends a sentence of 1 year and a day. Sent. Rec., p. 1.

Defendant agrees with Probation that a below-guideline sentence is supported by the factors enumerated in 18 U.S.C. §3553(a), but respectfully submits that a noncustodial sentence is the lawfully appropriate sentence. First, the government's total offense level of 24 is incorrect because it: (i) includes an overstated and unsupported loss amount; (ii) includes an unwarranted two-level abuse of trust enhancement; and (iii) fails to include a two-level reduction for acceptance of responsibility. Second, separate and apart from the advisory guideline calculation, a non-custodial sentence is supported by important §3553 factors, including: (i) the nature and circumstances of the offense; (ii) Bob's exemplary personal, family, employment, and community history characteristics; (iii) Bob's 50+ years of no criminal history or problem with the law; (iv) the unlikelihood of recidivism; (v) the substantial collateral consequences which Bob has already suffered; and (vi) the need to avoid unwarranted sentencing disparities. As such, the proposed non-custodial sentence is "sufficient but not greater than necessary" to comply with the purposes of sentencing enumerated in §3553(a). In contrast, a custodial sentence, respectfully, would be unduly harsh, unfair and unjust, and contrary to purposes of federal sentencing laws and principles.

## II.   FACTUAL AND PROCEDURAL OVERVIEW

Probation prepared an extremely thorough summary of Bob's personal and family background. PSR ¶¶47-62. Also, Bob's family, friends, colleagues, and peers have written 47 character letters recounting Bob's true nature and character – a hardworking man, a supportive and

---

[1] We cite to the government's July 24, 2019 sentencing memorandum (Dkt. 146) as "Gov. Memo." We cite to the government's Version of the Offense, submitted to Probation on May 16, 2019, as "GVO." We cite to the Defendant's Version of the Offense, submitted to Probation on May 30, 2019, as "DVO." We cite to Probation's Presentence Investigation Report, dated June 19, 2019, as "PSR." Finally, we cite to Probation's Sentencing Recommendation as "Sent. Rec."

devoted family member, a generous, selfless friend and co-worker, and valuable contributor to society. We have summarized some of these character letter in the sections below where indicated. Additional character letters (not cited herein) are attached to this submission as Group Exhibit 38.

## A.    <u>**Bob's Family Values.**</u>

Bob (DOB 2/28/60, now 59 years old) was born into a large, religious family in Saint Charles, Missouri. PSR, ¶47. Bob's parents, Charles and JoAnne, married in 1955 and remained married for nearly 65 years until JoAnne's recent death in February, 2019, during Bob's trial. Bob is one of six children born to Charles and JoAnne, two of whom, Katherine and Daniel, died shortly after birth. *Id.*, ¶48. Bob's father worked in manufacturing before retiring, while his mother worked as a homemaker. *Id.*, ¶47. Bob's elderly father now resides in Hartsville, South Carolina, although Charles managed to attend portions of Bob's criminal trial shortly after his wife's passing. Bob was extremely close with his mother and remains extremely close with his father, which was reflected, in part, in Bob's email correspondence admitted at trial.

Bob too maintains strong relationships with his siblings. Bob's older sister, Jane Walsma is 61 years old and a retired social worker. PSR, ¶48. Jane resides with her husband and two surviving children (another is deceased) in Missouri. *Id.* Bob's brother, Charles (Andrew) O'Rourke, is 56, works as a purchasing manager, and resides in Missouri with his wife and two daughters who, in turn, have six children (grandchildren). *Id.* Bob's other brother, Timothy O'Rourke, is 55 years old, a tool and die maker by trade, and lives in South Carolina with his wife. Timothy and his ex-wife have two children. *Id.* Timothy suffers from multiple sclerosis and is working to become a vocational training teacher. *Id.*

Bob highly values family. Throughout his lifetime, Bob has enjoyed a close relationship with his parents and siblings. Growing up, Bob's family regularly shared meals together and attended church weekly. PSR, ¶50. Bob's parents were very actively involved in their local church.

More generally, Bob and his siblings were reared in a strong Catholic family that placed great emphasis on hard work, responsibility, education, family, good moral behavior, and community involvement. *Id.*, ¶¶49-50.

Bob earned an engineering degree and master's degree. Also, aside from his isolated, misguided and regrettable conduct on September 13, 2015, Bob has lived his entire life free of any criminal wrongdoing. In all other respects, he has been a valued and productive member of society, loyal friend, loving family member, and highly knowledgeable and talented co-worker.

**B.** **Bob's 30+ Years with Dura-Bar.**

Bob was one of Dura-Bar's longest tenured employees, spanning some 30+ years (1984 – September 15, 2015). Bob started as a Dura-Bar intern while attending what is now known as Missouri University of Science and Technology. After graduating, Bob rose through the Dura-Bar ranks to hold a variety of positions, spending his last 25 years or so in sales. Among other positions, Bob worked as Melt Supervisor, Barline Production Foreman, Plant Metallurgist, Quality Assurance Manager, Product Engineering Manager, International Business Development Manager (Sales), and Dura-Bar China Country Manager (Sales). While at Dura-Bar, Bob attended graduate school and received an MBA from Keller Graduate School of Management (June 1993). PSR, ¶81.

Bob was incredibly dedicated to Dura-Bar and its owners, first Marshall Wells and then his son Tom. Bob helped recruit and mentor summer interns, spending significant time after hours and on weekends doing so. Frank Abruzzo, a government witness who worked with and supervised Bob for 30 years, recalls how Bob selflessly devoted his time and energy, writing, "[I]t wasn't a job requirement, but as an intern himself, he knew how much that meant to these kids." Ex. 1, F. Abruzzo. Sara Goad also illustrates Bob's selfless nature, work ethic, and leadership skills:

> [W]e would send Bob to colleges to recruit summer interns. You could tell Bob enjoyed that. He wanted the students to succeed and have the same opportunities he did. When Bob found those special interns, he would create their projects for the summer.... Bob made sure the interns each summer had

4

> housing and when they arrived their first day, he was there making sure they felt welcome. Bob was that guy that every parent wanted their child to have as their mentor when they go off at college. At the end of every summer Bob had an intern appreciation day at his house. All the interns were invited to his house for a barbecue.... Bob wanted them to feel valued in being a part of the Wells family with hopes to retain them in the future or give them a sendoff with thanks for their efforts.  Ex. 2, S. Goad.

Bob excelled at Dura-Bar because of his intellect, talent, hard work, and passion for Dura-Bar and his profession. Bob's Dura-Bar colleagues and peers throughout his industry respected Bob's knowledge, skills, work ethic, good nature, and enthusiasm. Frank Abruzzo, Bob's immediate supervisor for 25 years, describes Bob as "an exemplary employee who loved his job and the people he worked with." Ex. 1. Abruzzo continues, "The Bob O'Rourke I have known for over 25 years is hardworking, dedicated, caring, generous and admired by his peers, customers, friends and family." *Id.*  Tom Wells, Dura-Bar's former owner who worked directly with Bob for over 15 years, similarly describes Bob:

> Throughout his career, Mr. O'Rourke always impressed me with his dedication to our company, his high level of energy, the degree to which he was well respected and liked by our customers and his deep knowledge of our product and markets. Frankly, he was one of the best assets in our company and I feel that he was an incredibly hard working and loyal member of our team.

Ex. 3, T. Wells. Chuck Rigali, who worked with Bob for over 30 years, also regarded Bob as a uniquely skilled engineer, exceptional employee, and good person:

> I almost instantly recognized in Bob a unique and rare combination of technical intelligence, humility, humor combined with commercial savvy. Very seldom did you find an intelligent talent like Bob that could communicate with anyone; from the shop floor to the executive suite. I knew Bob could help us in sales to reach a necessary new level of understanding and to be successful with our customers.

Ex. 4, C. Rigali.; *see also* Ex. 5, J. Sheahan (Bob was "admired by his peers and respected by his bosses and customers. He was one of only a handful of employees that was truly considered to be 'irreplaceable.'"); Ex. 2, S. Goad. (Bob was "Mr. Dura-Bar," the "go-to-guy," "mentor to many").

5

Bob's positive traits were instrumental to Dura-Bar's success and the company it is today. Abruzzo writes, "Bob was always my best performing sales person. He worked harder, traveled more and generated more sales and interest in our products than anyone on my staff." Ex. 1, F. Abruzzo. Kevin Conners, a Dura-Bar Account Manager who has known Bob for over 35 years, also attributes Dura-Bar's success to Bob: "Bob was personally responsible for the much of the growth and success of Dura-Bar sales…" Ex. 6, K. Conners. Dozens of other Dura-Bar employees attribute Dura-Bar's success to Bob's hard work, intelligence, skills, and dedication. *See e.g.*, Ex. 7, N. Trebesch ("All I can say is that Bob is the reason Dura-Bar is what it is today. Bob was the most honest, hardworking and loyal employee a company could ask for."); Ex. 8, M. Haak ("Largely through his efforts, technical knowledge, people skills, personality, and his love of the Dura-Bar company and fellow employees, Bob became an integral part of the dynamic sales team, making the Dura-Bar name and company what it is today.); Ex. 10, J. Accorsi ("Mr. O'Rourke was critical to the company's success. In my estimation, he was responsible for much of the success enjoyed by Dura-Bar. He was gifted and dedicated . . . He was the best Dura-Bar ever had.).

**C.**     **Bob's Legitimate Interest in the Chinese Market.**

Bob's long held a legitimate interest in China and the Chinese market. In the mid-2000's, Dura-Bar introduced Bob to the Chinese market by tasking him to investigate a joint venture with a Chinese continuous cast iron manufacturer, which included a lengthy courtship with Hualong. Since the mid 2000's, Bob expressed keen interest in Dura-Bar expanding its manufacturing capability and sale of continuous cast iron in China. Ultimately, Dura-Bar chose not to purchase Hualong's Chinese manufacturing plant, opting instead to open a Chinese Dura-Bar warehouse to sell its product manufactured in Illinois. This was a dubious proposition given the high costs associated with transporting heavy continuous cast iron product overseas, and Dura-Bar's

6

premium price, even without these extra exporting costs. Nevertheless, Dura-Bar tasked Frank Abruzzo and Bob with overseeing and testing the viability of Dura-Bar's Chinese warehouse sales.

Charter, within a year or so of purchasing Dura-Bar, in or about 2013, started making clear its disinterest in Dura-Bar's Chinese operations and the Chinese market because it was unprofitable. In or about 2014, Dura-Bar's new owners rejected Bob's request for an overseas assignment to China. In 2015, Dura-Bar's new owners decided to close Dura-Bar's Chinese warehouse and sell its inventory and equipment, effectively abandoning the Chinese market.

Bob and Hualong representatives forged a friendship dating back to the late 2000's. Given the circumstances with Dura-Bar's new owners and their lack of interest in the Chinese market, Bob and Hualong started preliminary discussions in approximately January 2014 about Bob's possibly joining Hualong. Over a year and one-half later, in August 2015, Bob finally accepted employment with Hualong and then resigned while off-site "effective immediately." However, at this off-site meeting, Bob's supervisor, Anthony Guiterrez (who had replaced Abruzzo), requested Bob to transition out for a number of weeks (ultimately 4 weeks). Bob agreed to stay to help.

**D.     The Offense.**

Two days before his last day of work, Sunday, September 13, 2015, Bob went to Dura-Bar to clear out his office, including his personal belongings. Bob entered Dura-Bar's surveilled Woodstock facility using his key. While there, Bob used his Dura-Bar issued laptop to copy an electronic folder titled "Lab Reports" stored on Dura-Bar's shared, unrestricted S: drive. Bob did so by "dragging over" the Lab Reports folder to a portable, external hard drive, which took 17 minutes to complete. The Lab Reports folder contained certain electronic files (such as external and internal lab reports saved by numerical designations only) and electronic subfolders, one of which was entitled Alloy Experiment Data.

7

Bob's final day of work at Dura-Bar was two days later, September 15, 2015. After work, Bob went out with some Dura-Bar colleagues, including, among others, Lon Hollis, Dura-Bar's Director of Human Resources, and Rhett Meal, Dura-Bar's Operations Manager. At this time, Bob informed his colleagues that he was moving to China in a week to work for Hualong. Dura-Bar's non-compete agreement with Bob precluded him from working in North America for 3 years. GX 5, p. 6. Nevertheless, when Guiterrez first heard about Bob's plans to work in China for Hualong (without knowing anything about Bob's copying), Guiterrez remarked, "This is not good for Bob nor for us." DX Z-64. On September 16, 2015, after Hollis inquired, Bob expressed no objection to Hollis and Meal informing Dura-Bar's President, Pete Murray, about his plans.

On September 21, 2015, federal agents stopped Bob at O'Hare Airport while he boarded a plane to China. Agents searched Bob's carry-on and checked luggage, seizing various electronic equipment (*e.g.*, portable hard drive, phone, personal computer) and hard copy files (*e.g.*, Dura-Bar Resource Manual, 1993 Document). After seizing these items, government agents permitted Bob to travel to China. Bob did so a number of times thereafter, between September 21, 2015 and 2017. Each time, Bob returned to the United States from China, knowing he was under criminal investigation and later even knowing that an indictment was forthcoming. In early 2017, upon the government's request, Bob cancelled his planned trip to China.[2]

In July 2017, almost two years after its September 2015 searches, the government criminally charged Bob in a thirteen-count indictment, alleging a total of 26 substantive and attempt trade secret charges pursuant to 18 U.S.C. §1832. In February 2017, the Court presided over a three week trial, after which the jury acquitted Bob on 16 of the 26 charges. These 16 acquittals comprised three of the five categories of alleged trade secrets. The jury concluded that

---

[2] This Court authorized Bob's travel to China even post-indictment after he and his father provided their retirement assets as security. Dkt. 29. Bob traveled to and from China without incident.

Dura-Bar's 1993 Document (Count 1), its IR Camera Reports (Counts 5-7), and IR2 Reports (Counts 8-10) were not "trade secrets" under federal law. As for the counts of conviction, the jury concluded that one or more of Dura-Bar's Lab Reports (Counts 2-4) and its Alloy Experiment Reports (Counts 11-13) qualified as a "trade secret" under federal law.[3]

**E.      Bob's Regret, Remorse, and Responsibility.**

For approximately four years, Bob has struggled with his decision on September 13, 2015 to "drag over" and copy the Lab Reports folder. He regrets doing so, accepts responsibility for doing so, and is remorseful. Without minimizing his conduct, Bob did not believe he was copying "trade secrets" under the law. Still, Bob is acutely aware that it is his conduct that has led him to stand before this Court. As such, Bob lives every day with his painful reality and the guilt of causing tremendous pain to himself, his family, friends, and others, after living an exemplary life. Those who have observed Bob firsthand over the last four years know best Bob's sincerity and candid remorse, as reflected in a sampling of just some of their character letters below:

- "Bob is aware and has communicated to me that he deeply regrets his poor judgment that has caused him to be in this current predicament. He accepts the jury's decision and respects the process while taking responsibility for what he was found guilty of." Ex. 4, C. Rigali (*former Dura-Bar employee*);

- "I believe [Bob] recognizes that his conduct was incongruent with his core principles and I believe he is sincere in his regret regarding his actions…I believe his remorse to be genuine." Ex. 3, T. Wells (*former owner of Dura-Bar*);

- "We talked for thirty minutes about how he had messed up his life and made some truly regrettable mistakes that could send him to prison. He told me that he was given a fair trial and he respects the justice system and the verdict." Ex. 6, K. Conners (*current Dura-Bar Account Manager*);

- "I simply want it to be known that I can inform you first hand that Bob understands the consequences of his actions and has accepted full responsibility." Ex. 11, R. Hardwick;

- "Bob has dealt with, suffered, persevered and accepted responsibility for quite a bit over the last three years." Ex. 12, T. Jennings;

---

[3] As to the 1993 Document (Count 1), although concluding the document was not a "trade secret," the jury found Bob reasonably believed it to be one, so it convicted on Count 1's "attempt" charge only. Dkt. 112.

9

- "I believe Bob understands the mistakes he has made and is genuinely remorseful for the pain he has caused." Ex. 13, S. Lammers (*Metallurgical Engineer and former American Foundry Society Technical Director and newly elected Executive Director of the Ductile Iron Society*);

- "[Bob] is a standup guy and [is] in no way blaming anyone for his current situation. I am very proud of him. No doubt in my mind that he will survive and be a better person for taking responsibility." Ex. 14, N. Huser;

- "[Bob] has admitted wrongdoing…he regrets his actions." Ex. 15, L. Wright;

- "Bob is paying terribly for his mistakes. He had learned much. He is contrite and accepts responsibility." Ex. 16, J. Keough;

- "Bob has acknowledged to me his remorse and his desire to put this behind him and move on." Ex. 5, J. Sheahan (*current Dura-Bar Finishing and Distribution Manager*);

- "I know Bob deeply regrets his actions and would do anything to take it all back." Ex. 17, Andy O'Rourke;

- "I know that [Bob] is remorseful for the trouble he has caused to his former company, and for the pain he has caused his family" Ex. 18, B. Singleton;

- "Bob is deeply remorseful and saddened by his error in judgment. He has expressed deep regret [for his conduct]…" Ex. 19, C. Werth; and

- "Bob has accepted the jury's decision, displaying a tremendous regard for lessons learned while keeping his dignity; humbly and remorsefully." Ex. 21, G. Reuss.

### III.  <u>LEGAL FRAMEWORK</u>

The defense respectfully submits that a non-custodial sentence with conditions is the appropriate sentence under federal sentencing laws. The goal of the federal sentencing is to fashion an individualized sentence that is "sufficient, but not greater than necessary" to promote the sentencing goals established by Congress in 18 U.S.C §3553(a). This standard or limitation – requiring district courts to only impose a minimally – sufficient sentence – is referred to as the "parsimony provision."  Section 3553's "parsimony provision" is not simply a "factor" to be considered.  Rather, the "parsimony provision" represents a cap above which the district court is statutorily prohibited from sentencing – even when a greater sentence is recommended by the

sentencing guidelines. *U.S. v. Denardi*, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J., concurring and dissenting in part).

A "minimally-sufficient" sentence is one that achieves statutory purposes of §3553(a)(2), namely, just punishment, general deterrence, individual deterrence, and rehabilitation. 18 U.S.C. §3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in 18 U.S.C. §3553(a) (2)). In so doing, it is the district court's duty to "make its own reasonable application of the §3553(a) factors, and to reject (after due consideration of) the advice of the Guidelines" if the result they suggest does not comport with the sentencing court's view of a minimally sufficient, appropriate sentence. *Kimbrough v. U.S.*, 552 U.S. 85, 113 (2007) (Scalia, J., concurring).

The applicable sentencing factors enumerated in 18 U.S.C. §3553(a) that the district court must consider are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and sentencing range established for –

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines issued by the Sentencing Commission... ;

(5) any pertinent policy statement –  (A) issued by the Sentencing Commission...

11

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

In analyzing these §3553(a) factors, the Supreme Court has emphasized that sentencing courts should impose a punishment that "fit[s] the offender and not merely the crime." *Pepper v. U.S.*, 131 S. Ct. 1229, 1240 (2011). District judges are not "permitted…to presume that a sentence within the Guideline range is the correct sentence." *U.S. v. Demaree*, 459 F.3d 791, 794 (7th Cir.2007), *rev'd on other grounds, Peugh v. U.S.,* 133 S. Ct. 2071 (2013); *Nelson v. U.S.*, 129 S. Ct. 890, 892 (2009). The court must fashion a sentence "based on §3553(a) without any thumb on the scale favoring a guideline sentence." *U.S. v. Sachsenamier,* 491 F.3d 680, 685 (7th Cir. 2007).

The district court's "choice of sentence, whether inside or outside the guideline range, is discretionary." *U.S. v. Ngatia*, 477 F.3d 496, 501-02 (7th Cir. 2007) (citing *U.S. v. Rita*, 127 S. Ct. 2456, 2465 (2007)). A district court judge's "freedom to impose a reasonable sentence outside the range is unfettered." *Demaree*, 459 F.3d at 795. A sentence below the advisory guideline range is appropriate as long as the reasons for selecting that sentence "are rooted in §3553(a), sufficiently individualized to the circumstances of [the] case, and generally associated with sentencing leniency." *U.S. v. Wachowiak*, 496 F.3d 744, 745 (7th Cir. 2007).

A careful individualized assessment of Bob and his case establishes the propriety of a noncustodial sentence with appropriate conditions, because such a sentence is "sufficient but not greater than necessary" to comply with §3553 sentencing considerations.

## A.    Bob's Personal History and Characteristics Support a Non-Custodial Sentence.

Pursuant to §3553(a)(1), Bob's personal history and characteristics support a non-custodial sentence. Bob's many extraordinary qualities and positive traits are important considerations for the Court to consider in fashioning an appropriate sentence. The Court may entertain a broad analysis in this respect. *Pepper*, 131 S. Ct. at 1240 (there are no limitations on the kinds of

background and character information that the sentencing court may consider in determining a defendant's sentence); *U.S.. v. Perez-Molina*, 627 F.2d 1049, 1051 (7th Cir. 2010). As Judge Rakoff from the Southern District of New York observed, "If ever a man is to receive credit for the good he has done, and his immediate conduct accessed in the context of his overall life hereto, it should be at the moment of his sentencing, when his very future hangs in the balance." *U.S. v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y. 2006).

Bob's many character letters provide a true and accurate portrayal of the man behind the criminal conduct that brought him before this Court. Indeed, they reveal that Bob's conduct in this case stands in stark contrast to an otherwise praiseworthy, admirable, and contributory life. The letters show that Bob is not a greedy or malevolent person. Rather, they reveal Bob as a kind, generous, selfless, loyal, and compassionate person who values hard work, family, and those around him. From using his financial resources to help relatives and friends through hard times, to being an active member in his church and community, to mentoring disadvantaged children and Dura-Bar interns, to taking the time to make a colleague feel special, to stopping to help a stranger in need, Bob can be, and is, counted on in times of need no matter his personal circumstances. Throughout his life, Bob has proven himself a valuable member of his community and society. If given the opportunity, Bob will continue to make significant contributions to the community, as attested to by just some of the testimonials from those who know Bob best.

1.  Bob's Dedication to Dura-Bar Colleagues and Peers.

The many character letters from former and current Dura-Bar employees reveal a collegial co-worker devoted to the wellbeing and success of those around him. *See e.g*., Ex. 22, A. Berman ("I know Bob as a generous individual who is always looking out for the interests of his co-workers and customers…Bob was always generous with his time and shared his knowledge to the benefit of others."). Nancy Trebesh, a former Dura-Bar Regional Sales Manager, recalls that when she

13

was first hired by Dura-Bar in 1990, Bob was incredibly welcoming, patient, and helpful: "Bob worked with me while I was in training, explaining every process that Dura-Bar used. He was incredibly patient and knowledgeable in explaining everything…" Ex. 7, N. Trebesh. Indeed, Bob was admired for his willingness to educate others, regardless of whether it benefitted him or not. John Accorsi, a former Dura-Bar employee of 35 years, writes, "[Bob]" was always incredibly helpful to me. He took the time to listen to my ideas and answer my questions even though doing so provided him with no benefit, rather he did it because he was just a good guy who was always looking to help others." Ex. 10, J. Accorsi.

Kevin Conners, a current Dura-Bar Account Manager, recalls that "[Bob] trained every new sales person who didn't know the difference between Dura-Bar or a two by four. He taught in a way that all great teachers teach. He made the complicated easy and he made learning fun. He certainly helped me in the twenty some years we worked directly together." Ex. 6, K. Conners. Similarly, Sara Goad, who retired from Dura-Bar in 2016 after 22 years of service, describes Bob's unique abilities when it came to helping others as follows:

> I always admired Bob's ability to educate others, develop others and speak well to groups of any size. I was envious, he made it look so easy…Being in the office, I never understood much about Dura-Bar but Bob had a way of teaching or explaining the processes so I could understand. Everyone felt that way. Not only did Bob have wonderful leadership skills, great work ethic, and is brilliant but he also was someone who worked weekends, late nights, early hours and never complained once. Just an ideal employee. Ex. 2, S. Goad.

Others relied on Bob as their mentor. For example, Jon Sheahan, the Finishing and Distribution Manager for Dura-Bar, describes how Bob went above and beyond to help him prepare for his new position in China:

> He served as a true mentor to me in preparing me for life in another country. He had made a couple of trips to China previously and knew what to expect, how to behave and what not to do. He helped pick out my apartment and set things up with our consultant prior to my arrival. I spent two consecutive months and a total of four and a half months living there over the next year and a half. Bob was instrumental in preparing me and ensuring my success. Ex. 5, J. Sheahan.

14

Beyond helping colleagues grow professionally, Bob personally cared. Many of Bob's former co-workers describe Bob as a true friend. Sara Goad reflects on this close relationship:

> I have been a friend of Robert O'Rourke's for [] 22 years. The reason I say a friend rather than just a co-worker is when we were Wells Manufacturing Company, we all were so very close and were one big family. Bob played a huge role in that family. When I started with Wells, my "cube" was down the hall from Bob's office. He would walk by and take the time to say good morning, ask how my weekend went and find out how I was doing. He always made me feel like I was one of the team, like an equal. . .
>
> While working with Bob at Dura-Bar, I got to know how truly compassionate, kind, giving, selfless, humble and loving he is when dealing with everyday things. I saw firsthand how Bob helped others and there were many. Throughout the years, you see employees fall on tough times. One that specifically comes to mind is an employee who had just lost her husband and had many children to take care of, Bob helped her emotionally and at times financially. He was that person that always bought the Girl Scout cookies, the person who took charge to make sure when someone had a special birthday, anniversary or retirement that we all chipped in to make them feel extra special. Bob is one of these guys that can walk into a room with 100 people and leave with 99 friends, just a joy to be around. Ex. 2, S. Goad.

Over his lifetime, Bob has gone above and beyond for others. Ann DeFrancisco, who met Bob nearly 40 years ago as a Dura-Bar receptionist, recalls how she benefited from Bob's extraordinary kindness and generosity:

> I lost my husband when I was 43 years old and I had 8 children to care for and Bob seriously came to my rescue more times than I can count. He helped me with a family dog who passed as I did not have the heart to take care of it. He helped me with selling my home when I had just no clue what to do. . . He was truly a savior to me. Every SINGLE day (without fail) he stopped at my desk to see how I was doing and asked if he could do anything for me or at the house, if he could help in anyway at all…who does this and who continues it, every day checking in with me, everyday offering his help and continuing to do this for years and years.

Ex. 23, A. DeFrancisco. Mary DeFrancisco, Ann's daughter, also recalls experiencing and witnessing Bob's generosity first hand. Mary writes:

> My mother was widowed at a very young age and had 8 children to care for . . . My mother, a true saint and beloved by so many, just fell in love with him [Bob] as he really filled her days with joy. The laughs and the care he gave my mother allowed her a second chance at happiness and Bob became

> family. . . I have countless more examples of what Bob has done for my mother, my family... and all on his own personal time of course, never asking for anything in return, just a good, stand up gentleman helping an older woman that truly needed help. Ex. 24, M. DeFrancisco.

Bob's love and respect for his Dura-Bar co-workers was evident to even Bob's friends.

Tim O'Donnell writes:

> Bob was not just friendly with his co-workers at the office, he often interacted with them socially outside of the office. I can't tell you how many times Bob had his co-workers over to his house for a barbeque or to play cards. . .Bob never hesitated to have them over, every month. Everyone was invited, from the owner to the guys working in the factory. They all liked and respected Bob. It was a genuine friendship between them. Bob's relationship with the Dura-Bar/Charter people was one of the reasons I asked him to get me an interview at Dura-Bar. Ex. 25, T. O'Donnell.

2.    Bob's Family Values and Devotion to Family.

Bob's similarly possesses exceptional family values. By all accounts, Bob has always been the "rock of the family" and the "go to guy."  Jane Walsma, Bob's older sister and a retried clinical social worker, describes Bob's commitment to family:

> The family has always been a priority for Bob, since a very early age. Our family is very spread out geographically, and Bob has always been at the forefront of organizing family gatherings. Although he has no children of his own, he has had a special relationship with his nieces and nephews. I chose Bob to be the Godfather for our daughter. He has always been very generous and supportive of siblings in need. When one of our brothers was facing a financial crisis, Bob was the first to offer financial and emotional support.

Ex. 26, J. Walsma. Andy O'Rourke, Bob's younger brother, recounts the same sentiment:

> Bob has been a huge part of keeping our loving family connected . . . He helped make those Beach Weeks the best memories of our lives. Outside of Bob loving to have fun, he was always willing to help his friends and family with financial difficulties, and no one more than me. Ex. 17, A. O'Rourke.

Bob's youngest brother, Timothy (Tim) O'Rourke, refers to Bob as an "excellent role model" and leading "by example." Ex. 27, T. O'Rourke. Andy O'Rourke agrees with Tim's assessment, writing that Bob "has always been the example of who I wanted to be." Ex. 17, A. O'Rourke. Tim recalls that Bob's instrumental love and support when Tim struggled with alcohol

16

and drug addiction, noting that "Bob helped me throughout my recovery with intervention and support." Ex. 27, T. O'Rourke.

Bob's kindness, love, regard, and devotion to his mother, who passed away during the trial after long suffering from Alzheimer's and dementia, too is clear. Frank Abruzzo notes:

> Bob is also very close to his parents whom are both in poor health. His father has heart problems and his mother, who tragically passed away during Bob's trial, was afflicted with Alzheimer's and dementia. Bob's support for them has been crucial to their health and survival. His father refused to put her in a home, but this became quite a burden for his father and his health. Bob stepped in and hired a home nurse during the day which helped both his mother and father.

Ex. 1, F. Abruzzo. Tim O'Rourke similarly describes Bob's devotion to his family and mother:

> Even though he spent much of his time in China the past few years we haven't felt the distance because he has kept in touch with us and traveled back to the States often to attend to important family needs. Our mother passed away in February of this year after living with dementia for over ten years. During those years Bob made many visits to Mom. He built wheelchair ramps and remodeled rooms to accommodate Mom's changing and challenging conditions. Bob also took our father to China for a well needed vacation. We are grateful to him for his unselfish giving of himself.

Ex. 27, T. O'Rourke. Bob's cousin, Norma Huser, makes similar observations, noting that, "[I]t was heartwarming to observe Robert interact with his loving mother. Never wavering but clearly handling everything as normal. She loved to laugh and as much as she had already lost of herself, she still would laugh at his humor." Ex. 14, N. Huser. Bob's father simply describes Bob as a "wonderful son who has always been there for my late wife and me." Ex. 28, C. O'Rourke.

Over the years, Bob generously, without hesitation, provided significant financial support to his family. Frank Abruzzo explains:

> Bob was often helping his brother who had chronic financial problems and frequently lent him money to support his wife and daughter. In spite of Bob's help his brother was essentially bankrupt and the bank was about to foreclose on his home. Once again Bob came to the rescue taking over his mortgage payments, helping him rearrange his finances and saving their home. Unfortunately, there was one more victim in this mess, their daughter and Bob's niece. Apparently, his brother had also spent his daughter's

17

> college savings. Once again Bob stepped up and paid for her college tuition,
> I believe for all 4 years!

Ex. 1, A. Abruzzo. In fact, Andy O'Rourke explains that Bob lent him significant monies knowing

Andy would be unable to repay him. *See* Ex. 17, A. O'Rourke. ("When he extended financial help

to me and my family I think he did it knowing he would probably not get paid back but did it

anyway"). Accordingly to Bob's cousin Lori, ""If it was not for Bob, his brother, Andy, would be

[in dire straits]. . . . Bob helped his brothers out financially and emotionally to get them through

some rough times. Bob is an honest, selfless person." Ex. 15, L. Wright.

Bob's strong character and selfless nature has extended to his fiancée Tina's family as well.

Madi Gagliardi, Tina's daughter, has come to think of Bob as a father figure and describes in her

letter the reasons she loves and respects him:

> Bob is so generous. From welcoming in our family; to moving me from apartment
> to apartment; to helping neighbors and friends constantly; to suggesting my
> grandmother move in with him and my mother this summer, I have seen Bob's
> good heart and pure intentions. I am the first person in my family to graduate
> college and Bob has been instrumental in my preparation for the real world. He
> inspires me to work hard, think smartly, and respect myself.

Ex. 30, M. Gagliardi. Tina Gagliardi likewise describes how Bob immediately welcomed,

supported, and respected her family. Tina writes:

> When we began seeing each other, Bob accepted my family with open arms. My
> daughter, who was finishing high school, and my mother, who was living with me
> at the time, were shown nothing but love and support. He not only took time to help
> my mother relocate when she wanted to make a move to Menomonee, Wisconsin,
> but he also continued to help her financially over the years to ease her burdens.
> When my daughter left for college, less than a year after we met, he volunteered to
> help move her in and care for our family in any way he could.
>
> Even this summer, during the chaos of trying to find a way to provide and stay the
> course through this case, Bob suggested to move my mother in with us as she was
> depressed and no longer happy living away from us. It is these examples that speak
> to his true character… Ex. 31, T. Gagliardi.

Bob's positive character showed even through his emotionally traumatic criminal trial and

in the aftermath of the jury's verdict. Immediately after trial, Tina's mother became very ill,

required hospitalization, and was diagnosed with advanced stage colon cancer. She passed away less than one month after trial and the verdict. Despite everything, Bob dropped everything to be by her side as well as Tina's and Madi's. Madi Gagliardi who drafted her letter prior to her grandmother's passing, describes Bob's selflessness during this very trying time:

> My grandmother, who is my rock and best friend, has been diagnosed with advanced stage colon cancer. Due to her age and complicated condition, she not only faces daily pain and risk medical operations, but also an unforeseeable future. This is an incredibly scary time for my small family and Bob's presence is needed at home now more than ever to help my mother. I am endlessly thankful for his proactive and loving heart, as it is the reason she currently lives with them and not on her own. Ex. 30, M. Gagliardi.

    3.    <u>Bob's Lifetime of Kindness, Generosity and Compassion to Others</u>.

Bob also has made substantial contributions to the lives of many others. Those who know him best describe him as "selfless," "the first one to step and say how can I help," "the kind of guy who would take his shirt of his back for anyone in need," "empathetic," "loving," "kind-hearted," "generous," "honest," "reliable," "a great person" and, put simply, "one of the best human beings."

Gerald Holmberg, who first met Bob upon retiring and moving to Lake Geneva, recalls knowing instantly that Bob was a wonderful person and friend. Gerald describes Bob as, "[A]n honest, generous, loving and caring person. Very devoted to his family as well as to his friends. A very selfless individual. Always the first one to step up and say, "How can I help?" In other words, a true friend. A man who I am proud to know." Ex. 32, G. Holmberg. George Reuss, who has known Bob for over 20 years, similarly observes, "Objectively, I can say that the lives of his family and friends are forever better for knowing him. If I had to use one word to describe Bob as a person, it would be selfless…Without doubt, he is one of the best human beings that I have ever known… As long as I have known Bob, he has always been the kind of guy who would give the shirt off his back to anyone in need." Ex. 21, G. Reuss.; *see also*, Ex. 11, R. Hardwick. ("I can honestly say that not only do I look up to him as a stellar citizen, but I also care for him as a

selfless, loving friend. Always hard-working, he is known to help others and has never asked for anything in return. Many lives have been enriched because of Bob, mine included.").

Chuck Rigali too attests to Bob's positive contribution to the lives of others:

His empathetic responses to his friends' needs was always on display. Bob's genuine generosity caused him to help you out with anything you needed: money, time, rides, tools, advice and sometimes simply companionship. He has a very high EQ, emotional intelligence level. I will never forget that during the long struggle of my divorce proceedings Bob realized I was turning 40 years old and would not be with my children and had nothing planned to celebrate. He put together a wonderful party at his home and took us all sailing, windsurfing, skiing and dining. He made me feel loved and valued. He was always good at that too.

Ex. 4, C. Rigali. Tim O'Donnell, another friend, also writes how Bob made his life better:

When I moved to Lake Geneva for a new job, I knew not a single person in town. Bob was one of the first people I met and thankfully so. . . . There wasn't a time when Bob didn't invite or include me in anything he was planning. He got me involved with his church. He got me involved in bowling, volleyball, and many other activities. He taught me how to windsurf, scuba dive, sail, wakeboard, etc. and he also taught me how to fix basically anything in my house. There isn't anything he wasn't good at. He also introduced me to one of my greatest passions, triathlon racing. Bob and I would train for hours together all the while he would be teaching me the art of endurance training/racing and the life lessons you learn from trying to be a better you, every day. . . . Bob is not only a great friend, but he is also like my brother.

Ex. 25, T. O'Donnell. Jelka and John Leedle explain Bob's friendship and character in this way:

Mr. O'Rourke is a cherished friend and an all-around wonderful man. He is thoughtful, reliable, and kind. Our two young children look up to Mr. O'Rourke and think of him like family, they call him "Uncle Bob". They cannot wait to go over to his house for a gathering as they just love to play with him and his neat gadgets. Oh, and how could we forget the fun rides on the wave runner when we go on the Lake. Let's just say Uncle Bob is a favorite in our home. He may not have his own children, but he sure does know how to make a child feel special. Saying our Max adores Uncle Bob would be an understatement. Ex. 33, J. Leedle.

Bob's generosity and contributions also extend to complete strangers. Lorna O'Rourke, Bob's ex-wife and government witness at trial, recalls numerous times when Bob stopped to help a stranger, for instance, change a tire on the side of the road or help fishermen having trouble with their trailers and boats. Ex. 34, L. O'Rourke. Lorna also remembers Bob offering strangers his

20

tools and jacks or even running to the store to pick up tools for stranded boaters. *Id*. According to

Lorna, that "was his nature" which has "carried on into present day." *Id*. Lorna recounts one

particular "Good Samaritan" encounter that landed Bob in the hospital:

> It was only a few years ago that an elderly man was battling the wind trying
> to get his boat onto his trailer when Bob offered to walk into the water and
> help hold it steady for him. Bob, unfortunately, wasn't in proper water shoes
> and slipped on the wet mossy ramp surface and broke four small bones in
> his back. He did not blame the city nor the boater for his fall, he isn't like
> that. And he wouldn't hesitate to jump in and help if that same situation
> presented itself again. *Id*.

Tina too has witnessed Bob's selflessness toward strangers. She observes, "Bob goes out

of his way to help people, even if he doesn't know them well. . . . [H]e is never one to turn someone

away. Bob is a great person, some might even say to a fault - given his generosity and willingness

to drop everything to help someone." Ex. 31, T. Gagliardi.

Bob has also been an active member of his church and community, donating his time and

money to worthy organizations and those in need. *E.g*., PSR, ¶56 (volunteering as a mentor for

disadvantaged youth). George Reuss, who has known Bob for 20+ years, writes of Bob's charitable

giving and steadfast support of those in need:

> Bob and I were members of Saint Francis where he served as a Eucharistic
> Minister, lector, and valuable member of our church and community. He is
> usually the first person to step up to the plate to get things done. His fun
> loving demeanor and kind-hearted character makes him one of the top
> people I like to associate with. Bob always has a genuine smile on his face.
> He is a people person. He is organized and has been a facilitator for many
> charitable events including annual scholarship bike rides raising money for
> abused and neglected children of Walworth County and charity golf events
> supporting research for cancer and Alzheimer's. Bob volunteers regularly
> at my girlfriend's school, in Beloit, as a mentor for at-risk and homeless
> children who are living in high poverty also affected by abuse and
> dangerous crime.

Ex. 21, G. Reuss. Frank Abruzzo recalls that "Bob and Lorna were very active in the Catholic

Church in Lake Geneva. Not being able to have children of their own, they volunteered their time

helping young people and participated in a program that counsel young couples getting married."

Ex. 1, F. Abruzzo.

> Lorna O'Rourke also noted Bob's involvement with his church and community:
>
> While living in Lake Geneva Bob became very active in the church. We always attended mass . . . [and] he became a Lector and was a fixture at the Saturday evening mass as an Usher and presenter of the Gifts. As a couple we helped with administering and discussing the results of the pre Cana compatibility test given to couples wishing to get married in the Catholic church. These couples would visit our home 2 to 3 times for about 2 to 3 hours each visit and we would ultimately report our recommendations to the parish priest.

Ex. 34, L. O'Rourke. Per Lorna, Bob also was "very generous with his checkbook if the church, friends or family were in need… and also continued to support numerous fundraisers and charity events." *Id*.

Bob's character traits are why, in part, Kirk Hesemann, Dura-Bar's current Quality Assurance Manager, calls Bob a "role model." Ex. 35, K. Hesemann. Kirk writes:

> Bob and his ex-wife taught Sunday school, something they chose to do even though they did not have a child in the program. They also helped create and grow the Lake Geneva Cycling Club . . . I always admired Bob as someone of great discipline. At one point, Bob decided to try triathlons, of which he was very successful. That eventually turned in to competing in Ironman competitions, which include a 2.4 mile swim, followed by a 112 mile bike ride and then a 26.2 mile marathon. Bob was always the kind of person who was able to do anything he put his mind to. *Id*.

> Based on Bob's lifetime of selflessness, contributions, and good works, Bob's family and friends were shocked to learn of Bob's criminal charges and conviction. Andy O'Rourke reflects:

> He [Bob] has been very open about his conduct in this case and has admitted his wrongdoing. But to be frank, we are all in shock. Considering Bob's character and the fact that he's always been so upstanding, I don't think any of us saw this coming. Indeed, never has Bob ever remotely been involved in any business dealings that could be considered immoral and dishonest. I have been through trade compliance and global market security training, so I understand that there is a very fine line between what is, and what is not acceptable when it comes to dealing with foreign countries. It's extremely sensitive. But Bob has always, throughout his life, stayed on the right side of the line.

Ex. 17, A. O'Rourke. Bob's brother Tim reacted the same way: "When Robert first told me about the crimes that he was being accused of committing the news was hard to process because it is so

far out of character for him. I can't remember him ever being in trouble with the law beyond a speeding ticket in his teenage years." Ex. 27, T. O'Rourke; *see also* Ex. 15, L. Wright. ("Bob shared with me the legal problems he was experiencing and the details behind the charges. That was unimaginable news because this is not Bob's character. I know Bob to be a law-abiding, honest, respected, industrious, hardworking, family man"); Ex. 25, T. O'Donnell. ("[Bob's] lapse in judgment is an aberration to his otherwise praiseworthy life"); Ex. 12, T. Jennings ("Bob is a good person who had made a mistake, and he owns that. Since I've known him for decades, I truly believe his wrongful action represents a true aberration that he will never repeat. He has demonstrated honesty, integrity, and fairness in every action I have ever been a part of over the years.").

**B.      The Nature and Circumstances of the Offense Support a Non-Custodial Sentence.**

Consistent with §3553(a)(1), the nature and circumstances of Bob's offense also support a non-custodial sentence. To be clear, Bob understands the seriousness of his offense more than anyone, particularly given the significant repercussions already suffered to date, spanning the financial, emotional, personal, reputational, and familial. The defense presents the following mitigating facts and circumstances of the offense not to justify or minimize it, but to put in some context Bob's relative culpability (*e.g.*, lack of criminal intent, motive, context, etc.), as is expressly permitted and relevant under §3553(a)(1). *U.S. v. Vrdolyak*, 593 F.3d 676, 685 (7th Cir. 2010) (Hamilton, J., dissenting) (defendant's lack of intent to harm is not inconsistent with defendant's guilt and can be taken into consideration under § 3553(a)); *see also U.S. v. Milne*, 384 F.Supp.2d 1309, 1310-11 (E.D. Wis. 2005) (sentencing defendant below advisory guideline range where "defendant did not take the bank's money out of greed or a desire to live a lavish lifestyle..."); *U.S. v. Ranum*, 353 F.Supp.2d 984, 990 (E.D. Wis. 2005) (Court considered it mitigating that bank fraud defendant was not motivated by limited personal financial gain).

First, as a threshold matter, it is important to distinguish this case from the more typical EEA case. Unlike most EEA cases, the government never charged Bob with espionage under 18 U.S.C. §1831 for aiding a foreign governmental entity or foreign governmental agent. Likewise, the government never charged Bob with conspiracy under 18 U.S.C. §1832(a)(5). In particular, the government never charged Hualong or any of its representatives with any EEA charges or conspiracy. Similarly, unlike many EEA cases, Bob's conduct posed no national security risk. Moreover, while Bob copied the Lab Reports (many hundreds of which Dura-Bar itself publicly disseminated without any restrictions) and Alloy Experiment Reports (which did not reveal the alloy ingredient being tested), Bob never absconded with any high tech intellectual property like proprietary software coding or proprietary design drawings (the latter of which he had access). Finally, Bob never used, delivered, or tried to sell the Lab Reports or Alloy Experiment Reports, although he maintained them for a full week.

Second, Bob's conduct prior to September 15, 2015, also distinguishes this case from more typical criminal EEA cases because it establishes his lack of nefarious intent to maliciously injure Dura-bar. For instance, as to Bob's pre-September 15, 2015 conduct, the government's evidence and many email communications admitted establish that: (i) Hualong never solicited or paid Bob to misappropriate any Lab Reports or Alloy Experiment Reports; (ii) Bob never promised, or provided, Hualong any Lab Reports or Alloy Experiment Reports; (iii) Hualong never conditioned Bob's employment on him misappropriating any Dura-Bar confidential or trade secret information; and (iv) Bob and Hualong never discussed the topic of any Dura-Bar purported trade secrets or confidential information or that Hualong even wanted such information. While there were several, lengthy emails between Bob and Hualong representatives between January 2014 and September 2015, not one touched upon the topic of trade secrets, confidential information, Lab Reports, or

Alloy Experiment Reports. *E.g.*, GX 59, 102-119, 121, 132-133. Moreover, not one email (or other communication) alludes to an exchange of bribe money, information, or anything nefarious. *Id*.

The government's witness, Lorna O'Rourke (Bob's ex-wife) corroborated Bob's lack of nefarious intent to maliciously injure Dura-Bar. Lorna participated in 2014 meetings with Bob and Hualong, and she never once heard anyone from Hualong ask for Dura-Bar confidential information or trade secrets. During this time-frame and meetings, Lorna never once saw Bob provide Hualong representatives with any Dura-Bar documents or information. Further, Lorna never once heard or sensed that Hualong's employment offer was contingent upon Bob misappropriating Dura-Bar trade secrets.

Third, also probative of Bob's actual intent, knowledge, and motive is examining what Bob could have taken, but did not. Although he had the access and opportunity, Bob never copied Dura-Bar's most valuable information, which a competitor would need to recreate Dura-Bar's manufacturing process. For example, Bob did not take Dura-Bar's unique and proprietary: (1) graphite die designs, (2) cooler jacket designs, (3) bar machine crucible designs, (4) customer sales reports, (5) bar machine logs, (6) change of process database, and (7) manufacturing run parameters, such as stroke delays, stroke profiles, and exit temperatures. Bob had access to all of this information but took none of it, which undermines claims of nefarious intent. The government urges the Court to chalk the foregoing up to Bob simply not being a good criminal. *See* Gov. Memo., p.13. Such a conclusion, however, is directly at odds with the government's entire theory of the case, mainly, that Bob, motivated by anger and revenge, was on a two year mission to destroy Dura-Bar. If Bob truly was engaged in a two year mission of revenge aimed at destroying Dura-Bar, he most certainly would have taken Dura-Bar's most valuable information. Accordingly, the fact that Bob could have easily taken, but did not take, Dura-Bar's most valuable information, certainly informs his criminal culpability and intent.

Fourth, Bob's 30+ years of observing Dura-Bar's own treatment of its information informs Bob's relative culpability, intent, knowledge, motive, and conduct. The government's own witness, Frank Abruzzo, testified that in his 30+ years of experience, he never once heard Dura-Bar use the word "trade secret," and maybe only once or twice heard the term "confidential," but not in the context of any of the electronic information at issue here. To be sure, Dura-Bar never labeled any of the information at issue as "confidential," never placed any of this information on its restricted drive, and never trained its employees (including Bob) that it considered such information "confidential." Significantly, Bob copied only electronic information in Dura-Bar's shared drive, information Dura-Bar made generally available to hundreds of its employees who had no NDA, including warehouse employees and interns, among others.

Only after Bob left did anyone from Dura-Bar ever claimed its Lab Reports (hundreds of which Dura-Bar publicly disseminated to customers or potential customers without any restrictions on dissemination) contained "trade secrets." O'Rourke's nationally renowned expert, Naomi Fine, was compelling on this issue of Dura-Bar failing to reasonably communicate its expectations as to the information at issue. And, although the jury seemingly rejected her opinion (at least in part), Ms. Fine's expert testimony can still inform the Court on the nature and circumstances surrounding Bob's offense.

Fifth, Bob did not attempt to conceal his actions or engage in any cover-up to prevent Dura-Bar from learning about his actions. Bob could have easily accessed, and downloaded to a portable memory device, Dura-Bar's Reports remotely on a personal (or hotel) computer, while in China or anywhere else in the world, without detection. Bob did not do so. Instead, on a Sunday, in broad daylight, Bob walked into Dura-Bar's with conspicuous surveillance cameras and used his Dura-Bar issued laptop computer to do so. DX TT-1. The only reason Dura-Bar discovered Bob's conduct was because he used his Dura-Bar issued laptop computer, which he returned after leaving.

26

If he truly possessed some nefarious intent to harm Dura-Bar by stealing known trade secrets, Bob would have copied far more than the S: drive Lab Reports folder and would have done so in a manner to avoid detection (*e.g*., accessing Dura-Bar's computer network remotely, through a non-Dura-Bar owned computer, while not at Dura-Bar's surveilled premises during broad daylight, and not on the eve of his departure). Further, on September 15, 2015, Bob freely volunteered he was leaving the following week to work in China for Hualong, and on September 16, 2015, expressed no objection (and displayed no concern) to having that information relayed to Dura-Bar's owner.

Sixth, the timing and events surrounding Bob's resignation similarly provide context to his actual intent, knowledge, motive, and conduct. On August 12, 2015, Bob resigned from Dura-Bar "effective immediately" while off-site. Bob agreed to a transition period only because his supervisor requested one. At the time, Bob had not downloaded any of the information at issue. If Bob had long-planned to steal trade secrets to harm Dura-Bar, as the government claims, Bob never would have resigned off-site, effective immediately, before doing so.

The government's effort to portray Bob's as engaging on a "two-year mission" of "lies" motivated by "revenge," and "greed," to cripple Dura-Bar is a disheartening invention. Gov. Memo., p. 3. First, Bob engaged in no criminal conduct over any so-called "two-year mission" leading up to the 15 minutes in his Dura-Bar office on September 15, 2015. Rather, starting in January 2014, Bob entered into negotiations with a prospective new employer, Hualong, the owners of which were longtime friends from the parties' previous joint venture discussions. Pejoratively labeling such discussions as "secret negotiations" is silly, as all such negotiations with a prospective employer will be kept from an employee's then-existing employer.

Far more probative is that during this time-period, January 2014 to September 15, 2015, Bob never once copied Dura-Bar trade secrets, accepted a bribe, or engaged in any other criminal

27

wrongdoing. In fact, Bob's numerous emails to Hualong (and his father) during this time-frame demonstrate Bob's reluctance to leave Dura-Bar for Hualong and Bob ultimately agreeing to leave only because of Dura-Bar's effective abandonment of the Chinese market.[4]

Second, the government's character assassination of Bob as "greedy" also is belied by its own evidence. Frank Abruzzo (who supervised Bob for 25 years "traveling the world together"), another government witness, testified under oath that Bob never cared about money and is not a greedy person. Mr. Abruzzo echoes these same sentiments in his character letter to the Court:

> Bob and his ex-wife Lorna were both metallurgists and both had very successful careers is business. However, one would never know that by their lifestyle. They lived in a very modest home in Lake Geneva, WI and ***they never spent their money on fancy cars, clothes, trips or jewelry***. My personal experience with Bob was that ***money just wasn't that important to him***. For example, I had at least 25 annual salary reviews of Bob, and depending upon business conditions, there were years of good raises, small raises and sometimes no raises, but his attitude was always the same. If his job was challenging and meaningful, he was happy. That was always more important than the money. With approximately 15 people on my team I can assure you that kind of attitude was highly unusual!

Ex. 1, F. Abruzzo (emphasis added). Similarly, the government presented written evidence that Bob's decision to leave Dura-Bar for Hualong was, at best, a "push" financially. While Bob's Hualong position provided a slightly higher salary ($160k per year including bonus vs. $145k per year including bonus), that modest increase was to offset Hualong not paying for Bob's health and dental insurance, and Hualong offering no 401k savings plan, which Dura-Bar provided. GX60 (Hualong Employment Agreement).

Third, contrary to the government's claim, no fair assessment would characterize Bob as motivated by "revenge." If motivated by revenge, Bob would have copied Dura-Bar's restricted

---

[4]  The Court should reject the government's reliance on Bob's text message to Lorna O'Rourke in early 2015 (almost one year before his September 2015 conduct) about a "huge fuck over for Charter" and the "damage he [could] potentially do to the business" in support of its revenge claim. Gov. Memo., p.15. Lorna O'Rourke, the government's witness, testified that she understood Bob to be drunk at the time (bowling night with the boys) and, in any event, referring to his disagreement with Dura-Bar closing its Chinese warehouse and abandoning Chinese sales, which he could, in his view, make very profitable if he left Dura-Bar and hired the Chinese team fired by Dura-Bar.

F: drive information (all of which he had access to), such as proprietary design drawings, change of process data, and all of the manufacturing run parameter data. He did not, choosing instead to copy ("drag over") only the Lab Reports folder accessible to hundreds of Dura-Bar employees who had no NDA and no need to see such information. Similarly, if motived by revenge, Bob would have downloaded all of this F: drive Dura-Bar information and more in 2014 or 2015 while in China from a remote location and with a non-Dura-Bar computer, which would be wholly undetectable. Moreover, if motivated by revenge, Bob never would have tendered his resignation in August 2015 "effective immediately" while off-site, prior to any copying. Likewise, Bob never would have agreed to Guiterrez's plea for Bob to help transition for four weeks, during which time Bob affirmatively assisted Dura-Bar, including recruiting his own replacement. *E.g.*, DX R-13 (8/17/15 email to Guitterez: "I'll support whatever you need."); DX Z-16 (8/25/15 email: O'Rourke assisting in supporting customers); DX Z-87 (8/26/15 email to Guitterez and Dura-Bar China employees: recommending actions to avoid Dura-Bar losing a customer to a competitor); DX Z-17 (9/15/15 email to Guitterez: introduction to DIS key contacts); DX Z-18 (9/15/15 email to Hollis and Guiterrez: possible replacements).

Finally, the government's unrelenting refrain of Bob as a "liar" is grossly overstated, unfair, and wrong. Gov. Memo., p. 7 (wrongly claiming that during his "exit interview" Bob misrepresented that he was considering a job "with a steel company near where his parents lived in North Carolina" and "confirmed" he "return[ed] all Dura-Bar materials). As the defense has repeatedly informed the government (many times to no avail), the undisputed trial evidence clearly disproves its position. Lindsay Olsen conducted Bob's exit interview and kept copious, extensive notes on a Dura-Bar Exit Interview form, which was admitted as an exhibit at trial. DX A-12; GX 19B. Ms. Olsen's exit interview notes nowhere mention "North Carolina" or Bob's "parents" or any "steel company." *Id.* Rather, Ms. Olsen's exit interview notes reference that Bob stated: (i) his

"new position" would provide him with "more control over plant metallurgy," (ii) he would stay in a "sales role," (iii) with "possibly more management opportunities, international travel," and (iv) would "decide end of this week" as to which opportunity to except as he was "waiting for a few things to make a decision." DX A-12, p. 3. Significantly, Ms. Olsen admitted that she would have noted if Bob had made comments about going to work for a steel company.[5]

The same is true for Bob allegedly representing in his exit interview that he "returned all of Dura-Bar's materials." Gov. Memo., p. 7. Again, Ms. Olsen's Exit Interview form and extensive notes are silent on the topic, and she admitted she would have noted such information if asked and/or answered. DX A-12; GX 19B. Moreover, Dura-Bar also used an "Exit Checklist Form" at the time, which asked this precise question. DX A-20. However, Dura-Bar never could produce an Exit Checklist Form used with Bob's departure and/or signed by Bob. Finally, also contrary to the government's claim, Dura-Bar's management knew Bob used multiple portable memory devices for work purposes and never requested such portable memory devices back. Indeed, Ms. Olson's immediate supervisor admitted he never (nor anyone at his direction ever) request that Bob return his portable memory devices or any other hard copy papers that Bob accumulated at his home throughout his 30+ year career prior to departing. Quite to the contrary, Bob's supervisor, Mr. Guiterrez, admitted to asking Bob to make a "copy" of the Dura-Bar information that Bob maintained, the suggestion being that Bob could keep his personal copies of such information.

In conclusion, there is no doubt that Bob did something that was serious and wrong. Bob has acknowledged this and accepts full responsibility for taking information and documents

---

[5] What the government is mistakenly referring to is the testimony of Bob's supervisor, Mr. Guiterrez, in which he attributed to Bob this alleged comment about a "steel company in North Carolina" in August 2015 (not during his exit interview), when Bob tendered his resignation effective immediately before agreeing to stay on a few additional weeks. However, even Guitterez's detailed notes from this August 2015 conversation do *not* corroborate his testimony or the government's claim. DX Z-11 (supervisor notes).

belonging to Dura-Bar without Dura-Bar's permission. That is why Bob is currently before the Court for sentencing. But that does not permit the government to take liberties with the facts in their quest for an improperly excessive, unfair, and "aggravated" sentence.

**C.** **Considerations of Just Punishment, Specific Deterrence, General Deterrence, and Rehabilitation Support a Non-Custodial Sentence.**

Considerations of the seriousness of the offense/just punishment, general and specific deterrence, and rehabilitation – §3553(a) sentencing factors necessary to determine the "minimally sufficient sentence" – similarly support a non-custodial sentence. 18 U.S.C. §3553(a)(2).

Incarceration is unnecessary to promote considerations of just punishment and general deterrence for Bob's offense, for which he accepts responsibility and is remorseful. Even without incarceration, Bob has suffered tremendously and will continue to do so for the rest of his life. For instance, after living a lifetime free of any criminal conviction, arrest, or antisocial activity (no gambling, gang activity, or drug addiction), Bob's isolated misconduct and misjudgment now will forever tarnish him and his family. Bob will forever be a convicted federal felon, with all the public condemnation and loss of civil rights and privileges that accompany this reviled status. Bob's life has been irreversibly altered and cemented with his conviction.

Even prior to his conviction, Bob gravely suffered from many different forms of significant punishment. For approximately the last four years, since September 21, 2015, Bob has suffered the intense stress, anxiety, depression, and uncertainty that accompanied the government's investigation and prosecution with very real emotional, behavioral, and physical manifestations as explained by Probation. *See* PSR, ¶¶59, 66-68, 72. Likewise, Bob (now 59 years old) has been unable to work in his chosen profession as a metallurgical engineer over these last four years or so, a career and work Bob has great passion for and which largely defines him. Instead, for years, Bob has been forced to work at an hourly wage as a part-time laborer or helper, watching his hard-earned life savings marked for retirement dwindle. In addition, Bob has been forced to put his

personal life on hold for the last four years. Given the uncertainty surrounding his future, Bob and

his fiancée, engaged since March 2015, have had to indefinitely postpone their wedding plans.

The last four years also have brought down on Bob a deep degree of intense public humiliation.

Once a respected member of society, revered professional (working at the same job for 30+ years),

and respected family member, Bob now suffers an irreversible public humiliation, exacerbated by

the highly public nature of this case trumpeted throughout the press and Internet, which will cast

a dark cloud on Bob's character and reputation forever. A simple Google search proves the point,

including publications from the McHenry County Blog, WBBM 780 Radio, Chicago Sun-Times,

Daily Herald, and many more. As Bob's sister Jane writes, "There has been considerable publicity

about these charges, both in the newspapers and online. Bob has experienced a great deal of

embarrassment and shame. Friendships have been lost…Bob has been punished with financial

loss... He has experienced loss of self-esteem and self-confidence, as well as, loss of friendships,

embarrassment and having his life disrupted for several years." Ex. 26, J. Walsma.

Bob's conduct and criminal trial also caused a different type of deep personal pain. Bob's

mother passed away in the middle of his criminal trial, which precluded him from being with his

family and taking the time to properly mourn their (and his) incredible loss. As mentioned

previously, Bob was incredibly close to his mother. As a result of the on-going trial proceedings,

Bob's family had to postpone the funeral until after the verdict. Bob will never forgive himself for

not being able to be there for his loved ones during that terrible time.

Courts routinely find non-custodial sentences to be significant, meeting the ends of general

deterrence and just punishment. *U.S. v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very

nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is

entitled'"); *U.S. v. Coughlin*, No. 06-20005, 2008 WL 313099, at *5 (W.D. Ark. Feb. 1, 2008)

(recognizing that "[h]ome detention and probation can be severe punishments, hugely restrictive

of liberty, highly effective in the determent of crime and amply retributive," and that "[n]ot all defendants must be sentenced to imprisonment to be duly punished"); *U.S. v. Brady*, No. 02 CR 1043, 2004 WL 86414, at *8 (E.D.N.Y. Jan. 20, 2004) (noting that probation is "a punitive measure"); *Doe v. U.S.*, No. 14 MC 1412 (JG), 2015 WL 2452613, at *5 n.25 (E.D.N.Y. May 21, 2015) (describing the "myriad conditions of probation that significantly impair [probationers'] freedom"). The Court can also impose a variety of "discretionary conditions" to probation, 18 U.S.C. § 3563(b), and the violation of any condition can be grounds for revocation and the imposition of a term of incarceration.

Again, to be clear, Bob accepts that his foregoing and forthcoming punishment and consequences stem from his own misjudgment. The point is not to avoid responsibility. Rather, the point is that a term of incarceration is unnecessary to further §3553(a)(2)'s consideration of "just punishment for severity of the offense" and "general deterrence." *U.S. v. Redemann*, 295 F.Supp.2d 887, 894-97 (E.D. Wis. 2003) (departing downward where defendant suffered serious collateral consequences from conviction); *U.S. v. Samaras*, 390 F.Supp.2d 805, 809 (E.D. Wis. 2005) (imposing non-guideline sentence in part because, as a consequence of his conviction and sentence, defendant lost a good public sector job, a factor not considered by the guidelines); *U.S v. Vigil*, 476 F.Supp.2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation, widespread media coverage, and emotional toll of two lengthy public trials); *U.S. v. Olis*, 2006 WL 2716048, at *13 (S.D. Tex. Sept. 22, 2006) (granting substantial variance in part because "the attendant negative publicity, the loss of his job and accounting and law licenses, and the need to provide support for his family will provide adequate deterrence against any potential future criminal conduct.").

Those individuals closest to Bob have observed the severity of the punishment already dispensed and still to occur. For example, Gerald Holmberg, a Lake Geneva neighbor, writes:

> This entire process has been extremely difficult for Bob, and has definitely taken a toll. It had made him question his own integrity. It's been very sad and hard to watch such a good man slowly disintegrate before our eyes.

Ex. 32, G. Holmberg. Similarly, Bob's future daughter, Madison Gagliardi, writes, "Bob is not the same as when I first met him. It is as if he's been imprisoned in his own mind for years, spending day after day agonizing over the case and his mistakes." Ex. 30, M. Gagliardi. Madison continues, "I know Bob has made mistakes and I have seen him pay for them every day for the last three and a half years." *Id*. Likewise, Bob's cousin Lori writes, "His life has been put on hold these past few years. He has suffered mental anguish, depression, and financial hardship. The trial has taken Bob away from his loving family." Ex. 15, L. Wright. Tina Gagliardi, Bob's fiancée, echoes the same sentiments, "It is almost as if Bob has been in jail for the last three years – torturing himself, not being able to work, and being a shell of the person I know and love…" Ex. 31, T. Gagliardi.

> Bob's brother, Tim O'Rourke, describes the past four years this way:
>
> Robert's life, in a sense, has been put on hold because of these proceedings. Our family has been missing the "Bob" that we all know and love. The past four years have filled Bob with nothing but worry, sorrow and regret. I feel as if these charges and the trial have taken the Bob I love away from me. I only hope and pray that Robert will be able to get back his life and put this terrible chapter, but not the lessons he has learned, behind him.

Ex. 27, T. O'Rourke. Tina Gagliardi describes their current reality and Bob's pain and punishment as follows:

> Over the past three and half years, I have seen our lives torn apart. There isn't a day that goes by where Bob doesn't think about, and sorely regret, his actions. I know in my heart Bob did not do anything out of maliciousness – he truly made a mistake and lives every, single day with pain and regret. . . . [A]ll I can hope for is that there is a light at the end of this dark, dark tunnel.

Ex. 31, T. Gagliardi. Bob's close friend Carey MacDonald explains Bob's punishment and the toll it has taken in this way:

> He has suffered so much already with the loss of his mother, the loss of his mother-in-law, the loss of his ability to work in his chosen profession, the loss of financial security and the ability to care for those he loves. He has also suffered emotionally

and spiritually. In sum, these past four years have been trying on Bob and have taken a huge toll.

Ex. 36, C. MacDonald.

Those closest to Bob acknowledge Bob's significant punishment from a professional, reputational, and financial perspective. Bob's reputation at Dura-Bar and throughout the industry was unmatched. But now, as Bill Singleton writes, "[Bob] has lost his job, his career, his retirement savings, and most importantly, his reputation." Ex. 18, B. Singleton. Likewise, Sara Goad, who worked with Bob at Dura-Bar for over 22 years and describes Bob as being held in high regards by his colleagues and peers, writes:

> Bob was Mr. Dura-Bar, he was the go-to guy, he was a mentor to so many and now he has to hand his head low. I'm sure he feels he's disappointed all his family and co-workers as he was looked up to as such a brilliant, trustworthy individual. Bob has to feel humiliated, lost, unworthy and I know this has changed his life forever.

Ex. 2, S. Goad.

The other two §3553(a)(2) sentencing factors -- specific deterrence and rehabilitation -- require less analysis but also support a non-custodial sentence with appropriate conditions. First, Probation properly concluded that considerations of specific deterrence are not implicated here. S*ee* Sent. Rec., p.5. Bob presents essentially no risk of recidivism, given his age, lack of criminal record, personal history and characteristics, and the nature and circumstances of this matter. *Gall*, 128 S. Ct. at 593 (sentence of probation, despite advisory guideline range of 30-37 months, in part, because risk of recidivism was low given defendant's lack of criminal history); *U.S. v. Darway*, 255 Fed.Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *U.S. v. Urbina*, 2009 WL 565485, at *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *U.S. v. Cabrera*, 567 F.Supp.2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other

offenders"). Accordingly, sentencing concerns of "incapacitation" and "protecting the public from further criminal activities by the defendant" are non-existent in this case.

Second, it is equally undisputed that incarceration is not needed to provide Bob with any vocational, educational, or other correctional rehabilitative services, per §3553(a)(2). Thus, based the foregoing, sentencing considerations of just punishment for the severity for the offense, general and specific deference, and rehabilitation all support an appropriate non-custodial sentence. Those who know Bob best also note why a non-custodial sentence serves societal interests. For instance, Tim O'Donnell explains:

> Sentencing Bob to any prison time would be taking one of the most caring, trustworthy and productive members of our society off the streets and depriving his family and friends of everything he does to make the lives of everyone who knows him, brighter. In a world where we are bombarded with stories of horrible people doing nothing but bad in our world, putting Bob in jail would take away all the untold stories of what he does every day, selflessly without any need for recognition.

Ex. 25, T. O'Donnell. Likewise, in pleading with the Court to show leniency, Thomas Jennings writes, Bob "is one of the most sincere, genuine, kind and caring people I have ever met…Put simply…Bob is a good person who had made a mistake, and he owns that. Since I've known him for decades, I truly believe his wrongful action represents a true aberration that he will never repeat. He has demonstrated honesty, integrity, and fairness in every action I have ever been a part of over the years." Ex. 12, T. Jennings.

Finally, in assessing these §3553(a) factors, this Court should resist the government's efforts to equate Bob's matter with "economic espionage" by a "foreign enemy" and the "threat" posed by the "People's Republic of China" to the grave detriment of "United States economy." Gov. Memo., p.16-19. The government presented no evidence whatsoever – at trial or now at sentencing – to establish that Hualong or any Chinese actor (private citizen or governmental agent) solicited, encouraged, or even knew about Bob's conduct on September 13, 2015. The

government's entire attempt to cast Bob's matter as part of the "industrial espionage threat posed by China" (*id.,* p.17) rests entirely on Hualong being a Chinese company and nothing more. As explained to the Court during a particularly heated part of this trial, there is every reason to believe that Bob's conduct would have been identical if his prospective employer was located in England, France, or the United States. This Court should not hold Bob responsible for years of Chinese economic espionage that he and Hualong have no involvement or connection with whatsoever.

**D.    A Non-Custodial Sentence Would Avoid an Unwarranted Sentencing Disparity.**

A non-custodial sentence also would avoid an unwarranted sentencing disparity. As part of its sentencing decision, courts must seek to avoid "unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §3553(a). As illustrated below, a non-custodial sentence would comply with this sentencing mandate. On the other hand, the government's proposed incarceration of 60 months would not only create an unwarranted sentencing disparity, but would also result in one of the longest sentences ever imposed since the EEA's enactment in 1996.

Between 1996 and January 1, 2018, the government has convicted approximately 131 defendants under 18 U.S.C. §1832.[6] The court sentenced approximately 65% of these defendants (85) to anywhere from probation to 1 year and 1 day in custody. *See* Exhibit 37. Less than 6% of these 131 defendants (8 in total) received a sentence of 60 months of imprisonment or more, with the conduct in these cases being far more egregious than here. *Id.* Moreover, as a general proposition, district courts in these EEA §1832 cases have frequently issued a sentence below the

---

[6] Based on research done in or around January, 2018, defense counsel located 131 EEA cases on Pacer. Defense counsel believes that these cases include all EEA convictions where data is publically available. Information and details regarding all of the summarized cases are taken from documents and transcripts that are publically available through Pacer. Should the Court desire copies of any of these materials, defense counsel will provide them in advance of the August 16, 2019 sentencing hearing.

recommended guideline range, even when faced with greater loss amounts and more egregious conduct. Below is a sampling summary in support of a non-custodial sentence here:

- *U.S. v. Yang*, 11 CR 458 (N.D. Ill.):

  - Yang, a former senior software engineer for the Chicago Mercantile Exchange (CME) pled guilty to stealing the source code behind the company's electronic trading platform and shopping it to a Chinese futures exchange.

  - Yang worked as a software engineer for Chicago-based CME. He admitted that over a *six month period* he made unauthorized downloads of more than *20,000 files* containing CME source code, much of it related to the company's electronic trading platform. Yang then made and executed plans with two business partners to form a company aimed at increasing the trading volume on China's Zhangjiagang chemical electronic trading exchange. Yang was to be the new company's president and expected the company to use the stolen source code to help the Chinese exchange improve its trading volume and speeds, while adding various trading functions. Yang and his partners had developed business proposals and were in the process of negotiating a contract with the Zhangjiagang Exchange

  - The government and Probation submitted, based on a loss amount of *$23 million*, Yang's total offense level was 25, resulting in an advisory guideline range was 57-71 months' imprisonment.

  - Judge Darrah rejected the government's loss calculation, determined the appropriate guideline range to be 30-37 months and imposed a sentenced of *48 months' probation*.

- *U.S. v. Wilkinson*, 07 CR-570-2 (D. Md.):

  - Wilkinson was convicted of conspiracy to steal trade secrets, as well as conspiracy to defraud the United States and commit wire fraud. He was the co-founder and manager of two companies that provided flight support, including aviation fuel, at airports throughout Europe and Central Asia. Wilkinson paid Bittenbender, an employee of a larger competitor, to provide him with confidential bid data and other proprietary information related to fuel supply contracts with the Department of Defense (DoD). Wilkinson also paid Bittenbender a percentage of the profits he earned on each contract he obtained as a result of his bid-rigging.

  - Wilkinson used the unlawfully obtained trade secrets to underbid his competitor on each and every contract. Because of the wars in Iraq and Afghanistan, the DoD was actively bidding out aviation fuel contracts throughout Eastern Europe and Central Asia. Wilkinson received insider information about fuel supply contracts worldwide, including a significant contract at Bagram Air Force Base in Afghanistan. Wilkinson used the unlawfully obtained trade secret

information to win several contracts, thereby subverting the DoD's competitive bidding system and compromising logistics related to United States' war effort.

o At sentencing, the parties argued about the loss figures and the scope and breadth of Wilkinson's conduct. The government advocated for a sentence between 51 and 63 months for Wilkinson's procurement fraud and theft of trade secrets. The Court ultimately sentenced Wilkinson to ***three years' probation*** and fined him $20,000. Bittenbender, the insider who provided the information to Wilkinson, was charged separately. *See* Case No. 08 CR 5 (D. Md.). He also received ***three years' probation***.

- *U.S. v. Roberts*, 08 CR 175 (E.D. Tenn.):

  o Roberts and his co-defendant, Howley, were charged with five counts of theft of trade secrets, in addition to conspiracy and wire fraud counts. Both Roberts and Howley were engineers with Wyko, a tire technology company. In 2007, that company won a $1.2 million contract with Haohua South China Guilin Rubber Company (HHSC), a company owned and operated by the Chinese government, to build a machine that manufactured off-the-road (OTR) tires.

  o After obtaining the contract with HHSC, Roberts and Howley traveled from Tennessee to Kansas so that they could gain access to a Goodyear Tire facility where OTR tires were made. Because Wyko was unable to create an effective design for the machine, they decided to copy Goodyear's design, even though they knew it was a protected trade secret.

  o The men gained access to the plant by falsely claiming that they were there to service Wyko equipment that Goodyear used in unrelated operations. Roberts and Howley each signed confidentiality agreements upon entering the plant.

  o Instead of servicing their company's machinery, Roberts and Howley surreptitiously photographed the Goodyear equipment necessary for the production of OTR tires. When they were done, Roberts and Howley emailed the photos to a Wyko office in England. The pictures were taken so that Wyko could steal the machine design and build its own machine. Wyko ultimately used the materials to complete its own machine.

  o Roberts and Howley contested the charges at trial, and were ultimately convicted by a jury on all counts. At sentencing, the court found that Roberts and Howley knew they were working for an instrumentality of the Chinese government, and also concluded that the plan's purpose was to undercut Goodyear's competitive standing in the OTR tire marketplace. If HHSC received the necessary machine from Wyko, it would be able to undercut Goodyear's pricing and steal customers.

- o Despite the circumstances of their conduct, Roberts and Howley were sentenced to ***four years' probation***. [7]

- *U.S. v. Lee*, 09 CR 290-1 (N.D. Ill.):

  - o Lee stole trade secrets over the course of ***five months***, from his employer Valspar as he prepared to begin employment with a Valspar competitor that maintained office in Asia and the United States.

  - o Lee stole 160 formulas for paints and coatings, as well as raw materials information, sales and pricing data for Valspar products, market research, confidential internal memoranda, and product research that were specifically labeled and marked as confidential. Much of the information related to Valspar's largest customer, Lowe's Home Improvement Center, an account worth ***$600 million*** to Valspar in annual sales. Also found in Lee's possession were Valspar materials, ***clearly marked as "confidential,"*** that outlined Valspar's future plan for the introduction, sale and strategy of a specific new product line.

  - o To copy the files at issue, Lee downloaded onto his work computer an unauthorized software program prohibited under Valspar's Electronic Mail and Computer Access policy, designed to copy, move, rename and delete files between folders, external drives or different computers. Lee also took steps to clear his computer user history to avoid detection by Valspar.

  - o Lee also directed other Valspar employees to save certain trade secret information that was not previously available to him to a drive he could access so that he could secretly download the trade secrets to his personal hard drive.

  - o Lee also attempted to recruit other Valspar employees to work for him in Asia, including a high-level Valspar scientist responsible for paint colorants, coordinating lab projects and tests methods and paint manufacturing and Valspar's Technical Director and Lab Manager.

  - o With a total offense level of 25, based on a loss amount between ***$7 and $20 million***, the advisory guideline range was 57-71 months' imprisonment. The government asked for Lee to be sentenced to 57 months. Lee was sentenced to 15 months of incarceration.

- *U.S. v. West*, 08 CR 709 (N.D. Cal.):

  - o West, a highly paid senior executive, pled guilty to stealing trade secrets from his employer Philips Lumileds Lighting Company (Philips) after accepting

---

[7] The government appealed the sentences and the Sixth Circuit remanded for resentencing on the ground that the district court did not give a sufficient explanation as to its finding of no loss. *U.S. v. Howley*, 707 F.3d 575, 582 (6th Cir. 2013). At resentencing, the district court imposed the same sentences for both Roberts and Howley, specifically, four years' probation.

employment with Philips' primary competitor, Bridgelux, as Director of Product Development, but while still employed at Philips. West resigned his position with Philips after he stole the information at issue but only because he was confront by Philips with a letter from Bridgelux offering West a position as Director of Product Development.

o West downloaded, over a period of months, over **10,000 files**, including confidential and proprietary technical documents as well as financial and marketing documents. The documents contained considerable information on Philips' products that had not yet been released and were still in development. West made multiple copies of the stolen information, storing it on several hard drives and other storage media devices as well on his personal home computer and his Bridgelux work computer.

o West received a below-guideline sentence of **two years' probation**.

- *U.S. v. Zhang*, 10 CR 827 (N.D. Cal.):

o Zhang pled guilty to stealing trade secrets from his employer SiRF Technology, Inc. ("SiRF") where he was employed as a Senior Software Engineer and Director of Software Development. Specifically, Zhang downloaded **100,000 files** constituting millions of lines of SiRF's source code to external devices. Zhang conceded that he replicated the interface contained in SiRF's source code to use in developing a product for his own competing company. SiRF spent approximately **$1.7 million** to develop its source code.

o Zhang established his competing company before accepting employment with SiRF. However, not once during his seven year employment with SiRF did Zhang inform SiRF about his competing company, which was in violation of his employment agreement.

o During his time at SiRF, Zhang recruited two SiRF employees to work for his competing company. Zhang also while employed at SiRF, made pitches and presentations to SiRF customers and clients on behalf of his competing company.

o Zhang was sentenced to **five years' probation** and a $20,000 fine.

In sum, the foregoing and attached analysis is informative to avoiding an unwarranted sentencing disparity. First, it illustrates that courts faced with similar circumstances regularly impose sentences significantly lower than the advisory guideline range. Second, it illustrates the propriety of issuing a non-custodial sentence here. Third, it illustrates that the government's proposed sentence of 60 months' imprisonment (rejected by Probation in favor of one year and

one day) would be an unwarranted sentencing disparity, unjust punishment, and contrary to a "sufficient but not greater than necessary" sentence. For these reasons as well, a non-custodial sentence is not only reasonable and just, but it is also necessary to avoid unwarranted disparities.

**E.    The Court Should Reject an Advisory Guideline Total Offense Level 24.**

The government and Probation calculated Bob's advisory Guideline range to be 51-63 months based on a total offense level of 24, and criminal history category I.  Gov. Memo., p.11; PSR ¶38. This advisory Guideline calculation depends on: (i) a base offense level of 6 (§2B1.1(a)), (ii) a two-point increase based on Bob knowing the information at issue would be transported out of the United States (§2B1.1(b)(14)(A)), (iii) a fourteen-point increase based on an intended loss amount of between $595,437.50 and $887,270[8], being greater than $550,000 but less than $1,500,000 (§2B1.1(b)(1)), (iv) a two-point increase for "abuse of trust" (§3B1.3), and (v) no credit for acceptance of responsibility (§3E1.1).

We agree with a criminal history category I (zero points), a base offense level of 6, and a two-level §2B1.1(b)(14)(A) increase.  Respectfully, however, we dispute the three other aspects of the foregoing advisory calculation, specifically, the "abuse of trust" enhancement, the intended loss amount calculation, and withholding credit for acceptance of responsibility.

As explained below, we submit the correct advisory guideline range is 0-6 months based on a total offense level of 6, calculated as follows: (i) a base offense level of 6 (USSG §2B1.1(a)), (ii) a two-point increase based on Bob knowing the information at issue would be transported out of the United States (USSG §2B1.1(b)(14)(A)), and (iii) a two-point reduction for acceptance of responsibility (USSG §3E1.1).

---

[8] Probation calculates the intended loss as between $595,437.50 and $887,270. PSR, ¶28. The government calculates the intended loss to be $837,250.  Gov. Memo., p.9

1.    This Court Should Reject Any Two-Level "Abuse of Trust" Enhancement.

Respectfully, a §3B1.3 "abuse of trust" enhancement is not warranted.  To apply, the Court must find that (i) Bob occupied a position of trust, and (ii) abused that position of trust to significantly facilitate the commission of his offense. *U.S.. v. Sierra*, 188 F.3d 798, 802 (7th Cir. 1999). Here, the government has not established either prong by a preponderance of the evidence.

To satisfy the first element, the government must satisfy a precise definition, which it has not done. A person is considered to occupy a position of trust when the person is in a role that allows for professional and managerial discretion. *See* §3B1.3, Comment n.1; *see also U.S. v. Stewart*, 33 F.3d 764, 768 (7th Cir.1994) (A person is considered to have occupied a position of trust if he had access to or authority over valuable things, including, for example governmental power.). A person occupying a position of trust often has significant discretion to act on his victim's behalf. *See U.S. v. Davuluri*, 239 F.3d 902, 909 (7th Cir. 2001).  The Application Notes caution, "This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors." *See* §3B1.3, Comment n.1

Here, the government has not established this first element by a preponderance of the evidence because Bob held no "position of trust" with "significant discretion to act on behalf" of Dura-Bar.  The mere fact that Bob was a 30-year Dura-Bar employee, as the government contends, does not mean that Bob occupied a "position of trust." *See* Gov. Memo., p. 10. Bob was an at-will employee holding a sales position. Significantly, Bob did not create any of the files at issue, did not have any discretion over the development of the files at issue, and did not control the storage of those files or their use. Bob had the identical access to the information in question as hundreds of other Dura-Bar employees, including interns and warehouse personnel.  Just as a bank teller has access to bank property as part of his or her employment, Bob had access to the information at

issue in this case as part of his employment. That access – and his sales position – is not enough to find he occupied the requisite position of trust.

Even assuming the government could establish this first element by a preponderance (which it has not), a two-level abuse of trust enhancement still would be unwarranted because the government has not established that Bob abused any alleged position of trust "in a manner that significantly facilitated the commission or concealment of the offense." *See* §3B1.3 at Comment n.2. It is not sufficient that a defendant enjoyed a position of trust, and thus had an opportunity to commit a difficult-to-detect wrong. *See U.S. v. Nuzzo*, 385 F.3d 109, 116 (2d Cir. 2004). In order to satisfy the final prong of §3B1.3, Bob "must have enjoyed a 'superior' position, relative to other potential perpetrators, as a result of a trust relationship," ***and*** Bob "***must have capitalized on that superior position in committing the offense conduct***." *Id.* (emphasis added).

Here, Bob did not "capitalize" on a superior position that "allowed him to commit the offense." Bob's sales position provided him with no greater access or authority over the Dura-Bar files at issue than any other of the hundreds of Dura-Bar employees who had access to its unrestricted, shared S: drive (where the information was stored). Human Resource employees, warehouse employees, sales and administrative staff in China, and interns, among others, all had access to Dura-Bar's S: drive and the information therein. Dura-Bar permitted all of these other employees to access this identical information without any NDAs or employment agreements.

The government wrongly asks the Court to disregard the foregoing, claiming it matters not that Bob had the same level of access as hundreds of other Dura-Bar employees. Gov. Memo., p. 11. The Seventh Circuit, however, has stated otherwise, in fact, in the very case relied on by the government. *U.S. v. Hernandez*, 231 F.3d 1087, 1090 (7th Cir. 2000) (in determining whether a particular defendant occupied a position of trust characterized by "less supervis[ion]" or "more discretion," the sentencing court must look to the "other employees" for comparison).

Moreover, case authorities establish the inapplicability of the abuse of trust enhancement. *U.S. v. Castagnet,* 936 F.2d 57, 62–63 (2d Cir. 1991) (enhancement is not warranted if the position of trust "merely... provided an opportunity that could as easily have been afforded to other persons"); *U.S. v. Nuzzo,* 385 F.3d 109, 116 (2d Cir. 2004) (to satisfy the final prong of §3B1.3, defendant "must have enjoyed a 'superior' position, relative to other potential perpetrators, as a result of a trust relationship" and the defendant "must have capitalized on that superior position in committing the offense conduct"). Thus, because neither prong of §3B1.3 applies, the Court should reject any two-level enhancement for abuse of trust.[9]

2. <u>The Government Has Failed to Prove Any Actual or Intended Loss</u>.

This Court should reject the government's §2B1.1 loss analysis, generally, and proposed "intended loss" calculation of $837,250, in particular. Gov. Memo., p. 8-10. In summary, the government's loss analysis and calculation is: (i) based on an improper methodology; (ii) contrary to the evidence introduced at trial; and (iii) based on unsupported conclusory claims lacking sufficient proof.

The legal framework for calculating "loss" under §2B1.1 is well established. The general rule is that the district court "determines the greater of actual or intended loss." §2B1.1 n. 3(A); *U.S. v. Pu,* 814 F.3d 818, 824 (7th Cir. 2016).

Probation correctly rejected the government's "actual loss" calculation of $181,875, finding that there was "no actual loss" in this case. PSR, ¶ 26 ("there was no actual loss (as further detailed below, the actual losses referenced by the government's version [*i.e.,* $181,875] are not appropriate for loss calculation)…"). "Actual loss" is defined as "reasonably foreseeable pecuniary harm that resulted from the offense" but expressly excludes "costs incurred by victims primarily

---

[9] None of the EEA defendants in *U.S. v. Hanjuan Jin*, No. 08 CR 192, *U.S. v. Lee*, No. 06 CR 290-1, *U.S. v. Yang*, No. 11 CR 458-1 and *U.S. v. Newman*, No. 14 CR 704-1, received a two-level abuse of trust enhancement. What is more, the government never sought an abuse of trust enhancement in these cases.

to aid the government in the prosecution and criminal investigation." §2B1.1 n. 3(A) & 3(D)(ii).

Accordingly, contrary to the government's claim, the actual loss figure of $181,875 fails because

Bob's retention bonus earned in December 2014 for remaining with Dura-Bar through its transition

period ($127,000) and various costs allegedly involved in the investigation of the offense

($54,875) are not properly included in calculating "actual loss." *See* PSR, ¶28; *see also U.S. v.*

*Schuster*, 467 F.3d 614, 619 (7th Cir. 2006); *U.S. v. Nasal*, No. CR-08-0237 EMC, 2014 WL

121519, at *3 (N.D. Cal. Jan. 13, 2014). Moreover, the government concedes that there was "no

actual reduction in the value" of Dura-Bar's information here. Gov. Memo., p.8. Thus, this Court

should adopt Probation's conclusion that the government proved no actual loss in this case.[10]

Legal rules and principles surrounding the calculation of intended loss too are well

established. "Intended loss" is defined as the "pecuniary harm" that the defendant "actually

intended to result from" the offense, or, in the words of the guidelines, "purposely sought to

inflict." *Pu*, 814 F.3d at 824; §2B1.1 n. 3(A). "Pecuniary harm" is monetary harm or a harm that

is readily measurable in money and excludes non-economic harm. *Id.* The phrase "result from"

imposes a requirement of "but-for causation." *Pu*, 814 F.3d at 824. Thus, as the name suggests,

the intended loss analysis turns on how much loss the defendant "actually intended to impose" on

the victim as a "result of" the offense conduct. *Id.*; *U.S. v. Middlebrook*, 553 F.3d 572, 578 (7th

Cir. 2009) (The "true measure of intended loss [is] in the mind of the defendant").

---

[10] Similarly, the government does not advocate substituting "the gain [to defendant] that resulted from offense as an alternative measure of loss" pursuant to §2B1.1 n. 3(B). Nor can it. "Gain that resulted from the offense" can be used as "an alternative measure of loss only if there is a loss but it reasonably cannot be determined," but here, the government claims to calculate both an actual and intended loss analysis. *Id.* A "gain" analysis also is inappropriate because, as the government concedes, O'Rourke never used or delivered the Lab Reports or Alloy Data Experiment Reports before the government seized the information so no "gain resulted from the offense." Gov. Memo., p.8.

A district court need only make a reasonable estimate of either loss amount. *Pu*, 814 F.3d at 824; §2B1.1 n. 3(A). This "estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as":

> (i)     The fair market value of the property unlawfully taken, copied, or destroyed; or, if the fair market value is impracticable to determine or inadequately measures the harm, the cost to the victim of replacing that property; and/or

> (ii)    In the case of proprietary information (*e.g.*, trade secrets), the cost of developing that information or the reduction in the value of that information resulted from the offense.[11]

§2B1.1 n. 3(C)(i) & (ii); *Pu*, 814 F.3d at 824-25.

While a "reasonable estimate" will suffice, the government still bears the burden of proving any alleged loss amount by a preponderance of the evidence. *Pu*, 814 F.3d at 825; *see also U.S. v. Schneider*, 930 F.2d 555, 559 (7th Cir. 1991) (failure by the government to satisfy its burden with explicit evidence precludes the district court from sentencing the defendant based on the unproven loss); *U.S. v. Liss*, 265 F.3d 1220, 1230 (11th Cir. 2001) (The Government must "support[ ] its loss calculation with reliable and specific evidence.").

The Seventh Circuit's actual and intended loss analysis in *Pu* is instructive here. Like Probation in this case, in *Pu*, the Seventh Circuit Court noted that the government did not prove any actual loss from defendant misappropriating proprietary trading software from two companies. 814 F.3d at 823-824 (money spent on forensic analysts and attorneys were excluded from any loss calculation, and defendant used stolen software to lose money in the market). Turning to the intended loss issue, the Seventh Circuit reversed the district court's holding that the defendant "intended to cause a loss" of $12 million, which was the "cost of development" for the specific

---

[11]   The government expressly concedes the inapplicability of this provision, stating that it would be "impossible" to calculate the "research and development costs for the 667 Lab Reports and 25 Alloy Experiment Reports." Gov. Memo., p.8.

software misappropriated. *Id.* at 822. In so reversing, the Seventh Circuit reasoned that "[w]ithout evidence of Pu's intent to cause the victims to suffer a loss equal to the cost of development, the district court's use of the cost of development to determine the intended loss amount" was clearly erroneous. *Id.* at 826 (finding there is "no direct evidence of how much of a loss Pu intended" each company "to suffer," and there is "also no evidence from which we can infer how much of a loss Pu intended" each company "to suffer" as a result of his offense conduct). Thus, the Seventh Circuit reversed the district court's 20-level loss enhancement.

Based on the foregoing principles, this Court should conclude that the government failed to prove any intended loss by a preponderance of the evidence. As in *Pu*, the government has presented no "direct evidence" or "evidence from which the court can infer" how much of a loss Bob "actually intended" Dura-Bar to suffer from copying the Lab Reports and Alloy Experiment Reports. For instance, the government presented no email, recording, conversation, testimony, or admission of Bob's intent along these lines. Indeed, the government does not even address this *mens rea* issue that Bob "actually intended loss" in any of its submissions. *See* Gov. 't Memo., p.8-11; GVO p. 8-9. Accordingly, this Court should conclude that the government failed to prove by a preponderance of the evidence any actual or intended loss.

This Court should also reject the government's $837,250 "fair market value" intended loss analysis. Gov. Memo., p.9 (arguing intended loss should be the "fair market value," described as the "amount of money it would cost" Hualong to "purchase [and maintain] its own equivalent equipment and have the lab analysis performed" by an outside lab, which the government claims totals "approximately $837,250, broken down into: (i) $500,000 for purchasing and maintaining the lab equipment, (ii) $333,500 to "outsource the 667 Lab Reports", and (iii) $3,750 to "outsource... the 25 Alloy Experiment Reports"). First, as explained above and as emphasized in *Pu*, the government presents no direct evidence or evidence from which to infer that Bob "actually

48

intended" to cause Dura-Bar a loss of $837,250 by copying the Lab Reports and Alloy Experiment Reports. On these grounds alone, the Court should reject the government's loss claim.

Second, the government's "fair market value" methodology also is seriously flawed because the government misinterprets and misuses the phrase "fair market value" used in §2B1.1 n. 3(C)(i). Like a house being sold, "fair market value" is the "price a buyer will *pay*" for the property." Black's Law Dictionary, https://thelawdictionary.org/fair-market-value-fmv/. The government's methodology and $837,250 figure does not reflect "fair market price" (what someone would "pay" to purchase) but the supposed *cost* to create, which is contrary to the §2B1.1. *See* §2B1.1 n. 3(C)(i).

Indeed, the government presented absolutely no evidence on "market price" or "fair market value." For instance, the government presented no evidence as to what a competitor would pay for a 2012 "external" Dura-Bar Lab Report that Dura-Bar freely gave to its customer with no restrictions on its subsequent use. Similarly, the government presented no evidence as to what a competitor would pay for a 2012 "internal" Dura-Bar Lab Report that revealed a pre-production product that failed to meet production quality standards and little else. Finally, the government presented no evidence as to what a competitor would pay for Dura-Bar's Alloy Experiment Reports, although the clear answer is "zero" because even Steinkamp agreed the Alloy Experiment Reports never identified the key alloy ingredient tested so were "valueless" to a competitor.

Third, the Court also should reject the government's "fair market value" methodology because it seeks to unfairly "double count" the intended loss by combining the cost for Hualong to "purchase [and maintain] its own [laboratory] equipment" *and* then "outsource" the 667 Lab Reports and 25 Alloy Experiment Reports to a commercial laboratory. Gov. Memo., p.9. This obviously borders on the frivolous. No business would purchase and maintain tens or hundreds of

thousands of dollars in laboratory equipment and then pay a private laboratory retail commercial rates to generate "outsourced" Lab Reports or Alloy Experiment Reports.

Fourth, the government's "fair market value" intended loss analysis also should be rejected because it would be error to include $500,000, which the government claims, "Hualong would have to" incur to purchase and maintain its own laboratory equipment. Gov. Memo., p.9. Here, the government comes perilously close to an "intended gain" methodology of calculating "intended loss," which is contrary to federal law. *See supra,* n.10. In any event, the government has failed to prove by a preponderance that Hualong has no laboratory. Indeed, the trial evidence was all to the contrary. Frank Abruzzo, the government's own witness, specifically testified that Hualong has a laboratory. Moreover, Dura-Bar's own due diligence (when discussing a joint venture with Hualong) documented Hualong's laboratory. DX Z-43 (documenting Hualong lab equipment). Furthermore, Abruzzo further testified that Hualong (being started by professors) had full access to a university laboratory for testing.

Fifth, the government also has failed to prove by a preponderance of the evidence that "equivalent equipment" and maintenance would cost "approximately $500,000." Gov. Memo., p.9; GVO, p.8. Contrary to the government's contention (made in its Government's Version only), Bradley Steinkamp did ***not*** testify that "Dura-Bar spent approximately $400,000 to purchase the laboratory equipment used in the lab" and "approximately $30,000 per year for the maintenance and calibration of the lab equipment." GVO, p. 8. The government cites to no transcript testimony. Indeed, Mr. Steinkamp never so testified, as the defense informed the government in Defendant's version. *See* DVO, p. 24 ("counsel has no memory (or trial notes) of Steinkamp ever so testifying). Indeed, defense counsel would have objected to Steinkamp's alleged testimony because it would have been based on hearsay, lack of personal knowledge, absence of foundation, and no prior discovery. Virtually all of Dura-Bar's laboratory equipment preceded Steinkamp's employment.

50

Moreover, assessing 100% of Dura-Bar's alleged costs to purchase and maintain its laboratory equipment to the creations of the Lab Reports and Alloy Experiment Reports is unfair and incorrect given that Dura-Bar uses such laboratory equipment for many other purposes. For instance, Dura-Bar must purchase, maintain, and use its lab equipment to perform daily manufacturing process and pre-delivery quality control checks, which has no relation to the information at issue here. So, Dura-Bar needed to incur these lab costs regardless.[12] *See U.S. v. Nosal*, No. CR-08-0237 EMC, 2014 WL 121519, at *10 (N.D. Cal. Jan. 13, 2014) (declining to include company's overhead costs in loss amount calculation because the company would have incurred the overhead costs identified regardless of the defendant's conduct).

Sixth, the Court should further reject the government's $837,250 intended loss analysis because it unfairly and unconstitutionally includes all 667 Lab Reports and 25 Alloy Experiment Reports charged in the indictment. Gov. Memo., p. 9 (assessing a $333,500 "cost to outsource the 667 Lab Reports" and $3,750 to "outsource... the 25 Alloy Experiment Reports"). The jury never unanimously concluded that all 667 Lab Reports and 25 Alloy Experiment Reports were "trade secrets" under the EEA. To the contrary, the Court's jury instructions only required the jury to find the existence of "*one or* more trade secrets" in the Lab Reports and Alloy Experiment Reports categories. Dkt. 113, p. 21, 23, 25. There is no basis for concluding that the jury deemed every one of the 667 Lab Reports to include, or qualify as whole to be, a "trade secret."

The 667 Lab Reports were qualitatively different, further making any assumption that the jury found all of them to be, or contain, a "trade secret" impossible, wholly unfair, and improper. For instance, of the 667 Lab Reports, 530 were "external," meaning Dura-Bar publicly and freely

---

[12] It should be noted that of the 667 lab reports, only 2 were created in 2010, neither of which were assigned to any of the government alleged "trade secret" categories. *See* GX 200A. As such, even assuming the maintenance costs were properly included in the loss calculation (they were not), it would be entirely improper to hold Bob responsible for maintenance costs in 2010.

shared them with actual and prospective customers without any restrictions on confidentiality or publication whatsoever. There is no reason to believe the jury concluded that any of these 530 Lab Reports qualified as, or contained, a "trade secret." Indeed, even Dura-Bar (in early interviews with the government) plainly explained that it did ***not*** consider these "external" Lab Reports to be, or include, trade secrets because they were freely disseminated. FBI_001-000904 (Dura-Bar explaining to the government, "Lab reports which are specific to external customers would not be considered proprietary by Dura-Bar because they are shared with the customers"); FBI_001-000906 (Dura-Bar explaining to the government that lab report "3568 was regarding a Chinese customer" and "not believed to be sensitive or proprietary, as it is regarding an external customer").

Similarly, the government presented several alternative theories for the jury to choose as to why *one or more* of Dura-Bar's lab reports might contain a "trade secret," including: (1) 154 external Lab Reports that identified a defect; or (2) 259 other external Lab Reports that identified a defect and potential cause of the defect; or (3) 34 other external Lab Reports that identified a defect, a potential cause, and a potential solution; or (4) 137 "internal" Lab Reports that were not shared external to Dura-Bar, unlike the "external" ones; or (5) all of the 667 lab reports as a collective whole because of their "unique combination."[13] Dkt. 113, p.29. Again, for this reason as well, presuming the jury unanimously concluded that every one of the 667 Lab Reports contained a "trade secret" for calculating "intended loss" is wholly unfair and improper.

Moreover, the government at trial only elicited testimony about 21 Dura-Bar Lab Reports, not all 667 Lab Reports. Furthermore, the government vigorously resisted defense counsel's attempts to have the jury identify via a special interrogatory or other means the precise trade secret(s) it unanimously found to exist, if any, to avoid just such an unfair and constitutionally

---

[13] In fact, the government grouped the lab reports at issue in this case into 4 categories. *See* GX 200(a). 83 of the 667 lab reports were not assigned to a "trade secret" category. As such, at a minimum, those 83 lab reports must be excluded from the loss amount calculation, which the government fails to do.

infirm result. Based on this record, there is absolutely no proper factual basis to discern which of the 667 Lab Reports the jury unanimously agreed upon was, or included, a "trade secret."

In sum, the government has failed to present any proof or analysis as to why the Court should simply presume that all 667 Lab Reports qualify as a "trade secret" so as to be properly included in the Court's intended loss calculation. Indeed, the government's failure to satisfy its burden precludes the Court from sentencing Bob based on an unproven intended loss. *U.S. v. Schneider*, 930 F.2d 555, 559 (7th Cir. 1991) (remanding so that defendant can be sentenced "without an additional punishment based on a proven monetary loss -- for none was proved.").

Seventh and lastly, this Court should not consider Dura-Bar's "Market Analysis" as part of any loss calculation *or*, as the government would have it, in "aggravation." Gov. Memo., p.8-9. To be clear, the government concedes that Dura-Bar's so-called "Market Analysis" is inappropriate, and the Court should not consider it for any loss calculation. *Id.* (the government is "not relying on that analysis in its loss calculation"); GVO, p.9 (same). Similarly, Dura-Bar's $68 million "Market Analysis" also should *not* be considered in "aggravation" because it is speculative, conclusory, factually baseless, and wholly unreliable, particularly given Dura-Bar's highly partisan view of the matter. *Cf. U.S. v. Moose*, 893 F.3d 951, 956 (7th Cir. 2018) (A company's internal valuation of its admittedly highly speculative worth does not provide a particularly sound basis for determining the fair market value of its stock). Indeed, the government admits as much by disavowing the "Market Analysis" for loss purposes.

Equally damning is the ***date*** of Dura-Bar's $68 million "Market Analysis." GVO, at Ex. A, p.1. It is dated *February 2018*, one full year before the jury acquitted Defendant on 16 of 26 trade secret charges, which included rejecting the government's primary trade secret claim in Count 1 relating to the 1993 Document, which the government trumpeted as Dura-Bar's incredibly valuable, secret "operational playbook," as well as all of the trade secret claims relating to Dura-

Bar's IR Camera files and IR2 files. The fact that the government and Dura-Bar would submit the identical "Market Analysis" now without accounting for the jury's significant acquittals on three-fifths of the alleged trade secret categories (1993 Document, IR Camera, and IR2) is telling and fatal to any consideration of it or Dura-Bar's credibility on the matter.

By contrast, the government's position on intended loss, unlike Dura-Bar's, has steadily evolved and declined significantly over time. In June 2018, prior to any trial, the government delivered to Bob's Dura-Bar's $68 million "Market Analysis" but nevertheless noted its view that the intended loss was $13+ million. *See* June 1, 2018 USAO Correspondence. Subsequently, after trial and in its Government Version, the government substantially revised its intended loss to $1.06 million. GVO, p.8-10. Now, just one month later, the government asserts an intended loss of $837,250. Gov. Memo., p.8-9. Thus, the government has never – before or after trial – adopted Dura-Bar's calculations as reliable. Yet, the government without hesitation still insists that this Court should consider Dura-Bar's pre-trial $68 million "Market Analysis" for "aggravation," as if the government's view of intended loss has not changed and as if the acquittals on three-fifths of the alleged trade secrets categories (16 out of 26 charges) never occurred. *Id.* 9-10; *see also id.* p.1 (government advocating "aggravated" high end sentence of 60 months incarceration). For all of these reasons, Dura-Bar's "Market Analysis" should be wholly disregarded.

3.    <u>Bob Should Receive a Two-Level Reduction for Acceptance of Responsibility</u>.

The defense further respectfully requests consideration of a two-level reduction for acceptance. Section 3E1.1 affords a two-level point reduction in the adjusted offense level if a defendant clearly demonstrates acceptance of responsibility. Application Note 2 is instructive:

> Conviction by trial [] *does not automatically preclude a defendant from consideration for such a reduction*. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. *This may occur, for example, where a defendant goes to trial to assert and preserve issues*

> *that do not relate to factual guilt* (*e.g.*, to make a constitutional challenge to
> a statute or *a challenge to the applicability of a statute to his conduct*).

Excerpt of §3E1.1, Application Note 2 (emphasis added); *see also, U.S. v. Salvador*, 18 F.3d 1380, 1382 (7th Cir. 1994) ("There are situations in which a defendant may exercise his constitutional right to trial and still receive the two-level reduction for acceptance of responsibility…").

Here, this Application Note applies to Bob's defense and his current posture before the Court. Throughout pre-trial and trial, Bob always accepted responsibility for his underlying conduct (and regrettable isolated lapse in judgment) in leaving Dura-Bar after copying and possessing the information at issue. In the words of this Application Note, Defendant at all times merely sought, in good faith, to "challenge the applicability of a statute to his conduct" under a sparingly used EEA statute. §3E1.1, Application Note 2. In particular, the defense always focused on the legal issues of: (i) whether the Dura-Bar information met the statutory definition of "trade secret" as defined by 18 U.S.C. §1839, and (ii) whether Bob could have reasonably believed the information at issue to be a "trade secret" as so defined. In not testifying, Bob did not dispute any fact at trial. Significantly, the jury's split verdict (finding Bob innocent on 16 of 26 charges and three-fifths of the claimed "trade secret" categories) illustrates the difficulty of the legal issues presented by Bob's EEA charges, and his good faith objection to the application of the statute's elements to his admitted conduct.

Bob showed acceptance of responsibility in other ways too. For instance, prior to any indictment in January 2017, Bob provided a detailed proffer, during a lengthy interview and answering all of the government's pointed questions, although he had no obligation to do so. FBI_001-001132-1180. Thereafter, in January and February 2017, Bob also authorized counsel to provide the government with supplemental written proffer communications to answer certain additional government questions. Similarly, Bob accepted responsibility by voluntarily returning from China after federal agents on September 21, 2015, stopped him, seized his personal

belongings, and searched his residence and thereafter. Furthermore, shortly before being indicted in 2017, Bob agreed to cancel his plane ticket and plans to return to China upon the government's request that he not leave the country. For all the foregoing reasons, this Court should provide Bob with a two-level reduction for acceptance of responsibility under §3E1.1.

Aside from the foregoing Application Note, providing Bob with acceptance credit also is consistent with federal case law. For instance, in *U.S. v. Harjuan Jin*, Judge Castillo provided acceptance of responsibility under less favorable EEA circumstances (since the *Jin* defendant lied to governmental officials before trial). *Jin,* No. 08 CR 192 (N.D. Ill.).

Other case authorities are in accord. *See, e.g., U.S. v. Purchess*, 107 F.3d 1261, 1267 (7th Cir. 1997) (district court should not deny §3E1.1 adjustment because defendant challenged legal conclusion drawn from facts defendant admits); *U.S. v. Falls*, 78 F.3d 186, 171-72 (5th Cir. 1996) (district court erred in denying §3E1.1 adjustment where defendant admitted facts but challenged their legal interpretation at trial); *U.S. v. Gauvin*, 173 F.3d 798, 806 (10th Cir. 1999) (affirming district court's acceptance of responsibility reduction where defendant admitted the conduct with which he was charged but disputed at trial whether his factual state of mind met the legal criteria of intent to harm); *U.S. v. Blagojevich*, No. 08 CR 881 (N.D. Ill) (Judge Zagel crediting the former governor with a two-level acceptance reduction following his second trial conviction).

The Court should reject the government's misapprehension of Bob's position. Gov. Memo. p.12. Pointedly, the government argues that Bob has never "accepted responsibility" for his offense, explaining that he "stole over 1,900 electronic data files" from his employer which is "theft, which is a *crime*." *Id.* (emphasis in original). But, the federal government never charged Bob with "theft," which is not a *federal* crime. Bob has never disputed "theft." He has always admitted he should not have copied and taken Dura-Bar's information, whether under his employment contract (civil) or some other state law. Rather, what Bob has contested through trial

56

(which was his right, as explained above) was the legal application of the EEA prohibition of misappropriating "trade secrets" to his admitted factual conduct.

The Court also should reject the government's character assassination of Bob, wrongly labeling him "greedy," "entitled," "delusional," "unremorseful" and "spiteful." *See* Gov. Memo., p.1, 13, 15. The government's invective is belied by the facts, the defense presented at trial, and the many dozens of Bob's character letters, all of which portray the true person. First, contrary to the government's position, Bob does not deny, nor has he ever denied, his conduct during those 15 minutes or so on September 13, 2015, when he copied and took the information at issue without permission. *See* Gov. Memo., p. 12 ("This defendant's complete lack of acknowledgement of his [theft] is astounding. It is also indicative of his character."). In fact, on January 6, 2017, more than six months before being indicted and more than two years before trial began, Bob proffered and admitted precisely these facts to the government. FBI_001-001133-34. Further, although he has yet to testify or make any statements to this Court, Bob has expressed deep and sincere remorse for his isolated misjudgment on that Sunday morning. *See* p. 9-10, *supra* (Bob's family and friends recounting Bob's remorse, regret, and acknowledgement of fault). Indeed, even the government's own witness, Frank Abruzzo, testified at trial under oath that Bob, contrary to the government's baseless claim, is not a "greedy" or "entitled" person. Ex. 1, F. Abruzzo. Thus, disregarding the government's personal anger with Bob and his defense counsel for contesting the legal applicability of the EEA, this Court should grant Bob a reduction for acceptance of responsibility.

### IV.    RESTITUTION, FINES, AND FORFEITURE

### A.    This Court Should Reject the Government's $181,875 Restitution Figure.

The government's $181,875 restitution amount is objectionable for several reasons. By way of background, the government submits a restitution amount of $181,875 "to repay Dura-Bar for the amount they incurred to investigate the instant case," which allegedly includes:  (i) a

$127,000 "retention bonus" paid to Bob in December, 2014, almost one year before his alleged illegal conduct on September 13, 2015, (ii) $14,000 for an "internal forensic analysis" of Bob's Dura-Bar laptop, (iii) $36,400 of employee hours spent on conducting an "internal investigation," and (iv) $4,075 to conduct a forensic analysis of Bob's personal laptop and cellular telephone by Digital Intelligence. PSR, ¶¶14 & 102; GVO, p. 8.

This Court would commit error to include Bob's $127,000 retention bonus into any criminal restitution judgment. The applicable restitution statute, §3663A(b)(4), provides that Bob must provide restitution to reimburse Dura-Bar for "lost income … and other expenses **incurred during participation in the investigation or prosecution** of the offense." 18 U.S.C. §3663A(b)(4) (emphasis added). Bob's $127,000 retention bonus in no way falls within this legal standard because it was earned on December 31, 2014 (not after September 13, 2015), so it cannot legally be included in a criminal restitution order. Aside from not meeting the statutory temporal requirement, Dura-Bar was contractually obligated to pay Bob his retention bonus at the end of 2014, under the agreement's express terms. DX A-11, p. 3 ("Should Employee remain employed by Company through and including December 31, 2014, Employee **shall be entitled to, and shall receive,** a one-time retention payment, less applicable taxes, in the amount of $127,000" and no other provision of the employment agreement provides for "clawing back" the retention bonus in the case of a breach, which would be contrary to civil contract damages law) (emphasis added).

At best, the government wrongly conflates an arguable civil remedy for alleged breach of contract with its criminal prosecution. *See* Gov. Memo., p.22 (arguing "defendant was in clear breach of the Retention Agreement, and thus the $127,000 retention bonus was a loss to the victim Dura-Bar that was directly caused by defendant's offense conduct in this case…"). If Dura-Bar wanted to pursue costs against Bob in the form of his retention bonus for breach of contract, Dura-Bar should have gone through with its civil litigation, which it voluntarily dismissed with

prejudice. The government and Dura-Bar cannot use the government's criminal case as a means of getting around its voluntary dismissal and federal criminal restitution law.

Next, this Court also should omit Dura-Bar's alleged investigation costs totaling $54,875 from any criminal restitution order. GVO, p. 9 (arguing that these costs were attributable to, among other things, "employee hours to support internal investigation" in the fall of 2015). First, the government has failed to provide *any evidence* about this alleged $54,875 cost, including omitting specifics about the "how," "when," "why," and "who."[14] Contrary to its obligation, the government failed to provide a "complete accounting" for this alleged financial claim. *U.S. v. Robers*, 698 F.3d 937, 953 (7th Cir. 2012) (overturning restitution awards for "attorney's fees" and "other expenses" where evidence submitted by government lacked sufficient detail to tie those expenses properly recoverable under restitution statute); *U.S. v. Ferdman*, No. 13-2196, 2015 WL 619629, at *10 (10th Cir. Feb. 13, 2015) (government failed to satisfy burden on restitution where it relied on estimates of expenses supported by unverified signature of corporate officer).

Second, the government also has failed to submit *any proof* that such alleged costs were, as required by §3663A(b)(4), "incurred during participation in the investigation or prosecution of the offense," as opposed to being incurred for Dura-Bar's civil lawsuit against Bob (which was filed in September 2015 and remained pending and viable for years) or some other internal Dura-Bar purposes. 18 U.S.C. §3663A(b)(4); *see also U.S. v. Havens*, 424 F.3d 535, 538 (7th Cir. 2005) ("[C]onsequential damages and attorneys' fees spent in pursuing litigation against the wrongdoer do not qualify" for restitution under the MVRA); *Lagos v. U.S.*, 138 S. Ct. 1684, 1690 (2018) (restitution does not cover costs of private investigation into defendant's wire fraud that victim

---

[14] The government claims that its restitution calculation is limited to costs incurred by Dura-Bar *prior* to the government's involvement. Gov. Memo., p. 22. However, the government includes costs incurred for forensically imaging Bob's cellular phone and personal laptop confiscated by law enforcement, which must have been incurred *after* the government's involvement. PSR ¶14 & 102; GVO, p. 8.

chose on its own to conduct to perform, although victim shared with the government the information that its private investigation uncovered).

The Seventh Circuit's decision in *U.S. v. Hosking*, 567 F.3d 329 (7th Cir. 2009), is informative. In *Hosking*, the district court entered a restitution award based upon a single document offered by the government that summarized costs supposedly incurred by a bank in connection with its investigation of defendant's embezzlement. That document listed the name and title of each employee who worked on the investigation, the number of hours each employee worked and the employee's hourly rate. *Id.* at 33. The document also "briefly and generally" described the scope of the investigation and described the activities of a few employees, "but made no attempt to describe the work done by each one." Id. On appeal, the Seventh Circuit found that this evidence was insufficient and "fail[ed] to demonstrate that *all* of the in-house staff costs – or even half of those costs – were proximately caused by Hosking's conduct, produced a diminution in the value of the bank's property or were convincingly claimed as part of the investigation of the offense." *Id.* (emphasis in original). Thus, the Seventh Circuit found that the district court erred in relying on the face of the government's document "without requiring evidence that the costs reported were directly and reasonably demanded by the bank's investigation of Hosking's fraud." *Id.* at 333-34 (remanding with instructions that the government "provide an explanation, supported by evidence, of how each employee's time was spent in pursuing the investigation" and show that the work performed was "firmly connected to the investigation").

Here, the government presented even less information than provided in *Hosking*. As such, the government has failed to meet its burden of establishing Dura-Bar's "loss" by a preponderance of the evidence. 18 U.S.C. §3664(e) (burden of proof is a preponderance of the evidence).

**B.**     **The Court Should Reject the Government's Forfeiture Claim.**

The government also has not proven by a preponderance of the evidence the right to forfeit $15,000 in cash seized from Bob's home. Gov. Memo., p. 23-25 (seeking to forfeit the digital hard drive containing the files at issue and $15,000 seized from Bob's home safe during the government's search of his residence).  While there is no objection to the forfeiture of the digital hard drive and specific files at issue, we do object to forfeiting the $15,000, because the government has not proven by a preponderance of the evidence that it was property "used to facilitate the commission of the offense," pursuant to federal law.

By way of background, the government seized $15,000 in an envelope which contained handwritten symbols that translate to "I love you forever." In support of forfeiture, the government remarkably claims that there is "no other reasonable explanation" but that: (i) Bob's was supposedly having an affair with a Chinese woman while intermittently staying in China (argument with no evidence supplied), (ii) the Chinese woman was thus "the likely author of the love note on the Hualong envelope" (argument, conjecture, and no evidence supplied), (iii) "connecting her to both Hualong and the cash," such that the "preponderance of the evidence shows that Hualong used the woman to pay defendant a $15,000 cash bonus in exchange for stealing" Dura-Bar's trade secrets (argument, conjecture, and no evidence supplied). Gov. Memo., p. 24-25.

This Court should reject the government's unmoored logic and recklessly false factual allegations to forfeit $15,000. First and foremost, the woman who wrote "I love you forever" on the Hualong envelope was Tina Gagliardi, Bob's fiancée who lived in Bob's home, attended meetings with Hualong officials, and traveled to China with Bob (not some unnamed Chinese female agent supposedly working for Hualong as a "bagman"). *See* Ex. 39 (Gagliardi Affidavit).

Second, aside from pure conjecture and leaps of logic, the government in no way establishes by a ***preponderance of the evidence*** that the $15,000 was in any way "used to facilitate

the commission" of any trade secret offense (as opposed to be travel expenses for Bob (and Tina) to travel to and from China, the former of which Hualong expressly agreed to pay O'Rourke in his executed employment agreement). *See* DX Z-46; GX 60. Indeed, one wonders why Hualong would supposedly pay $15,000 for allegedly stolen trade secrets *before ever* receiving the trade secrets. Or, if the $15,000 was payment for the alleged trade secrets, why Bob never delivered the information to Hualong (via email, FedEx, otherwise) between September 13, 2015 and September 21, 2015, before being stopped at O'Hare. Or, one might wonder why Hualong would pay so little for such valuable alleged trade secrets worth $68+ million, per Dura-Bar's "Market Analysis."

The government's forfeiture claim is entirely speculative argument in other respects. By way of just one other example, the government never presents proof (again, just argument and conjecture) that Hualong "used" any alleged woman. No emails, no text message, bank records, or other evidence connecting Hualong's supposed illicit purpose to any alleged woman. Certainly, the government never charged Hualong, its officials, or any alleged woman with any conspiracy or other offenses. Indeed, even the government has acknowledged the weakness of its general position, previously speculating that the "cash was... *potentially* paid in exchange for defendant's surreptitious agreement to steal [before any actual delivery of] Dura-Bar's trade secrets," with no mention of any alleged female "bagman" to Probation. GVO, p.8 (emphasis added).

## C.    The Court Should Not Impose an Above-Guideline Range Fine.

This Court should not impose an above-guideline fine of $135,000. Using the government's total offense level of 24 (which is objected to), the fine range is $10,000 to $100,000. §5E1.2(c)(3) & (h)(1).  Using the Defendant's offense level of 6, the fine range is $500 to $5,000. *Id.* The defense objects to Probation's recommendation of a $135,000, ostensibly because Bob "has the financial means and was likely motivated to commit this crime due to greed," for a number of reasons. Sent. Rec., p. 6.

First, Probation's basis for imposing an above-guideline fine -- Bob "likely" being motivated by "greed" -- is unsupportable, as previously explained. The government's own witness, Frank Abruzzo, testified under oath at trial that Bob has never cared about money. Mr. Abruzzo would know, being Bob's immediately supervisor for 25 years and having known Bob for 30 years, a time-frame which included the two "traveling the world" together for work. Mr. Abruzzo, again a government witness, echoes those same sentiments in his character letter to the Court (which Probation admittedly did not have when it wrote its recommendation):

> Bob and his ex-wife Lorna were both metallurgists and both had very successful careers is business. However, one would never know that by their lifestyle. They lived in a very modest home in Lake Geneva, WI and ***they never spent their money on fancy cars, clothes, trips or jewelry***. My personal experience with Bob was that ***money just wasn't that important to him***. For example, I had at least 25 annual salary reviews of Bob, and depending upon business conditions, there were years of good raises, small raises and sometimes no raises, but his attitude was always the same. If his job was challenging and meaningful, he was happy. That was always more important than the money. With approximately 15 people on my team I can assure you that kind of attitude was highly unusual!

Ex. 1, F. Abruzzo. (emphasis added). John Keough, who testified at trial as an expert, makes similar observations about Bob's lack of "greed." John writes:

> On the personal front I know Bob to be honest, straight talking, and a man of faith. I grew to respect him professionally, and as a person, to the extent that, as CEO of Applied Process Inc., I once offered him a senior technical sales and marketing management role in my company. The role would have included a substantial increase in compensation. After a few days of contemplation, he responded to me saying (paraphrased slightly), "John, if I were going to work for anybody else, it would be you, and Applied Process. But I have made my career here at Dura-Bar and they have been great to me, so I'll be staying with Dura-Bar".

Ex. 16, J. Keough.  If Bob only cared about money, he would have taken the job that Keough offered him and never looked back. But of course, that is not what Bob did.

Second, there is nothing to suggest that money or "greed" was a motivating factor in Bob's decision to leave Dura-Bar for Hualong. At best, Bob's position with Hualong was a "push" financially. While Bob's Hualong position provided a slightly higher salary ($160k per year

including bonus vs. $145k per year including bonus), that modest increase was offset by Hualong not paying Bob's health and dental insurance and Hualong offering no 401k savings plan, all of which Dura-Bar provided. GX 60, p.3 (Hualong Employment Agreement). In short, Bob's motivation to join Hualong was not "greed," but his long-held desire to grow the continuous cast iron market in China, a market Dura-Bar had effectively abandoned. *E.g.*, Ex. 5, J. Sheahan.

Third, EEA case authorities establish that a $135,000 fine would constitute an unwarranted sentencing disparity. Of the five EEA defendants sentenced in this District, three received no fine whatsoever. *U.S. v. Pu*, No. 11 CR 669, Dkt. 292; *U.S. v. Yang*, No. 11 CR 458, Dkt. 151; *U.S. v. Lee*, No. 09 CR 290, Dkt. 63. And in the two instances where the court did impose a fine, the court ordered no restitution and a fine within the advisory guideline range. *U.S. v. Jin*, No. 08 CR 192, Dkt. 236 ($20k fine, no restitution); *U.S. v. Newman*, No. 14 CR 704, Dkt. 103 ($100k fine, no restitution). Also, in many EEA cases outside of this district, no fine was imposed[15], and in those cases where a fine was imposed, it was oftentimes a below-guideline fine and with no ordered restitution.[16] Accordingly, we respectfully submit that this Court should reject the recommended fine of $135,000. *See* §5E1.2(d) (in determining fine amount, the court must consider, *inter alia*, the financial burden it places on the defendant and his dependents and any ordered restitution).

---

[15] By way of example, no fine was imposed in the following EEA cases: *U.S. v. Roberts*, No. 08 CR 175-1 (E.D. Tenn.), Dkt. 176; *U.S. v. Howley*, No. 08 CR 175-2 (E.D. Tenn.), Dkt. 177; *U.S. v. Platts*, No. 05 CR 430 (C.D. Cal.), Dkt. 32; *U.S. v. Bittendender*, No. 08 CR 5 (D. Md.), Dkt. 23; *U.S. v. Zeng*, No. 08 CR 75 (S.D. Tex.), Dkt. 33; *U.S. v. Tampoe*, No. 99 CR 158 (S.D. Tex.), Dkt. 46.

[16] By way of example, in the following EEA cases, the courts imposed a below-guideline range fine and no restitution: *U.S. v. Huang*, No. 12 CR 189 (S.D. Tex.), Dkt. 28 ($500 fine, no restitution); *U.S. v. Koval*, No. 04 CR 61 (E.D. Wis.), Dkt. 10 ($1,000 fine, no restitution); *U.S. v. Munoz*, No. 06 CR 831 (S.D. Cal.), Dkt. 17 ($2000 fine, no restitution); *U.S. v. Lange*, No. 99 CR 174 (E.D. Wis.), Dkt. 34 ($2500 fine, no restitution); *U.S. v. Laude*, No. 06 CR 2147 (S.D. Cal), Dkt. 13, ($5,000 fine, no restitution);*; U.S. v. Buffin*, No. 06 CR 31 (N.D. Ohio), Dkt. 12 ($5,000 fine, no restitution); *U.S. v. Rashidi*, 05 CR 744 (N.D. Cal), Dkt. 14 ($6,000 fine, no restitution).

## V. RDAP/FACILITY RECOMMENDATION

Should the Court deny Defendant's request for a non-custodial sentence with appropriate conditions, Defendant would request an opportunity to briefly address at the sentencing hearing the issue of a facility recommendation and RDAP. *See* PSR, ¶¶66-68, 72, 75, 77-78.

## VI. CONDITIONS OF SUPERVISED RELEASE

### A. Mandatory Conditions.

Bob has no objections to the PSR proposed mandatory conditions of supervised release. PSR, ¶109.

### B. Discretionary Conditions.

The defense has no objections to the PSR proposed discretionary conditions of supervised release conditions 4, 6, 7, 8, 9, 14, 15, 16, 17, 18 and 22, the only exceptions being discretionary conditions numbers 5 and 14. *See* PSR, ¶ 110.

Discretionary condition 5 provides, in relevant part, that Bob shall refrain from "any employment in violation of the Dura-Bar non-compete agreement." PSR, ¶110. The defense agrees with the government that condition 5 is unnecessary because the non-compete agreement expired on September 15, 2018, three years after Bob departed Dura-Bar on September 15, 2015. *See* Gov. Memo., p. 26; *see also* GX 5, p. 8 (Dura-Bar three year non-compete including all of North America). As such, condition 5 imposes an undue deprivation that exceeds the goals of sentencing under 18 U.S.C. §3553(a) and should not be included in any conditions of supervised release.

Respectfully, the defense also objects to discretionary condition 14 based on the unique circumstances of the case. PSR, ¶110. Condition 14 provides that Bob throughout the period of supervised release shall not knowingly leaving the Eastern District of Wisconsin unless granted permission by the Court or Probation. *Id*. At the time of sentencing, Bob (now 59 years old) will have been "sidelined" and unable to meaningfully pursue his chosen livelihood for nearly 4 full

years. For his and his family's financial and emotional wellbeing, and also in light of any fine or restitution that may be imposed, Bob is requesting the ability to pursue his chosen profession while on supervised release, which necessarily means doing so outside of the United States because there are no continuous cast iron manufacturers in the United States other than Dura-Bar. Bob is a metallurgical engineer with 30+ years of experience in continuous cast iron manufacturing. Bob has never before had any problems with the law and has demonstrated an ability to conform to the mandate of the law throughout this 4 year investigation and prosecution, having never been permitted to travel while on bond, even to China, without incident. Accordingly, we respectfully submit that Bob be permitted to work outside of the United States during any period of supervised release or probation (on the condition that he return to the United States quarterly and provide regular telephonic contacts).

## C. <u>Special Conditions</u>.

Bob has no objections to the special conditions proposed by Probation as outlined in the PSR. PSR, ¶111.

## VII. <u>PROPOSED CORRECTIONS TO PSR</u>

Bob respectfully identifies the following factual errors contained in Presentence Investigation Report (PSR):

- **Page 7, ¶13**: Bob, during his exit interview, advised Dura-Bar that *"he had complied with his contract and returned all materials to the company to his departure, hiding the fact he maintained documents at his home and the electronic documents he downloaded."*

This statement, taken directly from the government's version of the offense, is not accurate and is unsupported by any evidence. First, no Dura-Bar witness so testified or stated. In fact, the Dura-Bar witnesses establish exactly the opposite. Lindsay Olsen conducted Bob's exit interview and memorialized her exit interview questions and Bob's answers on a Dura-Bar "Exit Interview Form," admitted into evidence. DX A-12; GX 19B. Lindsay Olsen's exit interview notes, although extensive, omit any such question or answer. Moreover, Ms. Olsen admitted that she would have

66

noted such a question and answer if she asked such a question. Second, Dura-Bar also used an "Exit Checklist Form," which asked this precise question, but Dura-Bar never could produce an Exit Checklist Form used with Bob's departure and/or signed by Bob. DX A-20. Third, Dura-Bar's management knew Bob used multiple portable memory devices for work purposes and never requested such portable memory devices back. Indeed, Ms. Olson's immediate supervisor admitted he (nor anyone at his direction) ever requested that Bob return his portable memory devices or any other hard copy papers stored at his home that Bob had accumulated throughout his 30+ year career prior to departing. Quite to the contrary, Bob's supervisor, Anthony Guitterez, admitted to asking Bob to make a "copy" of the Dura-Bar information that Bob maintained on his portable memory devices, the suggestion being that Bob could keep his personal copies of such information.

- **Page 7, ¶13:** During his exit interview Bob "*advised he was considering employment with a steel company nearby his parents' home in North Carolina*."

Again, this text is taken from the government's version of the offense and is wrong because it unfairly conflates two witnesses' testimony. *See* GVO, p. 7. First, there is no evidence that Bob stated this comment during his "exit interview." In fact, Lindsay Olsen's Exit Interview Form and extensive notes establish that Bob did not make this alleged comment in his exit interview. DX A-12; GX 19B. In particular, Ms. Olson's exit interview notes do not mention "North Carolina" or Bob's "parents" or any "steel company." *Id.* Rather, Ms. Olson's exit interview notes reference that Bob stated: (i) his "new position" would provide him with "more control over plant metallurgy," (ii) he would stay in a "sales role," (iii) with "possibly more management opportunities, international travel," and (iv) would "decide end of this week" as to which opportunity to except as he was "waiting for a few things to make a decision." DX A-12, p. 3. Second, the government's averment is a reference to Anthony Guiterrez's testimony in which he attributed this alleged comment to Bob in August 2015, when Bob tendered his resignation effective immediately before agreeing to stay on a few additional weeks. While Bob's supervisor

maintained notes from this August 2015 conversation, they do not corroborate his testimony. *See* DX Z-11.

- **Page 7, ¶14:** Bradley Steinkamp testified that "*Dura-Bar spent approximately $400,000 to purchase laboratory equipment*" and that it "*cost $30,000 annually to maintain and calibrate the equipment.*"

Again, Probation's foregoing statement is taken from government's version, which is not accurate. *See* GVO, p. 8. Mr. Steinkamp never so testified, as Defense counsel informed both the government and Probation after receiving the government's version. Mr. Steinkamp testified only to the alleged cost of having a commercial laboratory generate a laboratory report. Defense counsel would have objected to Mr. Steinkamp testifying to Dura-Bar supposedly spending "approximately $400,000 to purchase laboratory equipment" or "$30,000 to annually maintain and calibrate" such equipment based on hearsay, lack of personal knowledge, absence of foundation, and no prior discovery. Indeed, virtually all of Dura-Bar's laboratory equipment preceded Mr. Steinkamp's employment.

- **Page 13, ¶ 47:** Joann O'Rourke passed away on February 18, 2019, not March as stated in the PSR.

- **Page 13, ¶ 48:** Jane Ellen Walsma is now 61 years old, not 60 as stated in the PSR. Timothy O'Rourke is now 55 years old, not 54 as stated in the PSR.

- **Page 15, ¶ 55:** Bob moved to Woodstock, Illinois in January, 1984, not in 1983 as stated in the PSR. Lorna O'Rourke moved to Woodstock, Illinois in or around May, 1984, after Bob and Lorna married, not in 1983 as stated in the PSR.

- **Page 17, ¶ 60:** Bob lived in Woodstock, Illinois from 1984 to 1992, not 1983 to 1992 as stated in the PSR.

- **Page 17, ¶ 60:** Bob's residence has two bedrooms, not three as stated in the PSR.

- **Page 18, ¶ 64:** The PSR states that Bob reported "*no medical concerns,*" which was true at the time of Bob's interview but is no longer the case, as explained immediately below.

Since his interview with Probation, Bob's health has changed. Bob's medical provider recently diagnosed him with skin cancer, specifically, basal cell carcinoma. Bob is in the process

68

of scheduling a Mohs' surgical procedure to remove the cancer from his right ear. On August 6, 2019, Bob also must undergo a full body exam to check for any additional skin cancer. Bob's doctor now requires Bob to undergo a full body scan every three to six months.

## VIII.  <u>CONCLUSION</u>

There is no denying the seriousness of the offense to which Bob has been found guilty.  At the same time, there is no denying the decent person Bob is, the exemplary life that he has led, and positive contributions he has made to his family, friends, and community. The current sentencing regime invests discretion with the courts to consider all of the circumstances of an individual in determining the minimally appropriate sentence. We respectfully submit that the interests of justice and a "sufficient but not greater than necessary" sentence warrant a non-custodial sentence with appropriate conditions.

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2019, I electronically filed *Defendant Position Paper as to Sentencing* with the Clerk of the Court using the ECF system which sent electronic notification of the filing on the same day to:


**<u>VIA ECF SYSTEM</u>**
**All Counsel of Record**

<u>/s/ Anthony J. Masciopinto</u>
One of his Attorneys

**Table of Exhibits**

Ex. 1.         Frank Abruzzo Letter

Ex. 2.         Sara Goad Letter

Ex. 3.         Tom Wells Letter

Ex. 4.         Chuck Rigali Letter

Ex. 5.         Joh Sheahan Letter

Ex. 6.         Kevin Conners Letter

Ex. 7.         Nancy Trebesch Letter

Ex. 8.         M. Haak Letter

Ex. 9.         Jason He Letter

Ex. 10.        John Accorsi Letter

Ex. 11.        Rick Hardwick Letter

Ex. 12.        Tom Jennings Letter

Ex. 13.        Scott Lammers Letter

Ex. 14.        Norma Huser Letter

Ex. 15.        Lori Wright Letter

Ex. 16.        John Keough Letter

Ex. 17.        Andy O'Rourke Letter

Ex. 18.        Bill Singleton Letter

Ex. 19.        Celia Werth Letter

Ex. 20.        Li Jia Xu Letter

Ex. 21.        George Reuss Letter

Ex. 22.        Art Berman Letter

Ex. 23.        Ann DeFrancisco Letter

Ex. 24.        Mary DeFrancisco Letter

Ex. 25.        Tim O'Donnell Letter

Ex. 26.     Jane Walsma Letter

Ex. 27.     Tim O'Rourke Letter

Ex. 28.     Charles O'Rourke Letter

Ex. 29.     John Li Letter

Ex. 30.     Madison Gagliardi Letter

Ex. 31.     Tina Gagliardi Letter

Ex. 32.     Gerald Holmberg Letter

Ex. 33.     Jelka and John Leedle Letter

Ex. 34.     Lorna O'Rourke Letter

Ex. 35.     Kirk Hesemann Letter

Ex. 36.     Carey MacDonald Letter

Ex. 37.     Sentencing Chart

Ex. 38.     Additional Character Letter

Ex. 39.     Gagliardi Affidavit