**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 17-cr-00495 |
| v. ) | |
| ) | Judge Andrea R. Wood |
| ROBERT O'ROURKE ) | |

**MEMORANDUM OPINION AND ORDER**

In September 2015, shortly before leaving his current employer to go work for an overseas competitor, Defendant Robert O'Rourke downloaded over 1,900 documents from his employer's network onto a personal hard drive. He was later arrested boarding a plane to China while carrying some of the downloaded information in his luggage. O'Rourke was subsequently charged with thirteen counts of theft and attempted theft of trade secrets in violation of 18 U.S.C. § 1832(a). In April 2019, a jury returned a mixed verdict finding him guilty of seven of those counts and acquitting him of the remainder. Now before the Court is O'Rourke's motion for a new trial. (Dkt. No. 123.) For the reasons that follow, the motion is denied.

**BACKGROUND**

O'Rourke worked as a metallurgical engineer and salesperson for Dura-Bar from 1984 until September 15, 2015. Dura-Bar is an Illinois-based manufacturer in the iron foundry business. It manufactures specialized iron bars using a process called continuous cast iron. O'Rourke was unhappy with how Dura-Bar was being managed. Consequently, he accepted a position as vice president of research and development with Hualong, a China-based corporation that also manufactured cast-iron products, and resigned from Dura-Bar effective immediately on August 12, 2015. When he resigned, O'Rourke did not tell his former supervisors and co-workers that he planned to go work for another continuous cast-iron producer. Notwithstanding

his resignation, O'Rourke subsequently agreed to stay at Dura-Bar for a transition period, and it was during that stretch of time that the actions forming the base of this case took place.

On September 13, 2015, a Sunday two days before his final day at Dura-Bar, O'Rourke used his key to enter the Dura-Bar facility in Woodstock, Illinois. He downloaded over 1,900 documents from the Dura-Bar network onto a personal hard drive before departing. He told no one at Dura-Bar that he had done so. On September 15, 2015, O'Rourke attended an exit interview before going out for drinks with coworkers. It was at that point that O'Rourke, for the first time, informed his former colleagues that he would be going to China to work for Hualong, a company Dura-Bar viewed as a competitor. The colleagues reported this to Dura-Bar's management, who quickly discovered that O'Rourke had taken copies of documents without authorization. Dura-Bar contacted law enforcement, which obtained emergency search warrants for O'Rourke's person and residence. On September 21, 2015, O'Rourke was stopped by United States Customs and Border Patrol as he attempted to board a flight to China. In his checked luggage was the hard drive with the documents he had taken from Dura-Bar. In July 2017, a grand jury returned a 13-count Indictment against O'Rourke, charging him with stealing, downloading, and possessing trade secrets (and attempting to do the same) in violation of 18 U.S.C. § 1832.

The Government organized the documents it considered to be trade secrets into five categories. For each category, with the exception of Category One, the Indictment charges O'Rourke in three separate counts for stealing, downloading, and possessing the information. Category One consists of a single 1993 document entitled "Machine Preheat – Start Up and Operation" that details Dura-Bar's 1993-era manufacturing process (Count I). Category Two contains lab reports detailing results from experiments testing material for clients to search for

defects and vetting combinations of materials for quality (Counts II, III, and IV). Category Three includes experiment reports saved in an electronic subfolder on Dura-Bar's hard drive entitled "IR Camera." (Counts V, VI, and VII). Category Four includes experiment reports saved in an electronic subfolder on Dura-Bar's hard drive entitled "IR2." (Counts VIII, IX, and X). Finally, Category Five consists of alloy experiment data reports that tested different inoculations to reduce defects in the composition of material for the purpose of improving product quality. (Counts XI, XII, and XIII.) Each Category, aside from Category One, consisted of a large number of individual documents. And for each Category, the Government charged O'Rourke with both the substantive offenses of stealing, downloading, and possessing trade secrets, and the offenses of attempting to do so. The verdict form required the jury to find O'Rourke guilty or not guilty with respect to each count; and within each count, the jury was further required to specify whether they found O'Rourke guilty or not guilty based on the substantive offense, the attempt offense, or both.

The charges against O'Rourke proceeded to trial in February 2019. At trial, O'Rourke did not contest that he took materials without Dura-Bar's permission. But his counsel contended that the documents in question were not trade secrets and that he did not believe them to be so when he took them. Following a nearly three-week trial, a jury found O'Rourke guilty of seven counts of the Indictment: attempting to steal the Machine Preheat Document (Count I); stealing, downloading, possessing, and attempting to steal lab reports (Counts II, III, and IV); and stealing, downloading, and possessing alloy experiment reports (Counts XI, XII, XIII). With respect to all the other counts, the jury returned a not guilty verdict. The mixed verdict thus suggests that with respect to Count I, the jury did not believe the Machine Preheat Document was actually a trade secret but that O'Rourke believed it to be one; with respect to the lab reports

3

in Counts II through IV, the jury concluded that at least one document was a trade secret and that O'Rourke believed what he was taking were trade secrets; with respect to Counts V through X, the jury concluded that the IR Camera and IR2 documents were not trade secrets and O'Rourke did not believe they were; and with respect to the alloy experiment data reports in Counts XI through XIII, the jury concluded that the reports were not trade secrets but O'Rourke believed them to be when he took them.

O'Rourke now contends that multiple errors by the Court and a paucity of evidence presented by the Government warrant granting him a new trial. First, he contends that the Court should not have allowed the Government to prosecute O'Rourke on both attempt and substantive charges where O'Rourke did not engage in uncompleted conduct. He then takes issue with three different sets of jury instructions, contending that (1) the jury was wrongly instructed that the Government did not need to prove O'Rourke knew the information he took was a trade secret, (2) the instruction given on how a unique combination of information could be a trade secret did not require the Government to identify the trade secret with enough specificity, and (3) the jury instruction given on unanimity allowed the jury to convict O'Rourke without agreeing on what precise information constituted a trade secret. Finally, O'Rourke argues that the cumulative weight of the evidence on the record leaves such strong doubt of O'Rourke's guilt that failing to grant a new trial would be a miscarriage of justice.

## DISCUSSION

Federal Rule of Criminal Procedure 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The Court may grant a new trial under Rule 33 "if the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice" or "if there is a

reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006). However, "[a] jury verdict in a criminal case is not to be overturned lightly." *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994). In other words, "[t]he court should grant a motion for a new trial only if the evidence 'preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.'" *United States v. Swan*, 486 F.3d 260, 266 (7th Cir. 2007) (quoting *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989)).

## I. The Attempt Charges

O'Rourke first takes issue with the Court's decision to allow the Government to pursue an "attempt" theory of criminal liability at trial. Specifically, the Government sought, and the jury was given, an instruction that would permit O'Rourke to be found guilty of attempting the alleged offenses where he believed he was stealing, possessing, or downloading a trade secret, even though the information was not actually a trade secret. O'Rourke contends that § 1832 only allows for an attempt violation when a defendant tries and fails to misappropriate actual trade secrets. Thus, according to O'Rourke, if he actually succeeded in stealing, downloading, and possessing the documents described in the Indictment, he could only be held responsible for committing the substantive offense and could not be held responsible for attempting to commit that offense.

A person commits the offense of attempt when, with the intent to commit a specific offense, he does any act that constitutes a substantial step toward the commission of that offense. *See United States v. Muratovic*, 719 F.3d 809, 815 (7th Cir. 2013) (attempt convictions for robbery require the specific intent to commit the robbery and a substantial step taken toward that end). Here, the attempt violations for which O'Rourke was charged do not require proof that a

5

trade secret exists; instead, they require proof that the individual *taking* the information at issue believed that information to be a trade secret. *United States v. Hsu*, 155 F.3d 189, 198 (3d Cir. 1998) (holding that "Congress could not have intended [Economic Espionage Act] attempt crimes to be subject to the somewhat obscure and rarely used common law defense of legal impossibility"). In *Hsu*, the Third Circuit considered legislative history and policy rationales in finding that the common law legal impossibility defense did not apply to violations of the Economic Espionage Act ("EEA"), concluding instead that a defendant is guilty of attempting to take trade secrets if

> acting with the kind of culpability otherwise required for commission of the crime, he ... purposely does or omits to do anything that, ***under the circumstances as he believes them to be***, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

*Id*. (quoting Model Penal Code § 5.01(1)(c) (emphasis added)). Since the defendant's guilt rests on the "circumstances as he believes them to be," the Third Circuit concluded that the government did not need to prove that an actual trade secret was involved. *Id*. at 203. In so holding, the Third Circuit noted that the contrary conclusion would require the government to turn over actual trade secrets to would-be thieves in sting operations in order to charge them with attempted theft. *Id*. at 202. An attempt charge thus allows the government to charge not only individuals who are unsuccessful in stealing actual trade secrets, but also those who successfully steal information that they believe to contain trade secrets but in fact do not.

While there may be a paucity of caselaw regarding attempted theft of trade secrets in violation of § 1832, the Court finds the case law regarding attempted distribution of illegal drugs to be instructive. For instance, a would-be cocaine buyer cannot avoid criminal responsibility even if the only substances he managed to purchase were fakes planted by police officers. *See United States v. DeLeon*, 603 F.3d 397, 399 (7th Cir. 2010) (affirming attempt conviction for

6

intent to distribute cocaine where defendant purchased sham cocaine). Similarly, one who intends to steal trade secrets with the goal of harming a company and enhancing a competitor does not receive a "get out of jail free card" just because he incorrectly believed something to be a trade secret when it turns out that the information was not valuable or confidential enough to be a trade secret. Therefore, if the jury concluded that O'Rourke believed a document was a trade secret when he took it, he is guilty for attempted theft even if the document ultimately was not a trade secret and even though he succeeded in possessing and stealing the document by downloading it to his hard drive, taking it from Dura-Bar, and having it in his possession without authorization.

At trial, O'Rourke did not defend his case by arguing that he did not actually take information belonging to his employer to which he had no legal entitlement. Indeed, it was essentially undisputed that O'Rourke went to Dura-Bar's facility, placed copies of Dura-Bar's documents on his personal hard drive, and attempted to take that hard drive with him to China. Rather, the issue at trial was whether the documents that O'Rourke took were actually trade secrets and whether he also believed them to be so. The Court finds that the jury reasonably concluded that some of the documents (the lab and alloy experiment reports) were trade secrets, and that O'Rourke believed some of the items he downloaded (namely, the Machine Preheat Document) were trade secrets even though the documents did not qualify as such. Moreover, at trial, the Government argued that O'Rourke went to the Dura-Bar office on a weekend just before he left and placed copies of thousands of documents related to Dura-Bar's manufacturing process on his personal hard drive so that he could use the information to jumpstart research and development at Hualong, Dura-Bar's competitor. The jury was entitled to conclude based on the evidence that the lab reports O'Rourke took were trade secrets and that he knew the value of the

information he was taking. The jury could also reasonably find that O'Rourke *thought* he was taking a trade secret when he took a copy of the Machine Preheat document. None of that is inconsistent with the verdict or suggests confusion—it simply suggests that the jury believed some of the documents O'Rourke took qualified as trade secrets and some did not, and that O'Rourke believed something to be a trade secret when it was not.

In sum, the Court's decision to allow prosecution of the attempt charges was therefore not in error.

## II. Jury Instructions

In determining whether an error in a jury instruction warrants a new trial, the Court must consider whether the instructions, taken as a whole, "correctly and completely informed the jury of the applicable law." *Huff v. Sheahan*, 493 F.3d 893, 899 (7th Cir. 2007). A defendant is entitled to a new trial when the instructions "misstate the law or fail to convey the relevant legal principles in full and when those shortcomings confuse or mislead the jury and prejudice the objecting litigant." *Id*. O'Rourke contends that the instructions given by the Court contained three different errors. The Court will address each of them in turn.

### A. Elements Instruction for Substantive Offenses

At trial, the Court instructed the jury on the elements of the substantive offenses of possessing, stealing, and downloading a trade secret. (Jury Instructions at 21–26, Dkt. No. 113.) At issue is the Court's language describing the extent of O'Rourke's knowledge of what the information he took was. Specifically, the Court instructed the jury that to find O'Rourke guilty of those offenses, they had to find that O'Rourke "knew or believed that the Information constituting the trade secret was proprietary information, meaning belonging to someone else who had an exclusive right to it." (Jury Instructions at 21, 23, 25.) O'Rourke contends that the

8

Government instead was required to prove that O'Rourke knew that the information ***actually was*** a trade secret.

> Section 1832(a) defines theft of trade secrets as follows:
>
> (a) Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, ***knowingly***. –
>
> (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains *such information*;
> (2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys *such information*;
> (3) receives, buys, or possesses *such information*, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;
> (4) attempts to commit any offense described in paragraphs (1) through (3); or
> (5) conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy,

18 U.S.C. § 1832 (emphases added). O'Rourke contends that the statute should be read as requiring a defendant to know that the information he is taking constitutes a trade secret. According to O'Rourke, the "such information" referenced in §§ 1832(a)(1) and (2) should be read to mean "trade secret." In support, O'Rourke points to *United States v. Hanjuan Jin*, 833 F. Supp. 2d 977 (N.D. Ill. 2012), and *United States v. Chung*, 633 F. Supp. 2d 1132 (C.D. Cal. 2009), both of which hold that the government must prove that defendants know the information they are taking is a trade secret in order to establish a violation of 18 U.S.C. § 1831. *See Jin*, 833 F. Supp. 2d at 1012 (defendant must know "the information she possessed had the general attributes of a trade secret"); *Chung*, 633 F. Supp. 2d at 1145 (government must prove defendant knew the information he possessed was "trade secret information"). But both of those cases deal with violations of § 1831, ***not*** § 1832. Both provisions are part of the EEA, which more broadly protects proprietary information from misappropriation. Section 1831 criminalizes economic

espionage, or the theft of trade secrets to benefit a foreign government, instrumentality, or agent. But while § 1831 mimics the language of § 1832 in subsections (1)–(5) describing the means of violating the statute, § 1831 differs in one key respect: it criminalizes knowingly stealing or communicating a ***trade secret***, not, as § 1832 does, knowingly stealing or communicating ***such information***.

While this may appear to be a minor difference in language, it alters the meaning of the statute because it changes what the word "knowingly" modifies. *See Flores–Figueroa v. United States*, 556 U.S. 646 (2009) (finding that a phrase that introduces the elements of a crime with the word "knowingly" applies that word to each element in most criminal statutes). Section 1832 only requires that a defendant know that he is stealing, downloading, or possessing the information described in § 1839 as a trade secret—that is, information owned by another that the owner has taken reasonable measures to keep secret and that derived independent economic value from not being known to or ascertainable by the general public. *See* 18 U.S.C. § 1839. It does ***not*** explicitly require that the defendant know he is stealing, downloading, or possessing a trade secret. While O'Rourke would have the Court construe § 1832 in manner identical to § 1831, to do so would ignore a clear difference in the text. The Court declines to interpret the meaning of the EEA in a way that functionally erases the differences between § 1831 and § 1832, as O'Rourke appears to wish.

Additionally, the Court notes that the instruction given would not allow the jury to convict O'Rourke of violating §1832 simply because he took files from his employer. To the contrary, in this case, the jury still had to find that O'Rourke took proprietary information to which he had no claim, that he knowingly stole that information, and that he intended to convert that information to the economic benefit of a nonowner at the expense of the actual owner. That

the jury reached such a conclusion with respect to some counts and not others does not indicate that they were confused; rather, it suggests that the jury found some documents did not meet the definition of a trade secret, some did, and O'Rourke believed only some of the documents he obtained were trade secrets.[1] In sum, the result was not clearly an inconsistent verdict that was the product of confusion. The Court therefore finds that the instructions detailing the elements of the substantive offenses were not given in error.

### B. Unique Combination Instruction

O'Rourke also complains about the Court's "unique combination" jury instruction. Specifically, the Court instructed the jury that "[a] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." (Jury Instructions at 29.) O'Rourke concedes that the instruction properly stated the law but nonetheless contends that its use was unwarranted at this trial and furthermore only confused the jury by improperly suggesting that the Government did not have to prove that any of the individual lab reports was a trade secret.

While a combination of documents or information may constitute a trade secret, it is not enough for a party simply to point to a large swath of information and assert that it is secret. *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992). For

---

[1] For example, as the Government observes, the jury could reasonably have concluded that the 1993 Machine Preheat Document that is the subject of Count I was not a trade secret but that O'Rourke believed it was. While the jury may have credited the defense argument that the document described obsolete and thus not economically useful information, they may also have believed the Government's argument that O'Rourke thought the information was a trade secret that would be helpful to Hualong. Similarly, the jury reasonably could have concluded that the alloy experiment reports described in Counts XI, XII, XIII constituted trade secrets but that O'Rourke did not believe them to be so—they may have concluded that O'Rourke knew the documents belonged to Dura-Bar but underestimated their economic value.

both O'Rourke and the jury to be on notice of what exactly the Government contended were the trade secrets at issue, the Government had to describe how the unique combination of information was a trade secret and not publicly known. At trial, the Government argued to the jury that the unique combination of information contained in the lab reports constituted a trade secrets because it identified how Dura-Bar (1) tested products in development, (2) checked for potential defects, and (3) fine-tuned products in response to client complaints or concerns. Put differently, taken together, the lab reports showed precisely how Dura-Bar performed quality control. It is true, as O'Rourke asserts, that some of the lab reports included in Category Two are available in the public domain. But even if a few of the documents within the Category were available in the public domain, the vast majority of them were not, and more importantly, no one other than Dura-Bar had access to *all* of them. The jury was therefore entitled to believe the Government's contention that the combination of lab reports together was a uniquely valuable set of information that constituted a trade secret.

While O'Rourke contends that the Government improperly benefitted from the unique combination jury instruction by being able simply to point to the conglomeration of reports as trade secrets, that assertion ignores the fact that at trial, the Court *also* instructed the jury that the information also had to be a trade secret or, in the case of attempt, that O'Rourke had to have believed the information to be a trade secret for the jury to find O'Rourke guilty of theft or attempted theft of a trade secret. (Jury Instructions at 21–26.) In reaching their verdict that the Category Two lab reports contained a trade secrets, the jury first had to identify a trade secret in the lab reports, including finding that all of the criteria for defining a trade secret had been met. The jury clearly did so. The Court therefore finds that the unique combination instruction was not given in error.

### C. Juror Unanimity Instruction

Jury members must agree on each element of a crime in order to convict a defendant of that crime. *United States v. Griggs*, 569 F.3d 341, 343 (7th Cir. 2009). They may, however, disagree about "brute facts" or the means by which a crime is committed. *Richardson v. United States*, 526 U.S. 813, 817 (1999); *Griggs*, 569 F.3d at 343. Since the core of the crime of theft of trade secrets is whether the information at issue is, in fact, a trade secret, finding a document to be a trade secret is a key element of the crime. *See, e.g., United States v. Case*, No. 06-cr-210, 2007 WL 1746399, at *3 (S.D. Miss. June 15, 2007) (the existence of a trade secret goes to the core of the statute).

At trial, the Court instructed the jury that to find O'Rourke guilty of possessing, stealing, or downloading a trade secret, they needed to find that the category in question for the particular count "contained at least one trade secret" and that the jury agreed unanimously on what particular information in that category was a trade secret. (Jury Instructions at 28.) O'Rourke contends that this instruction left him unable to determine what specific information in the lab reports or alloy experiment reports the jury found to be a trade secret. He argues that the Court should have included additional language either elaborating on what constituted unanimous agreement or instructing the jury that the Government needed to prove the information was a trade secret "with all of you agreeing on which specific information" constituted the trade secrets. (Def. Mot. for a New Trial at 13, Dkt. No. 123.) In lieu of those proposals, O'Rourke claims a special verdict form should have been used.

None of O'Rourke's proposals, however, would have enhanced the instruction as given. Instructing the jury that they needed to agree unanimously on what particular information within each Category constituted a trade secret made the jury aware of their obligation to reach a

unanimous verdict. And O'Rourke's paragraph-long proposed addition would have doubled the length of the proposed instruction without changing its fundamental message. O'Rourke's second proposed change also duplicated the given instruction. Finally, a special verdict form was unnecessary. While Federal Rule of Criminal Procedure 31 does not prohibit the use of special verdict forms, they are generally disfavored in criminal cases. *United States v. Sababu*, 891 F.2d 1308, 1325 (7th Cir. 1989) (noting special verdicts are thought to "conflict with the basic tenet that juries must be free from judicial control and pressure in reaching their verdicts"). Here, the Court was concerned that the proposed special verdict form was unwieldy and unnecessary when a short instruction accomplished the same purpose of providing clarification.

Moreover, it is not clear how O'Rourke's proposed revisions would have solved what he claims to be the issue: that the parties are unable to determine what specific information the jury concluded was a "trade secret." Unless the jury were asked to specify which of each of the hundreds of reports were and were not trade secrets, O'Rourke's proposed changes would not have provided any new information. The jury was not required to sift through every single lab report and declare, one by one, that each document was a trade secret in order to find that a given category of documents, such as the lab reports, constituted a trade secret. The jury saw the reports and listened to Dura-Bar employees testify regarding the role and similarity of the reports. The jury was entitled to conclude that the reports highlighted by the Government were, in fact, representative of the lab reports as a whole. The Court therefore did not err in giving the unanimity instruction.

### III. Cumulative Weight of the Evidence

A court may grant a new trial if the verdict is against the manifest weight of the evidence. *See Bankcard Am., Inc. v. Universal Bancard Sys.*, 203 F.3d 477, 480 (7th Cir. 2000). O'Rourke argues here that no reasonable jury could have convicted him. The Court disagrees.

The Government presented evidence at trial that O'Rourke, unhappy with what he perceived to be Dura-Bar's abandonment of the continuous cast-iron market in China, began negotiating an employment agreement with Hualong well before he left Dura-Bar. He went to the Dura-Bar facility on the Sunday before his last day at work, a time when the facility was mostly empty, and downloaded 1,900 documents to his personal hard drive. He told no one he had done so. Nor did he tell anyone at Dura-Bar that he was leaving for a competitor until he was having drinks with former colleagues after his last day at work. Multiple Dura-Bar employees testified regarding the importance and confidential nature of the documents O'Rourke took, as well as their concern that O'Rourke would use what he took to benefit a competitor, Hualong. And Customs and Border Patrol agents stopped O'Rourke as he was getting on the plane to China with the hard drive of stolen documents. The jury reasonably concluded that O'Rourke, angry with Dura-Bar's management and seeking to harm Dura-Bar, took the documents with the goal of using Dura-Bar's experiment results to help a competitor.

Nor is the Court persuaded by O'Rourke's contention that the Government's witnesses were unreliable in describing the documents O'Rourke took as trade secrets. For instance, longtime Dura-Bar employee Bradley Steinkamp, a metallurgist, explained that lab reports performed structural analyses of material to determine the existence or cause of potential defects for clients. He also explained that lab reports were essential for testing new products and maintaining quality. The jury could have reasonably credited Steinkamp's testimony, and that of

other Dura-Bar employees, in concluding that obtaining copies of these reports would help a competitor with a nascent manufacturing division potentially to fast-track the development of its process to avoid known risks or defects.

In sum, the evidence presented at trial was sufficient for the jury to find O'Rourke guilty of stealing trade secrets. It was therefore not a miscarriage of justice that the jury convicted O'Rourke on some counts.

## CONCLUSION

For the foregoing reasons, the Court denies Defendant's motion for a new trial (Dkt. No. 123).

ENTERED:

Dated:  October 9, 2019

_____
Andrea R. Wood
United States District Judge